**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

United States of America,

      -  v.  -

Nicolás Maduro Moros,
Diosdado Cabello Rondón,
Huge Armando Carvajal Barrios,
     a/k/a/ "El Pollo,"
Cliver Antonio Alcalá Cordones,
Luciano Marín Arango,
     a/k/a "Ivan Marquez," and
Seuxis Paucis Hernández Solarte,
     a/k/a "Jesús Santrich,"

                 Defendants.

S2 11 CR. 205 (AKH)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CLIVER ALCALÁ
CORDONES' MOTION TO DISMISS THE INDICTMENT, FOR A BILL OF
PARTICULARS, AND THE PRODUCTION OF *BRADY* MATERIAL**

César de Castro
Valerie Gotlib
**The Law Firm of César de Castro P.C.**
111 Fulton Street – 602
New York, NY 10038
(631) 460-3951
cdecastro@cdecastrolaw.com
vgotlib@cdecastrolaw.com


Adam S. Kaufmann
Cristián Francos
Tara J. Plochocki
Diane M. Camacho
**Lewis Baach Kaufmann Middlemiss
PLLC**

The Chrysler Building
405 Lexington Avenue, 64th Floor
New York, NY 10174
(212) 826-7001
Adam.Kaufmann@lbkmlaw.com
Cristian.Francos@lbkmlaw.com
Tara.Plochocki@lbkmlaw.com
Diane.Camacho@lbkmlaw.com

*Attorneys for Defendant,*
*Cliver Antonio Alcalá Cordones*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................ 1

RELEVANT FACTS ........................................................................................................... 4

ARGUMENT ........................................................................................................................ 7

I.    THE INDICTMENT SHOULD BE DISMISSED UNDER THE DOCTRINE OF
      FOREIGN OFFICIAL IMMUNITY ....................................................................... 7

      A.    Relevant Law ................................................................................................ 7

      B.    General Alcalá Cordones is Entitled to Immunity ................................... 12

II.   THE COURT SHOULD ORDER THE GOVERNMENT TO PROVIDE THE
      DEFENSE WITH A BILL OF PARTICULARS, INCLUDING A LIST OF THE
      NAMES OF ALLEGED UNINDICTED CO-CONSPIRATORS, TO PERMIT
      GENERAL ALCALÁ CORDONES TO PREPARE HIS DEFENSE ............................ 20

III.  THE GOVERNMENT MUST DISCLOSE INFORMATION IN ITS
      POSSESSION REGARDING GENERAL ALCALÁ CORDONES'
      INVOLVEMENT IN ANTI-MADURO ACTIVITIES AS WELL AS THE
      IDENTITIES OF WITNESSES WHO HAVE FAILED TO INDICATE
      GENERAL ALCALÁ CORDONES' INVOLVEMENT IN THE ALLEGED
      CONSPIRACY ....................................................................................................... 29

IV.   CONCLUSION ..................................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Belhas v. Ya'alon,*
    515 F.3d 1279 (D.C. Cir. 2008) ........................................................................ 11

*Brady v. Maryland,*
    373 U.S. 83 (1963) ................................................................................. 3, 25, 29

*Carpenter v. Republic of Chile,*
    610 F.3d 776 (2d Cir. 2010) ........................................................................... 12

*In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.,*
    792 F.Supp.2d 1301 (S.D.Fla.2011) ................................................................ 16

*Dixon v. United States,*
    548 U.S. 1 (2006) ........................................................................................ 11

*Doe 1 v. Buratai,*
    318 F. Supp. 3d 218 (D.D.C. 2018) ..................................................... 11, 12, 18

*Doğan v. Barak,*
    932 F.3d 888 (9th Cir. 2019) .................................................................. *passim*

*Eliahu v. Jewish Agency for Israel,*
    919 F.3d 709 (2d Cir. 2019) ............................................................................ 8

*Filarsky v. Delia,*
    566 U.S. 377 (2012) ...................................................................................... 10

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ...................................................................................... 29

*Lewis v. Mutond,*
    918 F.3d 142 (D.C. Cir. 2019) ..................................................................... 9, 11

*Matar v. Dichter,*
    563 F.3d 9 (2d Cir. 2009) ....................................................................... *passim*

*Miango v. Democratic Republic of Congo,*
    No. CV 15-1265 (ABJ), 2020 WL 3498586 (D.D.C. June 29, 2020) ...................... 11

*Moriah v. Bank of China, Ltd.,*
    107 F. Supp.3d 272 (S.D.N.Y. 2015) ............................................................. 9, 11

*Morissette v. United States*,
    342 U.S. 246 (1952) ................................................................................................. 11

*Mwani v. bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005)................................................................................... 17, 18

*Mwani v. Bin Laden*,
    No. CIV A 99–125 CKK, 2006 WL 3422208 (D.D.C. Sept. 28, 2006)................................ 16

*Peterson v. Islamic Republic of Iran*,
    627 F.3d 1117 (9th Cir. 2010) ...................................................................................... 8

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
    506 U.S. 139 (1993) ................................................................................................... 9

*Republic of Iraq v. ABB AG*,
    920 F. Supp. 2d 517 (S.D.N.Y. 2013), *aff'd,* 768 F.3d 145 (2d Cir. 2014)............................ 12

*Rishikof v. Mortada*,
    70 F. Supp. 3d 8 (D.D.C. 2014)................................................................................... 11

*Samantar v. Yousuf*,
    560 U.S. 305 (2010) ..................................................................................... *passim*

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) ................................................................................................. 18

*Sikhs for Justice v. Singh*,
    64 F. Supp.3d 190 (D.D.C. 2014)................................................................................. 9

*Smith v. United States*,
    568 U.S. 106 (2013) ................................................................................................. 11

*Tel–Oren v. Libyan Arab Republic*,
    726 F.2d 774 (D.C.Cir.1984) (Edwards, J., concurring) ...................................................... 18

*In re Terrorist Attacks on Sept. 11, 2001*,
    122 F. Supp.3d 181 (S.D.N.Y. 2015) ....................................................................... 9, 16

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 118 (2d Cir. 2013) ...................................................................................... 16

*Underhill v. Hernandez*,
    168 U.S. 250 (1897) ................................................................................................... 8

*United States v. Bagley*,
    473 U.S. 667 (1985) ................................................................................................. 30

*United States v. Bailey,*
    444 U.S. 394 (1980) ................................................................. 10, 11

*United States v. Barnes,*
    158 F.3d 662 (2d Cir. 1998) .......................................................... 21, 29

*United States v. Bazezew,*
    783 F. Supp. 2d 160 (D.D.C. 2011)..................................................... 21, 23

*United States v. Bin Laden,*
    92 F. Supp. 2d 225 (S.D.N.Y. 2000) .................................................. 21, 22

*United States v. Bortnovsky,*
    820 F.2d 572 (2d Cir. 1987) ...................................................... 21, 22, 23

*United States v. Clarkson Auto Elec., Inc.,*
    No. 10–CR–6111G2014 ................................................................... 21

*United States v. Concord Mgmt. & Consulting LLC,*
    385 F. Supp.3d 69 (D.D.C. 2019)..................................................... 25, 28

*United States v. Coppa,*
    267 F.3d 132 (2d Cir. 2001) ......................................................... 29, 30

*United States v. Davidoff,*
    845 F.2d 1151 (2d Cir. 1988) .......................................................... 21

*United States v. Ikoli,*
    No. 16-cr-148 (AJN), 2017 WL 396681 (S.D.N.Y. Jan. 26, 2017) ......................... 22

*United States v. Jailall,*
    No. 00 Cr. 69 (RWS), 2000 WL 1368055 (S.D.N.Y. Sept. 20, 2000) .................... 22, 23

*United States v. Koschtschuk,*
    No. 09-CR-0096(S)(M), 2010 WL 584018 (W.D.N.Y. Feb. 16, 2010)..................... 22, 27

*United States v. Lino,*
    No. 00 Cr. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan 2, 2001)........................... 22

*United States v. Luna,*
    No. 05 Cr. 58 (SRU), 2006 WL 1668006 (D. Conn. May 17, 2006) ....................... 22

*United States v. Nachamie,*
    91 F. Supp.2d 565 (S.D.N.Y. 2000) ................................................. 23, 24

*United States v. Noriega,*
    746 F. Supp. 1506 (S.D. Fla. 1990), *aff'd,* 117 F.3d 1206 (11th Cir. 1997)........... 10

*United States v. Oakland Cannabis Buyers' Cooperative*,
    532 U.S. 483 (2001) ................................................................................... 11

*United States v. Pangang Grp. Co., Ltd.*,
    6 F.4th 946 (9th Cir. 2021) ................................................................... 8, 10

*United States v. Savin*,
    No. 00 Cr. 45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ............ 23, 24, 25

*United States v. Trie*,
    21 F. Supp. 2d 7 (D.D.C. 1998) ................................................................ 24

*United States v. Turkiye Halk Bankasi A.S.*,
    16 F.4th 336 (2d Cir. 2021) ...................................................................... 10

*United States v. Urso*,
    369 F. Supp. 2d 254 (E.D.N.Y. 2005) ...................................................... 22

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003) ....................................................................... 16

*Wake v. United States*,
    89 F.3d 53 (2d Cir. 1996) ........................................................................... 8

*WhatsApp Inc. v. NSO Grp. Techs. Ltd.*,
    491 F. Supp. 3d 584 (N.D. Cal. 2020) ........................................................ 9

*Wolfle v. United States*,
    291 U.S. 7 (1934) ...................................................................................... 11

**Statutes**

8 U.S.C. § 1182(a)(3)(B) ................................................................................ 17

21 U.S.C. § 960a(c) ........................................................................................ 17

22 U.S.C. § 2656f(d)(2) .................................................................................. 17

Classified Information Procedures Act ........................................................... 30

Foreign Sovereign Immunities Act ....................................................... 8, 10, 18

**Other Authorities**

Federal Rule of Criminal Procedure 5(f) ........................................... 3, 25, 29, 31

Federal Rule of Criminal Procedure 7(f) ........................................................ 21

Restatement (Second) of Foreign Relations Law of the United States § 66(f)
(1965).................................................................................................................8, 11

Restatement (Third) of Foreign Relations Law § 207 cmt. d (1987) ...........................................13

## PRELIMINARY STATEMENT

This case arises from the government's astonishingly broad, vague, and sweeping allegations of a far-reaching narco-terrorism conspiracy involving officials at the highest levels of the Venezuelan government, leaders of the Fuerzas Armadas Revolucionarias de Colombia ("FARC"), and Defendant Cliver Antonio Alcalá Cordones, a retired Major General in the Venezuelan military. The allegations in this case are equal parts stunning and underwhelming, both in scope and in content. Stunning because the indictment describes a global narco-terrorism conspiracy lasting over two decades. Underwhelming because the indictment and discovery fail to provide any detail about acts undertaken by General Alcalá Cordones in furtherance of this expansive conspiracy. There are no allegations of any illicit payments or laundered funds, no evidence showing ownership of offshore assets or accounts, and not even an allegation that he gave an order or performed an act undertaken in relation to a narcotics shipment. As to General Alcalá Cordones, the indictment asserts nothing beyond an alleged meeting fourteen years ago, which he would have been required to attend as part of his official military duties. Equally stunning is that the government has indicted a uniformed member of a foreign army for possessing weapons in his own country as a criminal act in the United States. General Alcalá Cordones adamantly rejects any allegation of having engaged in narco-trafficking, or of having assisted the FARC beyond what was required of him as a uniformed officer of the Venezuelan military and in accordance with official Venezuelan policy.

This Court should dismiss the indictment against General Alcalá Cordones because the allegations against him fall squarely within the protections offered by the foreign official immunity doctrine. This common law doctrine curtails the jurisdiction of the courts to hear cases where the conduct at issue was undertaken by foreign officials in furtherance of foreign sovereign policy.

1

Here, the conduct alleged against General Alcalá Cordones was undertaken as part of his official duties, and, thus, he is immune from this prosecution.

In *Samantar v. Yousuf*, 560 U.S. 305, 324 (2010), the United States Supreme Court held that the immunity of individual foreign government officials is governed by "foreign sovereign immunity under the common law." The majority of courts have held that immunity attaches where: (1) the actor is a public minister, official, or agent of the foreign state; (2) the acts in question were performed in his or her official capacity; and (3) the exercise of jurisdiction would serve to enforce a rule of law against the foreign state. First, there can be no doubt that General Alcalá Cordones, as a uniformed military general, was a foreign official of the Republic of Venezuela. Second, the conduct was performed in General Alcalá's official capacity. It is clear from the face of the indictment. The only detailed act in the indictment attributed to General Alcalá Cordones is a 2008 meeting with Hugo Carvajal (his superior officer in rank and the head of the Venezuelan Military Intelligence Agency) and Diosdado Cabello (then the former vice president of Venezuela and former chief of staff to President Chávez, and the leader of President Chávez' political party). This sole act tying General Alcalá Cordones to the alleged criminal conspiracy is a meeting with a superior ranking officer and a government official. Such a meeting was part of General Alcalá Cordones' official duties on behalf of the State of Venezuela and is precisely the type of conduct for which foreign official immunity must apply. Similarly, his alleged possession of weapons, and alleged provision of weapons to the FARC were both part of his official duties. This is not a case where an illicit gun dealer is accused of providing weapons to a street drug gang such that conspiratorial liability can be imputed; rather, any provision of weapons was an official act in furtherance of official government policy and cannot be prosecuted here. Third, the sovereign policy decisions of Venezuela in its dealings with the FARC are not subject to review in this Court.

The prosecution of this case requires this Court to litigate sovereign policy decisions of a foreign government and actions undertaken by a foreign official within the scope of his duties.  General Alcalá Cordones was at all relevant times acting in his official capacity on behalf of the sovereign state of Venezuela, and such conduct cannot form the basis for a prosecution here without effectively enforcing United States criminal laws against a foreign sovereign state.

Should the Court deny dismissal, it should order the government to produce a detailed bill of particulars, including the names of unnamed coconspirators and trial witnesses.  Such production is necessary for the defense to adequately prepare and avoid surprise at trial.  Defense counsel have reviewed thousands of documents containing millions of pages, and hundreds of hours of audio and video recordings.  To date we have seen no evidence demonstrating General Alcalá Cordones' involvement in the charged conspiracy.  Moreover, given the breadth of the conspiracy charged, the lack of detail in the indictment, and the lack of probative materials in the government's discovery materials, it is impossible for General Alcalá Cordones' lawyers to prepare for trial.  The defense team has no idea, other than allegedly attending a meeting fourteen years ago, what conduct by General Alcalá Cordones the government intends to prove at trial.

Lastly, pursuant to Federal Rule of Criminal Procedure 5(f) and *Brady v. Maryland*, 373 U.S. 83 (1963), the Court should order the government to produce all material related to General Alcalá Cordones' planning and coup attempts against the Maduro regime as well as identify all witnesses who participated in this conspiracy that have stated that General Alcalá Cordones was not involved in the charged conspiracy, or have stated that they have no knowledge of General Alcalá Cordones' involvement.  General Alcalá Cordones' attempts to remove his alleged co-conspirator from power were known by the highest levels of the United States law enforcement

and intelligence communities and the defense is confident that there exist materials that are central to it proving that General Alcalá Cordones is not guilty of the allegations.

## RELEVANT FACTS

On March 5, 2020, the government filed a second superseding indictment charging retired Major General Cliver Alcalá Cordones of the Venezuelan Army of participating in a narco-terrorism drug trafficking conspiracy and related offenses.[1]

General Alcalá Cordones enrolled in the Venezuelan military academy at the age of 17 and thereafter dedicated his entire professional career to serving Venezuela as a member of the Venezuelan Army. Over the course of his career, General Alcalá Cordones was steadfast and unwavering in his opposition to narco-trafficking and other forms of illicit trade, including illegal mining operations and gem smuggling. He retired in July 2013, having completed thirty years of military service and having achieved the rank of Major General.

General Alcalá Cordones served under former Venezuelan President Hugo Chávez until his death in office in March 2013, at which time General Alcalá Cordones' alleged co-conspirator, Nicolás Maduro Moros, assumed the office of the presidency. General Alcalá Cordones had no interest in being part of Maduro's government. He doubted that Maduro would be an effective leader and was suspicious of Maduro's fidelity to the democratic ideals that General Alcalá Cordones had supported in his long career. As such, he declined Maduro's offers of two separate

---

[1] According to the docket, the original indictment was filed in 2011 and charged only Hugo Carvajal. General Alcalá Cordones began his well-documented opposition to Maduro by 2014. As noted herein, General Alcalá Cordones' opposition was well known to the U.S. government beginning in 2014 and continuing thereafter. The first superseding indictment was filed in 2019 and still named only Carvajal as the defendant. The instant second superseding indictment was filed in March 2020 and while it added new defendants, it fails to add any new information or new overt acts. There is no indication why the government waited until 2020 to charge conduct that allegedly occurred in 2008.

embassy-based positions and retired from the army just four months after Maduro took office, which coincided with his achieving thirty years of military service.

There can be no dispute that General Alcalá Cordones has been a public and notorious foe of Maduro and his government allies for many years. After retiring in 2013, General Alcalá Cordones became a vocal and outspoken critic of the Maduro regime. At that time, he joined the leading civil anti-Maduro movement and began publicly (on social media and in the news media) calling Maduro and his henchmen corrupt, crooks, dishonest, and criminals.

General Alcalá Cordones' opposition to Maduro soon escalated, and by 2017, with the knowledge of the United States government, General Alcalá Cordones began actively planning his first attempt to remove Maduro and his cronies from office through military intervention. These were not theoretical debates about democratic change, these were plans for armed insurrection against a regime and its leadership. The first such attempt was planned for March 2018, but the Venezuelan government learned of the plan and crushed it. Many of the Venezuelan military officers recruited by General Alcalá Cordones and others to participate in the rebellion were imprisoned and many were reportedly tortured. General Alcalá Cordones fled to Colombia, but he did not give up his efforts to overthrow Maduro by armed rebellion.

General Alcalá Cordones spent the next year planning a second armed conquest against his alleged coconspirators, in which he and his men were once again ready to lay down their lives to remove Maduro and his henchmen from office, only to see it fall apart when the United States government indicted him in this case. On the eve of launching this second operation, General Alcalá Cordones received a knock on his door from a United States law enforcement agent, informing him he had been indicted in the United States on allegations of participating in a narco-terrorism conspiracy. The agent informed General Alcalá Cordones that he could either board a

private jet bound for New York or be held in a Colombian jail where he would no doubt be targeted by the Venezuelan intelligence services for assassination.  Left with little choice, General Alcalá Cordones agreed to accompany the agent back to the United States.

Although the United States was aware of General Alcalá Cordones' ongoing efforts to oust Maduro from power, the indictment nevertheless accuses General Alcalá Cordones of participating in a narco-terrorism conspiracy with Maduro and several senior members of his regime.   In exceptionally broad and sweeping terms, the indictment alleges a narco-terrorism conspiracy spanning more than twenty years, and accuses General Alcalá Cordones and his co-defendants of acting as the "leaders" and "managers" of the Cartel de Los Soles at various but undefined times throughout that twenty-plus year period.  *See* Indictment at ¶ 6.

General Alcalá Cordones is alleged to have joined the conspiracy in 2008.  *Id.* at ¶ 15(g).  At that time, he was a general in the Venezuelan Army.  Although the indictment describes a twenty-one-year narco-terrorism conspiracy, General Alcalá Cordones is mentioned with specificity only once:

> In or about 2008, CABELLO RONDÓN, CARVAJAL BARRIOS, and CLÍVER ANTONIO ALCALÁ CORDONES, the defendant, held a meeting at which they agreed that ALCALA CORDONES would take on additional duties coordinating drug-trafficking activities by the *Cártel de Los Soles* and the FARC.

*Id.* at ¶ 15(g).

The indictment alleges no overt acts allegedly undertaken by General Alcalá Cordones in furtherance of the conspiracy.[2]  It alleges in extremely generalized terms that, to ensure safe

---

[2] Conversely, the indictment contains ample factual allegations regarding the alleged conduct of General Alcalá Cordones' codefendants.  For example, the indictment alleges, with specificity, that Maduro "negotiated multi-ton shipments of FARC-produced cocaine; directed that the Cartel de Los Soles provide military-grade weapons to the FARC; coordinated foreign affairs with Honduras and other countries to facilitate large-scale drug trafficking," among other acts.  *Id.* at ¶ 5.  It also accuses Cabello and Carvajal of coordinating and dispatching a 5.6-ton cocaine shipment from Venezuela in 2006.  *Id.* at ¶ 15(d); see also ¶ 15(f) (alleging that at a 2008 meeting with a FARC representative, Maduro, Cabello and Carvajal agreed to provide the FARC with cash and weapons in exchange for increased cocaine

passage for cocaine shipments, "members and associates of the FARC and the *Cártel de Los Soles* paid bribes, which ultimately benefited [Maduro, Carvajal, Cabello, and General Alcalá Cordones]." *Id.* ¶ 14(d).   Beyond that, the indictment sets forth bare-bones legal allegations that General Alcalá Cordones was part of a conspiracy to import cocaine, and in similar bare-bones fashion charges him with substantive possession of machine guns and destructive devices and conspiracy to commit those crimes all during the time that he was an active Venezuelan service member.

## ARGUMENT

### I.   THE INDICTMENT SHOULD BE DISMISSED UNDER THE DOCTRINE OF FOREIGN OFFICIAL IMMUNITY

General Alcalá Cordones' alleged conduct falls squarely within the protections offered by the foreign official immunity doctrine and therefore the indictment should be dismissed.  This common law doctrine curtails the jurisdiction of the courts to hear cases where the conduct at issue was undertaken by foreign officials in furtherance of foreign sovereign policy.  Here, the conduct alleged against General Alcalá Cordones was undertaken as part of his official duties, and, thus, he is immune from this prosecution.  The crimes with which General Alcalá Cordones is charged include the criminalization of the possession of weapons by a soldier on his native soil, and criminalization of the execution of policy decisions of an elected civilian government.

A.   <u>Relevant Law</u>

In *Samantar v. Yousuf*, 560 U.S. 305, 324 (2010), the United States Supreme Court held that the immunity of individual foreign government officials is governed by "foreign sovereign

---

production); ¶ 15(h) (accusing Maduro, Cabello, and Carvajal of attending a 2009 meeting with a FARC representative to discuss a four-ton cocaine shipment).

immunity under the common law."[3]  This doctrine entitles foreign officials to sovereign immunity for acts undertaken in their official capacity.  *Eliahu v. Jewish Agency for Israel*, 919 F.3d 709 (2d Cir. 2019); *Matar v. Dichter*, 563 F.3d 9, 13-14 (2d Cir. 2009) (decided before *Samantar* and noting that "If (as may be) the FSIA does not apply to former foreign officials, it does not follow that these officials lack immunity.  The FSIA is a statute that 'invade[d] the common law' and accordingly must be 'read with a presumption favoring the retention of long-established and familiar principles'").

"At common law, foreign states were absolutely immune from suit and execution." *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1126 (9th Cir. 2010).  This immunity extends to foreign officials for "acts performed in his official capacity."  *Matar*, 563 F.3d at 14 (quoting Restatement (Second) of Foreign Relations Law of the United States § 66(f) (1965)).  The Supreme Court has long held that United States courts lack jurisdiction to adjudicate the validity of acts of state undertaken by foreign government officials in furtherance of their state's national interest, regardless of how the political branches of the United States' government views the foreign government in question.  *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) (holding that case against Venezuelan general for actions taken in his military capacity not subject to adjudication; such actions were protected by "[t]he immunity of individuals from suits brought in foreign tribunals for acts done within their own states, in the exercise of governmental authority, whether as civil officers or as military commanders.").[4]

---

[3] In contrast to the immunity of foreign states and agencies, whose immunity is governed by the Foreign Sovereign Immunities Act ("FSIA").  *Id.*

[4] Whether the Court views immunity as a matter of subject matter jurisdiction or a defense, the result must be the same.  Many courts have held that a showing of sovereign immunity divests the court of subject matter jurisdiction. *See e.g., Wake v. United States*, 89 F.3d 53, 57 (2d Cir. 1996) (explaining that sovereign immunity is "jurisdictional in nature," thus where a waiver of sovereign immunity does not apply, dismissal is required); *United States v. Pangang Grp. Co., Ltd.,* 6 F.4th at 959 (explaining that the question of foreign sovereign immunity "goes to subject matter jurisdiction"); *Eliahu*, 919 F.3d at 712-13 (finding that the defendant foreign officials were entitled to foreign official

The common law distinguishes between two types of immunity: (1) "status-based" immunity that is awarded to sitting heads of state; and (2) "conduct-based" immunity that is awarded to foreign officials acting on behalf of a sovereign government. *In re Terrorist Attacks on September 11, 2001*, 122 F. Supp.3d 181, 185-86 (S.D.N.Y. 2015) (citing *Moriah v. Bank of China, Ltd.*, 107 F. Supp. 3d 272, 277 (S.D.N.Y. 2015)).

While status-based immunity is only available to sitting heads of state, conduct-based immunity more broadly "shields individuals from legal consequences for acts performed on behalf of the state." *In re Terrorist Attacks on September 11, 2001*, 122 F. Supp.3d at 186 (quoting *Sikhs for Justice v. Singh*, 64 F. Supp.3d 190, 193 (D.D.C. 2014)). This form of immunity "stands on the foreign official's actions, not his or her status, and therefore applies whether the individual is currently a government official or not." *Moriah*, 107 F. Supp. 3d at 277. Conduct-based immunity is afforded to "any [] [p]ublic minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state." *Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019) (citing *Matar*, 563 F.3d at 14.)

There is a relative dearth of decisions analyzing claims of foreign official immunity in the context of criminal proceedings, likely attributable to the unusual circumstance in which such claims will arise; it is rare indeed that the government will indict a foreign government official for alleged violations of United States criminal law where the conduct in question constitutes the performance of the defendant's official duties.[5] However, the cases analyzing this issue make

---

immunity despite allegations of improper conduct and concluding that the court therefore lacked subject matter jurisdiction). Where the requirements for sovereign immunity are met, the "entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 143–44 (1993); *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 491 F. Supp. 3d 584, 591 (N.D. Cal. 2020) (applying *Metcalf & Eddy* in the context of sovereign immunity). Thus, if the Court determines that immunity applies but that it is not a limitation on the Court's subject matter jurisdiction, the Court should nevertheless decline to exercise its jurisdiction over this prosecution.

[5] In *Samantar*, the Supreme Court described a study analyzing all cases invoking sovereign immunity leading up to the enactment of the FSIA, noting that, "[a] study that attempted to gather all of the State Department decisions related

clear that sovereign immunity doctrines apply equally to criminal as well as civil cases.  *See e.g.*
*United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336 (2d Cir. 2021) (applying Foreign
Sovereign Immunities Act to sovereign instrumentality in criminal case); *United States v. Pangang*
*Group Company, Ltd.*, 6 F.4th 946, 954 (9th Cir. 2021) (same); *United States v. Noriega*, 746 F.
Supp. 1506, 1522 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997) (engaging in substantive
analysis of common law head of state immunity claim but denying immunity because the
defendant was not the recognized head of state).  Notably, while these three cases denied
application of their respective immunity doctrines, none held that the doctrines were not applicable
in criminal cases.

Other cases have similarly applied immunity doctrines in both criminal and civil cases
alleging criminal conduct by foreign officials.  In *Doğan v. Barak*, 932 F.3d 888 (9th Cir. 2019),
the court held that common law foreign official immunity barred a civil lawsuit alleging
extrajudicial killings by an Israeli official, citing the United States Supreme Court for the
proposition that "courts should 'proceed on the assumption that common-law principles of ...
immunity were incorporated into our judicial system and that they should not be abrogated absent
clear legislative intent to do so.'"  932 F.3d at 894 (citing *Filarsky v. Delia*, 566 U.S. 377, 389
(2012)).[6]

---

to sovereign immunity from the adoption of the restrictive theory in 1952 to the enactment of the FSIA reveals only
four decisions related to official immunity, and two related to head of state immunity, out of a total of 110 decisions."
560 U.S. at 323 n.18 (citing Sovereign Immunity Decisions of the Dept. of State, May 1952 to Jan. 1977 (M. Sandler,
D. Vagts, & B. Ristau eds.), in Digest of U.S. Practice in International Law 1977, pp. 1020, 1080).

[6] There is no question that common law doctrines apply in federal criminal prosecutions unless they have been
specifically abrogated or displaced by rule or statute. While federal criminal law is statutory in nature, the Supreme
Court has "nonetheless recognize[d] that Congress in enacting criminal statutes legislates against a background of
Anglo-Saxon common law." *United States v. Bailey*, 444 U.S. 394, 415 n.11 (1980) (analyzing common law
affirmative defense in a federal prosecution) (citing *Morissette v. United States*, 342 U.S. 246 (1952)).  *See also Smith
v. United States*, 568 U.S. 106, (2013) (where Congress did not specifically address common law rule in criminal
statute, "it is presumed that Congress intended to preserve the common-law rule"); *Dixon v. United States*, 548 U.S.
1, 13 (2006) (recognizing assumption that common law affirmative defenses apply in criminal prosecutions) (citing
*United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 491 (2001) and *Bailey*, 444 U.S. at 410);

In assessing whether conduct-based sovereign immunity exists, courts have almost universally looked to Section 66(f) of the Restatement (Second) of Foreign Relations Law of the United States (1965), which states that conduct-based immunity attaches to any "public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state." *See Belhas v. Ya'alon*, 515 F.3d 1279, 1285 (D.C. Cir. 2008) (quoting *Restatement* § 66(f)); *Rishikof v. Mortada*, 70 F. Supp. 3d 8, 12 (D.D.C. 2014) (applying *Restatement* § 66(f) factors to claim for conduct-based immunity); *Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 230 (D.D.C. 2018) (same); *Matar*, 563 F.3d at 14 (same); *Moriah*, 107 F. Supp. 3d at 277 (same).[7]

Per the Restatement, the majority of courts have held that immunity attaches where: (1) the actor is a public minister, official, or agent of the foreign state; (2) the acts in question were performed in his or her official capacity; and (3) the exercise of jurisdiction would serve to enforce a rule of law against the foreign state.  *See e.g.*, *Lewis v. Mutond*, 918 F.3d at 146; *Doğan*, 932 F.3d at 893-94; *see also Miango v. Democratic Republic of Congo*, No. CV 15-1265 (ABJ), 2020 WL 3498586, at *5 (D.D.C. June 29, 2020) (applying same three-factor analysis to claim for conduct-based immunity).

---

*Wolfle v. United States*, 291 U.S. 7, 12–13 (1934) (common law principles governing testimonial privilege applied in absence of federal statute to the contrary).

[7] In its decision in *Samantar*, the Supreme Court noted that it "express[ed] no view on whether Restatement § 66 correctly sets out the scope of the common law immunity applicable to current or former foreign officials."  560 U.S. at 321, n.15.  Nevertheless, appellate and trial courts have subsequently embraced Restatement § 66 when confronted with questions of foreign official immunity.

B.    General Alcalá Cordones is Entitled to Immunity

In this case, there is nothing in the statutes underlying the charges against General Alcalá Cordones that purports to in any way abrogate common law immunity, and he is therefore entitled to the benefit of the doctrine's protections.  *See Carpenter v. Republic of Chile*, 610 F.3d 776, 780 (2d Cir. 2010) (recognizing that foreign official immunity remains part of United States common law and is available to defendants appearing before United States courts) (citing *Samantar*, 560 U.S. at 324–25).  The application of these factors to the instant case makes clear that General Alcalá Cordones is entitled to the protections of common law immunity.

First, as a uniformed military officer of the sovereign state of Venezuela, there can be no question that General Alcalá Cordones was a public official at the time of the events alleged in the Indictment.  Military officials are routinely held to be officials or agents of a foreign state.  *See, e.g.*, *Matar*, 563 F.3d at 14 (Israeli agent was a foreign official for immunity analysis); *Doğan*, 932 F.3d at 894 (same); *Doe 1*, 318 F. Supp. 3d at 232-33 (Nigerian military officials were officials of the foreign state for purposes of immunity analysis).  Here, there can be no doubt that General Alcalá Cordones, as a uniformed military general, was a foreign official of the Republic of Venezuela.  Thus, the first factor in the immunity analysis is satisfied.

Second, and also clear from the Indictment, the alleged conduct would have been performed in General Alcalá's official capacity.  The Second Circuit has explained that "[i]n determining whether an act was within the authority of an official or an official body, or was done under color of such authority . . ., one must consider all of the circumstances, including whether the affected parties reasonably considered the action to be official, whether the action was for public purpose or for private gain, and whether the persons acting wore official uniforms or used official equipment."  *Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517, 537-38 (S.D.N.Y.

2013), *aff'd*, 768 F.3d 145 (2d Cir. 2014) (quoting Restatement (Third) of Foreign Relations Law § 207 cmt. d (1987)). Here, the only detailed act in the Indictment attributed to General Alcalá Cordones is a 2008 meeting with Hugo Carvajal (his superior officer in rank and the head of the Venezuelan Military Intelligence Agency) and Diosdado Cabello (then the former vice president of Venezuela and former chief of staff to President Chávez, and the leader of President Chávez' political party). In other words, the sole act tying General Alcalá Cordones to the criminal charges is a meeting with a superior ranking officer and a government official. Such a meeting was part of General Alcalá Cordones' official duties on behalf of the State of Venezuela and is precisely the conduct for which foreign official immunity must apply. Indeed, the indictment even notes that at the meeting, General Alcalá Cordones was assigned additional "duties." Indictment at ¶ 15(g). General Alcalá Cordones in 2008 was a recently-minted general. As such, he certainly wielded a degree of power and authority, but he was not in a position to reject a meeting with a superior officer who commanded the military intelligence service and the former chief of staff to the president. Attending such a meeting with a superior officer would be part and parcel of his duties as a military officer. Attending a meeting and undertaking "duties" as ordered by a superior is the quintessential act of a military official. Subordinate officers do not "agree" to orders given by superior officers and civilian officials. The military does not rely on junior officers' agreements; it operates on edict. Thus, any alleged agreement consummated at that meeting was an official act and part of General Alcalá Cordones' duties as an official in the Venezuelan military.

With respect to the allegations that General Alcalá Cordones, a military officer, conspired to and unlawfully possessed machine guns and explosive devices to aid and abet the FARC's possession of such weapons, and with a conspiracy to possess such weapons, these charges strike directly at the very essence of General Alcalá Cordones' duties as a soldier. There is nothing more

inherent to the official duties of a soldier than his possession of weapons to defend his country. Moreover, any alleged provision of weapons to the FARC (if indeed the Government is alleging such conduct against General Alcalá Cordones) would have been part of his military duties and reflected the execution of orders effectuating sovereign policies of his government.

For the same reasons, this is not a case where participation in the narcotics conspiracy can be imputed to General Alcalá Cordones on the basis that he may have supplied weapons to the FARC. Certainly, in a civilian, domestic setting, the gun dealer who provides weapons to a drug gang may be imputed with knowledge and intent to abet and join the narcotics conspiracy. That analogy from street crime cases does not hold in this matter. If General Alcalá Cordones provided weapons to the FARC in Venezuela, then he did so as a soldier and not as an individual engaged in criminal activity.[8]

General Alcalá Cordones satisfies the second factor as it relates to the narco-terrorism charge for similar reasons. That the government of Venezuela had sympathy for the FARC and provided support to the revolutionary organization was not a secret. Numerous examples credit that, from testimony offered by experts before the U.S. Senate Foreign Relations Committee,[9] and reports by the United States Department of State[10] and the United States Government

---

[8] Once again, we are forced to guess at the conduct at issue because of the lack of detail in the indictment and discovery.

[9] *Deepening Political and Economic Crisis in Venezuela: Implications for U.S. Interests and the Western Hemisphere: Hearing before the Senate Foreign Relations Subcommittee on the Western Hemisphere, Transnational Crime, Civilian Security, Democracy, Human Rights, and Global Women's Issues*, 114th Cong., 1st Sess. (2015) (Testimony of Douglas Farah at 12 n.36), https://www.foreign.senate.gov/imo/media/doc/031715_Farah_Testimony.pdf; *The Threat to Democracy in Venezuela and its Implications for the Region and the United States: Hearing before the Senate Foreign Relations Subcommittee on Western Hemisphere, Peace Corps and Narcotics Affairs*, 108th Cong., 2d Sess. (2004) (Testimony of Miguel Diaz at 4), https://www.foreign.senate.gov/imo/media/doc/DiazTestimony040624.pdf.

[10] United States Department of State, *Patterns of Global Terrorism: 2003*, at 82 (2004), https://2009-2017.state.gov/documents/organization/31912.pdf.

Accountability Office,[11] to presentations by the Government of Colombia at the Organization of American States.[12]

Scholars have attested that Venezuela's support for FARC emerged out of an ideological alliance, specifically, what Chávez termed the "Bolivarian Revolution." President Chávez publicly announced his alliance with the FARC. In 1997, when the United States designated the FARC a terrorist organization.[13] President Chávez publicly opposed the action and continued to support the FARC. In 2008, for example, he stated:

> "I say this even though somebody might be bothered by it: the FARC and the ELN are not terrorist groups. They are armies, real armies ... that occupy a space in Colombia."

> He added that the two groups' "insurgent forces" have a goal, "a project," that is "Bolivarian" and that "we respect."[14]

Venezuela's support for FARC is not unique. Other states belonging to the Bolivarian bloc of nations—Ecuador, Nicaragua and Bolivia—also have allowed FARC to advance its goals under their protection.[15] These states—known as the Bolivarian Alliance for the Peoples of Our America

---

[11] U.S. Gov't Accountability Off., GAO-09-806, *U.S. Counternarcotics Cooperation with Venezuela Has Declined: GAO Report to the Ranking Member, Committee on Foreign Relations, U.S. Senate* 12-14 (2009), https://www.gao.gov/assets/gao-09-806.pdf.

[12] Organization of American States (OAS), *Acta de la Sesion Extraordinaria celebrada el 22 de Julio de 2010*, CP/ACTA 1765/10, https://www.oas.org/consejo/sp/actas/acta1765.pdf (only in Spanish).

[13] Designation of Foreign Terrorist Organizations, 62 Fed. Reg. 52,650, 52,651 (Oct. 8, 1997), https://www.govinfo.gov/content/pkg/FR-1997-10-08/pdf/97-27030.pdf. In 2021, the United States revoked the terrorist designation of the FARC. In the Matter of the Designation of the Revolutionary Armed Forces of Colombia (FARC) (and Other Aliases) as a Foreign Terrorist Organization, 86 Fed. Reg. 68,293 (Dec. 1, 2021), https://www.govinfo.gov/content/pkg/FR-2021-12-01/pdf/2021-26083.pdf.

[14] *Chavez: Take FARC off terror list*, CNN, Jan. 11, 2008, https://www.cnn.com/2008/WORLD/americas/01/11/chavez.farc/.

[15] *Supra* note 9 (Farah Testimony) at 7.

(Alianza Bolivariana para los Pueblos de Nuestra América – ALBA)—also enjoy an alliance with Russia and share populist anti-United States sentiments.[16]

As a sovereign nation, the United States had the right to label the FARC a terrorist organization.  As an equal sovereign, Venezuela had the right to reject that designation and render its own policy determinations.  For Venezuela, relations with the FARC, a military force operating at times within Venezuela's borders, were nuanced and complicated.

The Second Circuit has recognized the difficulties in this regard.  In litigation over an action brought under the Alien Tort Statute (ATS), the Second Circuit in *In re Terrorist Attacks on September 11, 2001* noted:

> We regrettably are no closer now ... to an international consensus on the definition of terrorism or even its proscription; the mere existence of the phrase "state-sponsored terrorism" proves the absence of agreement on basic terms among a large number of States that terrorism violates [customary] international law. Moreover, there continues to be strenuous disagreement among States about what actions do or do not constitute terrorism, nor have we shaken ourselves free of the cliché that "one man's terrorist is another man's freedom fighter." We thus conclude ... that terrorism—unlike piracy, war crimes, and crimes against humanity—does not provide a basis for universal jurisdiction [under customary international law].

> Other courts have reached the same conclusion. *See Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 795 (D.C.Cir.1984) (Edwards, J., concurring) ("Indeed, the nations of the world are so divisively split on the legitimacy of such aggression [*i.e.*, terrorism] as to make it impossible to pinpoint an area of harmony or consensus."); *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.,* 792 F.Supp.2d 1301, 1317 (S.D.Fla.2011) ( "Plaintiffs thus attempt to group this broad, ill-defined class of conduct under the umbrella of 'terrorism,' or material support thereof, and create a cause of action against it under the ATS.... [T]his Court ... reject[s] Plaintiffs' attempt to categorize these broad claims as violations of the law of nations."); *Mwani v. Bin Laden,* No. CIV A 99–125 CKK, 2006 WL 3422208, at *3 n. 2 (D.D.C. Sept. 28, 2006) ("The law is seemingly unsettled with respect to defining terrorism as a violation of the law of nations.").

714 F.3d 118, 125 (2d Cir. 2013) (quoting *United States v. Yousef*, 327 F.3d 56, 106–08 (2d Cir. 2003)).

---

[16] *Supra* note 9 (Farah Testimony) at 6.

General Alcalá Cordones is not in the same posture as a civilian who is accused of joining or supporting a terrorist organization. He was a uniformed member of the armed forces of a sovereign nation, and as such his interactions and dealings with the FARC were conducted within the rubric of Venezuelan sovereign policy. Whether General Alcalá Cordones provided the FARC with food, medicine, humanitarian aid, or weapons, it was all undertaken as part of Venezuelan sovereign policy not subject to review in our courts, just as an Israeli official's orders to bomb targets in Gaza were a sovereign decision not subject to review in our courts. *See Doğan*, 932 F.3d at 888; *Matar*, 563 F.3d 9. In these circumstances, a prosecution of General Alcalá Cordones for terrorism for supporting the FARC is akin to an Iranian court prosecuting a United States general for terrorism for providing weaponry to forces in Yemen. Iran may consider such forces to be terror organizations, but that is not United States policy. Here, Venezuela made its own sovereign decision to support the FARC, and that decision and the acts undertaken to effectuate it are not subject to review in our courts.

Moreover, 21 U.S.C. § 960a(c) provides that to be subject to prosecution for a violation of that section "a person must have knowledge that the person or organization has engaged or engages in terrorist activity (as defined in section 1182(a)(3)(B) of Title 8) or terrorism (as defined in section 2656f(d)(2) of Title 22)." Here too, General Alcalá Cordones' knowledge and intent must be assessed in light of the official position he held. The country he served did not view the FARC as a terrorist organization. In his dealings with the FARC, General Alcalá Cordones followed the policies of his civilian government leaders. As such, he was not dealing with or supporting a "terrorist organization." Rather he was effectuating the sovereign policies of his country. Just as the decision of the Taliban to support Osama bin Laden was a sovereign decision not subject to review in *Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005), so too is Venezuela's

decision to support the FARC.  The sovereign policy decisions of Venezuela in its dealings with the FARC are not subject to review in this Court (factor 3 below).  Thus, the second factor of the immunity analysis has likewise been met.

The third and final factor in a conduct-based immunity analysis looks to whether the exercise of jurisdiction in a particular case would be "tantamount to enforcing a rule of law against" the foreign state itself.  The Supreme Court has held that the "(e)xercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce," and "can be performed only by the state acting as such."  *Mwani*, 417 F.3d at 6 (dismissing claim against Afghanistan for support of al Qaeda and Osama bin Laden) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 362 (1993) (dismissing case seeking damages for torture by government officials under FSIA; court expressly did not consider common law immunity grounds)).

For example, in *Doe 1*, the court found that defendants were acting in their official capacity when exercising command and operational control over Nigerian military and police forces which carried out attacks against plaintiffs, and thus "[a] decision by this Court on the legality of the defendants' actions would amount to a decision on the legality of Nigeria's actions."  318 F. Supp. 3d at 233 (citing *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 821 (D.C. Cir. 1984) (Bork, J., concurring) ("The prospect of a federal court ordering discovery on (whether an entity acted as an agent of a foreign country such that the country 'should be held responsible' for the agent's actions), to say nothing of actually deciding it, is, or ought to be, little short of terrifying.").  *See also Doğan*, 932 F.3d at 894 (Israeli official was entitled to common law immunity where military operation he commanded resulted in death of U.S. citizen since his actions were undertaken on behalf of the foreign state).

The prosecution of this case requires this court to litigate sovereign policy decisions of a foreign government and actions undertaken by a foreign official within the scope of his duties. General Alcalá Cordones was at all relevant times acting in his official capacity on behalf of the sovereign state of Venezuela, and such conduct cannot form the basis for a prosecution here without effectively enforcing United States criminal laws against a foreign sovereign state. If the sovereign could not be prosecuted for its conduct under rules of sovereign immunity, then neither can its sovereign agents. To hold otherwise would upend rules governing the sovereignty of nations and sovereign officials. United States officials could be prosecuted in any jurisdiction in the world that disagreed with United States policy. Our military officers would be subject to arrest and prosecution for their execution of policy choices undertaken by our political leaders. There are strong reasons why United States courts have followed this common law doctrine since the earliest days of the Republic, and we urge the Court to do the same. Thus, the third and final factor supporting a finding of immunity is met, and General Alcalá Cordones is therefore entitled to immunity with respect to the conduct alleged in the indictment.

II.   **THE COURT SHOULD ORDER THE GOVERNMENT TO PROVIDE THE DEFENSE WITH A BILL OF PARTICULARS, INCLUDING A LIST OF THE NAMES OF ALLEGED UNINDICTED CO-CONSPIRATORS, TO PERMIT GENERAL ALCALÁ CORDONES TO PREPARE HIS DEFENSE**

For General Alcalá Cordones to prepare for trial, the government must provide the defense with a bill of particulars.  The indictment alleges a twenty-one-year conspiracy dating back to 1999 and, despite the length of the indictment and the years of conduct it addresses, it provides virtually no detail regarding the acts alleged to be committed by General Alcalá Cordones.  Similarly, the government has produced mountains of discovery material which, after a thorough review by defense counsel, provide no evidence or documents implicating General Alcalá Cordones in any criminal conduct and the government has not provided any meaningful guidance as to which materials might be relevant to General Alcalá Cordones.

In addition, the government should be ordered to produce a list of unnamed/unindicted co-conspirators to further assist the defense in preparing for trial.  The number of co-conspirators named in the indictment (five including the current president of Venezuela), and the countless other unnamed co-conspirators allegedly involved in the conspiracy from 1999 to 2020, factor in favor of disclosure.  The enormous duration and breadth of the alleged conspiracy make preparing a defense to the allegations nearly impossible without additional particulars.  There are no allegations of which we are aware that General Alcalá Cordones has ever engaged in any violence in connection with the charged conspiracy or possessed any weapons other than in his official duties as a soldier and general in the Venezuelan army (and later in his attempts to overthrow the Venezuelan regime headed by his alleged coconspirators).  Furthermore, ordering the government to produce the names of unindicted co-conspirators should not harm the government's investigation since there is a protective order in place and it can produce those materials with appropriate restrictions.  Without a bill of particulars, General Alcalá Cordones cannot adequately

prepare for trial and prevent trial surprises.  The defense has no idea how the government intends to prove General Alcala Cordones' participation in the charged conspiracies, and the government steadfastly refuses to provide any further particulars.

Pursuant to Federal Rule of Criminal Procedure 7(f), the Court may order the government to file a bill of particulars. The government should provide the defense with particulars when it is needed for it to prepare its defense.  *See United States v. Bortnovsky*, 820 F.2d 572, 574, 575 (2d Cir. 1987); *see also United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000).

When the allegations are broad in scope, a bill of particulars is especially appropriate. *United States v. Clarkson Auto Elec., Inc.*, No. 10–CR–6111G2014 WL 3906324, at *2 (W.D.N.Y. Aug. 8, 2014) (citing *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998) (finding bill of particulars appropriate where "a conspiracy count covers a complex series of events over a number of years" but denying the claim under harmless error) and *United States v. Davidoff*, 845 F.2d 1151, 1154-55 (2d Cir. 1988)).  The decision to grant or deny a bill of particulars is within the sound discretion of the district court." *Davidoff*, 845 F.2d at 1154.

As noted above, when the government produces voluminous discovery, a bill of particulars can be necessary for the defense to identify relevant material to appropriately prepare for trial.  "It is not sufficient for the government to respond to a motion for a bill of particulars by pointing to the voluminous discovery already provided." *United States v. Bazezew*, 783 F. Supp. 2d 160, 168 (D.D.C. 2011).  The caselaw is very clear that when the government has compiled and produced mountains of discovery, it cannot rely on that fact to defend against providing more detail regarding the evidence and allegations.  It must provide more clarity in order to permit the defense to fairly prepare its defense.

21

Numerous courts in this Circuit have recognized that voluminous discovery is not a substitute for a bill of particulars.  "[A] bill of particulars is appropriately granted where the government's pre-trial discovery disclosures are so voluminous that the defendant remains in the dark about the specific acts of which he is accused."  *United States v. Urso*, 369 F. Supp. 2d 254, 271–72 (E.D.N.Y. 2005) (citing *Bortnovsky*, 820 F.2d at 575).  "[T]he Government cannot meet its burden by dumping voluminous discovery upon the defendants without any sort of guidance."  *United States v. Ikoli*, No. 16-cr-148 (AJN), 2017 WL 396681, at *6 (S.D.N.Y. Jan. 26, 2017) (citing *Bortnovsky*, 820 F.2d at 575 and *United States v. Jailall*, No. 00 Cr. 69 (RWS), 2000 WL 1368055, at *8 (S.D.N.Y. Sept. 20, 2000)); *see also United States v. Lino,* No. 00 Cr. 632 (WHP), 2001 WL 8356, at *4 (S.D.N.Y. Jan 2, 2001).  A bill of particulars can be "necessary to bring focus to the massive amounts of discovery produced and the lengthy, open-ended conspiracy charged."  *United States v. Luna,* No. 05 Cr. 58 (SRU), 2006 WL 1668006, at *3 (D. Conn. May 17, 2006).

In *Bortnovsky*, the Second Circuit held that "[t]he Government [does] not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided."  820 F.2d at 574, 575; *see also Bin Laden*, 92 F. Supp. 2d at 234 ("It is no solution to rely solely on the quantity of information disclosed by the Government; sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars.").  In *United States v. Koschtschuk*, No. 09-CR-0096(S)(M), 2010 WL 584018, at *13 (W.D.N.Y. Feb. 16, 2010), the court granted a bill of particulars where the defendants were only named in one count of an indictment involving many co-conspirators spanning a significant amount of time and where the government had produced an "enormous amount of discovery material."  In *Jailall*, the court would have granted the defense a bill of particulars but the government had included detailed

charts within the discovery summarizing and analyzing the voluminous bank records. 2000 WL 1368055, at *8.

Likewise, in *United States v. Savin*, No. 00 Cr. 45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001), Judge Sweet granted, in part, the defense request for a bill of particulars and held that Savin was entitled to more information in order for him to prepare for and not be subject to surprise at trial.  The government had produced 85 boxes with more than 100,000 pages.  Judge Sweet cited *Bortnovsky* and *United States v. Nachamie*, 91 F. Supp.2d 565, 571 (S.D.N.Y. 2000), among others.  Judge Sweet reasoned:

> In [*Nachamie*], a bill of particulars was ordered where the defendants were charged with conspiracy to commit Medicare fraud, and the government "produced over 200,000 pieces of paper in hundreds of boxes and files, relating to 2,000 Medicare claims."  The [*Nachamie*] court noted that the government had "not yet informed the defendants which of these claims were false and in what way they were false," and, relying on *Bortnovsky*, ordered a bill of particulars specifying the names of unindicted co-conspirators, the identity and details of each and every allegedly false claim submitted and/or filed as part of the conspiracy, and the identity and details of the allegedly false documents used in the conspiracy.

*Savin*, 2001 WL 243533, at *3.  Judge Sweet found that, without more particulars, Savin would be forced to comb through a mountain of documents and to attempt to guess which of the numerous transactions over a six-year period were alleged by the government to be illegal.  *Id.*

In *Bazezew*, the court ordered the government to provide a bill of particulars that included at least the following:

> (1) a description of any overt act taken by each of the 16 remaining defendants . . . ; (2) the identities of all persons the government claims to have been co-conspirators during the course of the alleged conspiracy, regardless of whether they have been indicted or previously have pled guilty and regardless of whether they will be called as trial witnesses; and (3) the approximate date of any conversations between any of the 16 remaining defendants and any purported co-conspirators.

783 F. Supp. 2d at 168–69.

In addition to the general particulars necessary to illuminate the charges in this extremely broad conspiracy, the Court has the discretion to also order the government to provide the defense with the names of unnamed and unindicted co-conspirators.   Disclosure of unnamed co-conspirators is "not warranted as a matter of routine," *Savin*, 2001 WL 243533, at *5, however, there is nothing "routine" about this indictment, which includes as a codefendant a putative head of state and the political leadership of a foreign country, which alleges conduct spanning more than two decades, and almost all the conduct is alleged to have occurred on foreign soil.   In such a case, the only way in which the defense can investigate and prepare for trial is with advanced notice of alleged unnamed co-conspirators.   The decision in *Savin* went on to list factors courts might examine in determining whether to provide this information:

> In determining whether a defendant is entitled to the names of his unnamed co-conspirators, the following factors have been considered useful: (1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the government has otherwise provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the government's investigation.

*Id.* (citing *Nachamie*, 91 F. Supp. 2d at 572 and *United States v. Trie*, 21 F. Supp. 2d 7, 22 (D.D.C. 1998) (granting request for names of unindicted co-conspirators where there were approximately 18 such persons, some of whom defendant may never have met, and conspiracy lasted more than three years)).

In *Savin*, Judge Sweet ordered the government to provide the defense the names of unindicted co-conspirators, holding that:

> [t]he number of unindicted co-conspirators is potentially quite large, as no fewer than six corporations, each with its own personnel, was potentially involved in the alleged "intercompany transfers."  The conspiracy may have spanned up to six years. The notice of the particulars of the charges provided by the indictment is not sufficient, as discussed above. The pretrial disclosure has been extraordinarily voluminous. There is no evidence of danger to co-conspirators, and, indeed, related civil actions concerning the same underlying events are being prosecuted without incident in this regard. Finally, the

government does not contend that its investigation may be harmed and, given the extensive investigation which has already been accomplished due to the civil litigation, any such harm would be negligible.

2001 WL 243533, at *5.

In *United States v. Concord Mgmt. & Consulting LLC*, 385 F. Supp.3d 69, 74-75 (D.D.C. 2019), the court held that, despite a thorough indictment listing twenty-six overt acts, a bill of particulars, including the names of uncharged co-conspirators was necessary. In ordering the disclosure of co-conspirators, the court noted that "this case, however, is not the typical case." Like the instant case, this case involved an international conspiracy carried out largely on foreign soil by at least thirteen individuals beyond jurisdiction of the court. The government had produced voluminous discovery of which the vast majority was restricted access due to national security concerns. Despite the detailed indictment, the defense would have been hard pressed to identify the co-conspirators who would be identified at trial, and thus, the government was ordered to provide the defense with a list of the alleged unnamed co-conspirators.

In this case, the Court should exercise its discretion and order the government to provide a detailed bill of particulars. A bill of particulars, including a list of unnamed/unindicted co-conspirators, is necessary to illuminate the sparse allegations against General Alcalá Cordones in the indictment. The government has been aware of the defense's need for additional particulars for months, culminating in a detailed defense request dated November 11, 2021, for a bill of particulars and disclosures of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and Federal Rule of Criminal Procedure 5(f) materials. *See* letter annexed hereto at Exhibit "A." The government responded by letter on December 22, 2021, providing no particulars except that it promised to produce, by January 15, 2022, certain witness statements, but it failed to make that production. *See* government's "Attorneys Eyes Only" letter annexed hereto at Exhibit "B" (provided to the

Court separately under seal).  The government has not produced any additional materials pursuant to the defense's request for particulars, however, it made a supplemental Rule 16 production on January 5, 2022.  These additional Rule 16 materials, like the mountain of materials previously provided, contain no information indicating criminal conduct by General Alcalá Cordones and do nothing to enlighten the defense as to the conduct the government intends to prove at trial.

Despite the lengthy pagination of the indictment, it provides virtually no detail regarding the acts alleged to be committed by General Alcalá Cordones.  It sets forth a broad and sweeping conspiracy including global narcotics trafficking of thousands of tons of cocaine, laundering of millions of dollars of drug proceeds, and coordinating attacks targeting United States persons and properties covering over two decades. In the twenty-eight pages of the indictment, General Alcalá Cordones is mentioned with specificity only twice.  He is described as "a Venezuelan citizen and a former general in the Venezuelan military" and it is alleged that "in or about 2008," he attended a meeting with defendants Cabello Rondón and Carvajal Barrios, "at which they agreed that [General Alcalá Cordones] would take on additional duties coordinating drug-trafficking activities by the Cartel de Los Soles and the FARC."  Indictment at ¶¶ 10, 15(g).  That is the sole substantive factual allegation against him.

In meeting its discovery obligations, the government has turned over thousands of voluminous electronic files, reports, wiretap reports, videos, audios, photographs, and so forth and continues to produce materials.  The defense has diligently reviewed the discovery materials. Despite the incredible scope of the government's investigation and volume of the provided discovery, the defense team has not reviewed a single piece of evidence implicating General Alcalá Cordones in criminal conduct.  After more than twenty-one months since General Alcalá Cordones surrendered and was detained, the government has not yet produced a single piece of admissible

evidence suggesting he undertook any act in furtherance of the conspiracy charged beyond the indictment's bare allegation that he participated in a single meeting in 2008.  To date, the government has not produced any evidence of payments, shipments, laundered funds, or even orders given by General Alcalá Cordones in furtherance of the alleged conspiracy.

Like the defendant in *Koschtschuk*, General Alcalá Cordones is named in only a limited portion of the indictment involving many co-conspirators spanning a significant amount of time and where the government had produced an "enormous amount of discovery material," none of it seeming to have anything to do with General Alcalá Cordones.  Without additional particulars, General Alcalá Cordones cannot adequately prepare for trial and prevent trial surprises.  The government has produced mountains of documents and materials with no guidance as to which materials are relevant.  In fact, the government has suggested otherwise in prior communications with the defense, acknowledging that the vast majority of produced discovery is unrelated to General Alcalá Cordones' alleged participation in the charged conspiracy.  Accordingly, the defense is left with little to no ability to adequately prepare for the case the government intends to present at trial.

The government should also be compelled to produce a list of unnamed/unindicted co-conspirators.  All six factors support this conclusion.  First, the number of co-conspirators named in the indictment, five including the current president of Venezuela, and the countless other unnamed co-conspirators allegedly involved in the conspiracy from 1999 to 2020 factor in favor of disclosure.  Second, as detailed above, the enormous duration and breadth of the alleged conspiracy make preparing a defense to the allegations near impossible without additional particulars.  Third, thus far, the government has failed to provide adequate notice of the particulars and fourth, the pretrial discovery is voluminous and contains relatively few references to General

Alcalá Cordones and certainly no evidence of criminal conduct.  And fifth and sixth, while the nature of the charges on their face may suggest danger to identifying potential witnesses, there are no allegations of which we are aware that General Alcalá Cordones has ever engaged in any violence in connection with the charged conspiracy or possessed any weapons other than in his official duties as a soldier and general in the Venezuelan army and his attempts to overthrow the current regime.  Ordering the government to produce the names of unindicted co-conspirators should not harm the government's investigation, especially since there is a protective order in place and it can produce those materials with the appropriate restrictions.[17]

Like *Concord Mgmt. & Consulting LLC*, 385 F. Supp. 3d at 69, this is "not the typical case."  This is an extremely broad international conspiracy, carried out largely on foreign soil by countless individuals beyond jurisdiction of the court, and the government has produced voluminous and extensive discovery.  Accordingly, in addition to the general particulars regarding the substantive allegations in the indictment, the government should be ordered to identify for the defense the names of all unnamed/unindicted co-conspirators.

In its letter response to our November request for more particulars, the government refused to provide any further particulars, arguing that providing such information would unnecessarily force the government to disclose other evidence and its theories of the case to which the defense is not entitled.  As the Second Circuit has made clear, if a bill of particulars is "necessary to give the defendant enough information about the charge to prepare his defense, it will be required even

---

[17] Given the geographic scope of these charges, the Court cannot permit the government wait until the eve of trial to disclose witnesses and conspirators.  The defense is entitled to reasonable time to investigate such persons.  Given the geographic distances, this would be difficult in any case.  With COVID-19, there is always the chance that travel will be restricted or prohibited.  Therefore, the defense will require more time to investigate, and the Court must order disclosure accordingly.

if the effect is disclosure of evidence or of theories." *United States v. Barnes*, 158 F.3d at 665 (citing 1 Charles Alan Wright, *Federal Practice and Procedures* § 129 (1982)).

Accordingly, for General Alcalá Cordones to adequately prepare his defense, this Court must order the government to provide the defense with a detailed bill of particulars, including identifying all unnamed/unindicted co-conspirators.

**III.  THE GOVERNMENT MUST DISCLOSE INFORMATION IN ITS POSSESSION REGARDING GENERAL ALCALÁ CORDONES' INVOLVEMENT IN ANTI-MADURO ACTIVITIES AS WELL AS THE IDENTITIES OF WITNESSES WHO HAVE FAILED TO INDICATE GENERAL ALCALÁ CORDONES' INVOLVEMENT IN THE ALLEGED CONSPIRACY.**

On November 22, 2021, General Alcalá Cordones made a specific and detailed demand to the government for Federal Rule of Criminal Procedure 5(f) / *Brady* material regarding witnesses and members of the United States government that were aware of General Alcalá's involvement in two coup attempts (and his planning of a third) against the government of his alleged co-defendant, Maduro. *See* Exhibit A. No such information has been disclosed. We believe the government is in possession of this exculpatory material and request that the Court order that material produced. Furthermore, we believe the government is in possession of information and documents related to co-conspirator witness statements that affirmatively stated that General Alcalá Cordones was not involved in the charged conspiracy and/or when asked specifically about General Alcalá Cordones' denied any knowledge of his role in the charged conspiracy.

The government has a duty to disclose material evidence favorable to a defendant pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Kyles v. Whitley*, 514 U.S. 419 (1995), and Federal Rule of Criminal Procedure 5(f). The Second Circuit articulated the *Brady* rule in *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) as "a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." "Favorable

29

evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness."   The focus is on whether the exculpatory and impeachment evidence, if suppressed, "would deprive the defendant of a fair trial."   *Id.* at 135 (quoting *United States v. Bagley*, 473 U.S. 667 (1985)).

Evidence demonstrating General Alcalá Cordones' hostility toward and armed rebellion against Maduro and his other alleged co-conspirators is wholly inconsistent with his participation in this alleged conspiracy.  Such evidence casts doubt on the government's theory of prosecution and, to the extent the government is able to prove such a conspiracy, would support a defense of withdrawal from any such conspiracy.

We have reason to believe that reports of General Alcalá Cordones' activities were communicated at the highest levels of a number of U.S. government agencies, including the Central Intelligence Agency, Treasury Department, the National Security Council, DEA, and DOJ. We recognize that much of this information may be classified and therefore may need to be produced pursuant to the Classified Information Procedures Act ("CIPA").  We have demanded production of such material in that it is directly probative of the defense case, and we ask that the Court specifically order its production.

The Court should further order the government identify all witnesses who participated in this conspiracy and have stated that General Alcalá Cordones was not involved in the charged conspiracy or have stated that they have no knowledge of General Alcalá Cordones' involvement when specifically asked.  During the government's investigation of this matter, a member of the defense, Adam Kaufmann, learned from the DEA agents working on this investigation that the government had located a witness or witnesses with information that caused the government to

decide not to seek the indictment of General Alcalá Cordones.  In an email dated November 10, 2014, Mr. Kaufmann wrote to the then-assigned prosecutor:

> First, as I understand it, this witness, who took direct orders from certain of your primary targets, corroborates much of what Cliver has been saying about his own lack of involvement in trafficking.  Hopefully this will advance the ball for Cliver.

*See* E-Mail Annexed Hereto at Exhibit "C."  No information regarding any such witness has been produced.

Accordingly, we respectfully request that the Court order the government to identify the names of and produce the relevant materials related to General Alcalá's several coup attempts against the Maduro regime and all witnesses who have stated that General Alcalá Cordones was not involved in the charged conspiracy or have stated that they have no knowledge of General Alcalá Cordones' involvement when specifically asked.

## CONCLUSION

This Court should dismiss the indictment against General Alcalá Cordones on foreign official immunity grounds.  Should the Court deny dismissal, in order for the defense to adequately prepare and avoid surprise at trial, the Court should order the government to produce a detailed bill of particulars, including the names of unnamed coconspirators and trial witnesses.  Lastly, pursuant to Federal Rule of Criminal Procedure 5(f), the Court should order the government to produce all materials related to General Alcalá Cordones' planning and coup attempts against the Maduro regime as well as identify all witnesses who participated in this conspiracy and have stated that General Alcalá Cordones was not involved in the charged conspiracy or have stated that they have no knowledge of General Alcalá Cordones' involvement when specifically asked.

Dated: January 28, 2022

_____/s/_____
César de Castro
Valerie Gotlib
**The Law Firm of César de Castro P.C.**
111 Fulton Street – 602
New York, NY 10038
(631)-460-3951
cdecastro@cdecastrolaw.com
vgotlib@cdecastrolaw.com


Adam S. Kaufmann
Cristián Francos
Tara J. Plochocki
Diane M. Camacho
**Lewis Baach Kaufmann Middlemiss PLLC**
The Chrysler Building
405 Lexington Avenue, 64th Floor
New York, NY 10174
(212) 826-7001
Adam.Kaufmann@lbkmlaw.com
Cristian.Francos@lbkmlaw.com
Tara.Plochocki@lbkmlaw.com
Diane.Camacho@lbkmlaw.com

*Attorneys for Defendant,*
*Cliver Antonio Alcalá Cordones*