UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>CLIVER ANTONIO ALCALÁ CORDONES,<br><br>Defendant. | S2 11 Cr. 205 (AKH) |

## THE GOVERNMENT'S OPPOSITION TO THE
## DEFENDANT'S PRETRIAL MOTIONS

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Jason A. Richman
Benjamin Woodside Schrier
Kyle A. Wirshba
Assistant United States Attorneys
  *Of Counsel*

**TABLE OF CONTENTS**

BACKGROUND ............................................................................................................. 2

   I. Factual and Procedural Background .................................................................... 2

   II. The Government's Discovery Productions .......................................................... 6

DISCUSSION .............................................................................................................. 9

   I. Applicable Law ..................................................................................................... 9

      A. Foreign Official Immunity ............................................................................ 9

      B. Bill of Particulars ....................................................................................... 15

   II. Argument ............................................................................................................ 18

      A. The Defendant Is Not Entitled to Foreign Official Immunity ..................... 18

              i.The Defendant Is Not Entitled to Foreign Official Immunity Because He Was Not Acting in His Official Capacity When He Committed the Offenses Alleged in the Indictment............................................................................... 19

              ii.The Absence of Any Request by Venezuela for Foreign Official Immunity for the Defendant Weighs Heavily Against Immunity ................................. 22

              iii.The Court Should Defer to the View of the Executive Branch that the Defendant Is Not Entitled to Foreign Official Immunity............................. 19

      B. The Defendant Is Not Entitled to a Bill of Particulars .................................... 24

      C. The Defendant's Motion to Compel Additional Discovery Is Without Merit ................ 26

   CONCLUSION.......................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976) ................................. 12

*Appel v. Hayut*, 2021 WL 2689059 (S.D.N.Y. 2021) .................................................... 10

*Brady v. Maryland*, 373 U.S. 83 (1963) ..................................................................... passim

*Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789 (D.C. Cir. 2021) ................................. 14, 19, 20

*Broidy v. Glob. Risk Advisors LLC*, 2021 WL 1225949 (S.D.N.Y. 2021) .................................. 9

*Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189 (S.D.N.Y. 1996) ........................................... 11, 20

*Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095 (9th Cir. 1990)............................... 11

*Doe 1 v. Buratai*, 2019 WL 668339 (D.C. Cir. 2019) ........................................... 12, 13

*Doe 1 v. Buratai*, 318 F. Supp. 3d 218 (D.D.C. 2018) .................................................. 12

*Doe v. Bolkiah*, 74 F. Supp. 2d 969 (D. Haw. 1998) ................................................. 11

*Doe v. Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004)........................................................ 11

*El Omari v. Kreab (USA) Inc.*, 735 F. App'x 30 (2d Cir. 2018) ................................... 9

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980)................................................... 13

*Giglio v. United States*, 405 U.S. 150 (1972) ........................................................ passim

*Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247 (D.D.C. 2011)................................... 12

*In re Doe*, 860 F.2d 40 (2d Cir. 1988) ..................................................................... 10

*In re Est. of Ferdinand Marcos, Hum. Rts. Litig.*, 25 F.3d 1467 (9th Cir. 1994) ....................... 10

*In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181 (S.D.N.Y. 2015)...................... 10

*Kashef v. BNP Paribas S.A.*, 925 F.3d 53 (2d Cir. 2019) ....................................... 12, 20

*Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019) ..................................................... 9

*Matar v. Dichter*, 500 F. Supp. 2d 284 (S.D.N.Y. 2007)........................................... 11, 13, 23

*Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009)......................................................... passim

*Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272 (S.D.N.Y. 2015) ......................... 10

*Omari v. Ras Al Khaimah Free Trade Zone Auth.*, 2017 WL 3896399 (S.D.N.Y. 2017).............. 9

*Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988)............................... 13

*Richardson v. Att'y Gen. of the Brit. Virgin Islands*, 2013 WL 4494975 (D.V.I. 2013).............. 10

*Samantar v. Yousuf*, 560 U.S. 305 (2010)................................................................. 9, 12

*The Schooner Exch. v. McFaddon*, 11 U.S. 116 (1812) ............................................. 13

*United States v. Adel El Zabayar*, 20 Mag. 5469 (S.D.N.Y.) ........................................ 7

*United States v. Agurs*, 427 U.S. 97 (1976) .................................................................. 28

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ............................................ 15

*United States v. Campo Flores*, 2016 WL 5946472 (S.D.N.Y. 2016)........................... 16

*United States v. Carroll*, 2020 WL 1862446 (S.D.N.Y. 2020) ............................... 16, 17

*United States v. Cimino*, 31 F.R.D. 277 (S.D.N.Y. 1962) ............................................ 18

*United States v. Dames*, 380 F. Supp. 2d 270 (S.D.N.Y. 2005) ................................... 15

*United States v. Donovan*, 2021 WL 5819915 (E.D.N.Y. 2021)................................... 24

*United States v. Flores, 15 Cr. 765 (PAC)* .................................................................... 7

*United States v. Galestro*, 2008 WL 2783360 (E.D.N.Y. July 15, 2008)...................... 27

*United States v. Gotti*, 2004 WL 32858 (S.D.N.Y. 2004) ....................................... 18, 26

*United States v. Heatley*, 994 F. Supp. 483 (S.D.N.Y. 1998)....................................... 17

*United States v. Helbrans*, 2021 WL 2873800 (S.D.N.Y. 2021)................................... 25

*United States v. Hernandez-Solarte, et al.*, 18 Cr. 262 (VEC) ..................................... 7

*United States v. Horge*, 2020 WL 6273932 (S.D.N.Y. 2020) ....................................... 25

*United States v. Huff*, 2014 WL 7192410 (S.D.N.Y. 2014) ..................................... 17, 26

*United States v. Ivanova*, 2014 WL 11510255 (S.D.N.Y. 2014)................................... 25

*United States v. Jimenez*, 824 F. Supp. 351 (S.D.N.Y. 1993) ................................. 18, 26

*United States v. Lobo*, 2017 WL 1102660 (S.D.N.Y. 2017) ......................................... 17

*United States v. Marcos*, 1989 WL 156289 (S.D.N.Y. 1989) ....................................... 16

*United States v. Noriega*, 117 F.3d 1206 (11th Cir. 1997) ..................................... 14, 19

*United States v. Noriega*, 746 F. Supp. 1506 (S.D. Fla. 1990)........................... 12, 21, 23

*United States v. Parris*, 2014 WL 2745332 (S.D.N.Y. 2014) ...................................... 15

*United States v. Rigas*, 258 F. Supp. 2d 299 (S.D.N.Y. 2003) ..................................... 26

*United States v. Rosenthal*, 793 F.2d 1214 (11th Cir.) .......................................... 17, 26

*United States v. Rosenthal*, 801 F.2d 378 (11th Cir. 1986) ......................................... 17

*United States v. Santana*, 2015 WL 5781413 (S.D.N.Y. 2015) ................................... 15

*United States v. Santiago*, 174 F. Supp. 2d 16 (S.D.N.Y. 2001) ................................. 16

*United States v. Shkreli*, 2016 WL 8711065, (E.D.N.Y. 2016) .................................... 16

*United States v. Sims*, 808 F. Supp. 607 (N.D. Ill. 1992) ............................................ 27

*United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336 (2d Cir. 2021)............... 14, 19

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ............................................................ 15

*United States v. Wedd*, 2016 WL 1055737 (S.D.N.Y. 2016) .......................................... 15, 16, 24

*United States v. White*, 2015 WL 72183 (W.D.N.Y. 2015)............................................... 17, 26

*United States* v. *Yun Lee*, 2013 WL 4889178 (S.D.N.Y. 2013) ............................................. 15, 26

*Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480 (1983) ................................................ 13

*Walid Makled-García*, S1 09 Cr. 614 (RWS).......................................................................... 7

*Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass 1995).................................................... 11, 23

*Yousuf v. Samantar*, 493 F. App'x 106 (D.C. Cir. 2012)......................................................... 12

*Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012) ......................................................... 10, 11, 20

**Statutes**

18 U.S.C. § 924 ........................................................................................................................ 2

28 U.S.C. § 1330 ...................................................................................................................... 9

28 U.S.C. § 1602 ...................................................................................................................... 9

**Rules**

Federal  Rule of Criminal Procedure 7 .................................................................................. 15

Federal Rule of Criminal Procedure 16 ................................................................ 2, 18, 25, 28

The Government respectfully submits this memorandum in opposition to the pretrial motions (the "Motions") of Cliver Antonio Alcalá Cordones (the "defendant"), one of the defendants in the above-captioned case.  In his Motions, the defendant argues that (1) the Court should dismiss the operative indictment, S2 11 Cr. 205 (AKH) (the "Indictment"), under the doctrine of foreign official immunity, *see* Def.'s Mot. 7–19; (2) the Court should order the Government to provide the defense with a bill of particulars, *id.* at 20–29; and (3) the Court should order the Government to disclose information in its possession regarding the defendant's alleged "involvement in anti-Maduro activities as well as the identities of witnesses who have failed to indicate [the defendant's] involvement in the alleged conspiracy," *id.* at 29–31.

The defendant's Motions should be denied.  First, the defendant is not entitled to foreign official immunity for the criminal acts that underlie the charges against him because he acted outside his official capacity when he committed those acts; Venezuela has not requested foreign official immunity on his behalf; and the Court should defer to the view of the Executive Branch that he is not entitled to foreign official immunity.

Second, the defendant is not entitled to a bill of particulars, because the 28-page speaking Indictment, the voluminous discovery that the Government has produced, the additional information about the defendant's involvement in the charged offenses that the Government provides in this memorandum, and the Government's commitment to providing Jencks Act material at least 30 days before trial are collectively more than sufficient information to enable the defendant to meet the charges against him and avoid prejudicial surprise, such that a bill of particulars is unwarranted under the applicable legal standard.

Third, the Government has already produced substantial discovery regarding the defendant's alleged "involvement in anti-Maduro activities," Def.'s Mot. 29; the Government has

not identified any witness statements in its possession in which a witness affirmatively stated that the defendant was not involved in a drug trafficking conspiracy and/or was not involved in a conspiracy to provide support to the Fuerzas Armadas Revolucionarias de Colombia (the "FARC"); and the Government will continue to comply with its obligations under Rule 16, *Brady*, and *Giglio*.  The defendant's motion to compel additional discovery is therefore moot.

For the foregoing reasons, and as described in greater detail below, the Government respectfully requests that the Court deny the defendant's Motions.

## BACKGROUND

### I.  Factual and Procedural Background

On March 5, 2020, a grand jury in this District returned the Indictment, which charges the defendant and Nicolás Maduro Moros ("Maduro"), Diosdado Cabello Rondón ("Cabello"), Hugo Armando Carvajal Barrios, a/k/a "Ell Pollo" ("Carvajal"), Luciano Marín Arango, a/k/a "Ivan Marquez" ("Marín"), and Seuxis Paucis Hernández Solarte ("Hernández") (collectively, the "defendants"), with (1) narco-terrorism conspiracy, in violation of Title 21, United States Code, Section 960a; (2) cocaine-importation conspiracy, in violation of Title 21, United States Code, Section 963; (3) possession of machineguns and destructive devices, in violation of Title 18, United States Code, Sections 924(c)(1)(A), 924(c)(1)(B)(ii), and 2; and (4) conspiracy to possess machineguns and destructive devices, in violation of Title 18, United States Code, Section 924(o). *See* Indictment (Dkt. No. 11).  As alleged in the Indictment, the charges stem from the defendants' participation in a corrupt and violent conspiracy involving the *Cártel de Los Soles*, or "Cartel of the Suns" (the "Cartel"), and the FARC, from 1999 until 2020.  *Id.* ¶ 1.

The Cartel was a Venezuelan drug-trafficking organization comprised of high-ranking Venezuelan officials who abused their positions and corrupted the legitimate institutions of

Venezuela—including parts of the military, intelligence apparatus, legislature, and judiciary—to facilitate the importation of tons of cocaine into the United States. *Id.* ¶ 3. The name of the Cartel is a reference to the sun insignias affixed to the uniforms of high-ranking Venezuelan military officials who were members of the Cartel. *Id.* The former President of Venezuela, Hugo Rafael Chávez Frias ("Chávez"), was one of the leaders of the Cartel until his death in 2013. *See id.* ¶ 7. After Chávez died, Maduro assumed the Presidency and continued to lead the Cartel and participate in cocaine trafficking on a massive scale. *Id.* Under Maduro's leadership, the Cartel sought not only to traffic massive quantities of cocaine for financial gain, but also to weaponize the drug by "flooding" the United States with it, thereby inflicting the drug's harmful and addictive effects on users in this country. *Id.* ¶ 4. In other words, whereas most drug-trafficking organizations in South and Central America have sought to recede from their roles in importing drugs into the United States in an effort to avoid U.S. prosecution, the Cartel, under the leadership of Maduro and others, prioritized using cocaine as a weapon against the United States and importing as much cocaine as possible into the United States to harm the U.S. population. *Id.*

For decades, the FARC was one of the largest cocaine producers in the world, operating cocaine fields and laboratories in Colombia and Venezuela. *See id.* ¶ 2. The FARC has also directed violent acts against U.S. persons and property in foreign jurisdictions, including, but not limited to, Colombia. *Id.* ¶ 11. For example, the FARC leadership ordered FARC members to kidnap and murder U.S. citizens and to attack U.S. interests in order to dissuade the United States from continuing its efforts to fumigate FARC coca fields and disrupt the FARC's manufacturing and distribution of cocaine and cocaine paste. *Id.* Consistent with these activities, in 1997, the

U.S. Department of State (the "State Department") designated the FARC as a Foreign Terrorist Organization.  *Id.*  The FARC remained so designated until November 30, 2021.[1]

For over 20 years, the FARC and the Cartel worked together to produce and distribute massive quantities of cocaine.  The defendants were all either leaders of the Cartel or the FARC during that time period.  Starting in 1999, while the FARC purported to negotiate peace with the Colombian government, the FARC also agreed with leaders of the Cartel to move certain cocaine-production operations to Venezuela under the protection of the Venezuelan government.  Indictment ¶ 14(a).  FARC members and associates began to cultivate coca leaves on farms in this region, such as southwest Colombia and in the mountain range spanning the Venezuela-Colombia border.  *Id.* ¶ 14(b).

The FARC and the Cartel dispatched processed cocaine from Venezuela, often to the United States, via transshipment points in Central America and the Caribbean, including Honduras. *Id.* ¶ 14(c).  The maritime shipments were shipped north from Venezuela's coastline using go-fast vessels, fishing boats, and container ships. *Id.*  Air shipments were often dispatched from clandestine airstrips, typically made of dirt or grass, concentrated in Apure State, Venezuela.  *Id.* In order to safely transport this cocaine, members and associates of the FARC and the Cartel paid bribes, which ultimately benefited the defendants who worked in the Venezuelan government, for access to ports and airspace and protection from arrest and investigation.  *Id.* ¶ 14(d).  In addition, the defendant, Maduro, Cabello, and Carvajal, along with other high-ranking members of the Venezuelan government, coordinated with the FARC to transport and distribute those large

---

[1] *See* State Department, Press Statement, Nov. 30, 2021, *available at* https://www.state.gov/revocation-of-the-terrorist-designations-of-the-revolutionary-armed-forces-of-colombia-farc-and-additional-terrorist-designations/ (last visited Feb. 10, 2022).

cocaine shipments; benefit from, and cause others to participate in, the provision of heavily armed security to protect the cocaine shipments; cause large quantities of previously seized cocaine to be sold to drug traffickers in exchange for millions of dollars; interfere with drug-trafficking investigations and pending criminal cases in Venezuela and elsewhere; and help provide the FARC with military-grade weapons, including machineguns, ammunition, rocket launchers, and explosives equipment. *Id.* ¶ 14(e). The defendant played an important role in facilitating the foregoing activities. For example, in 2008, the defendant, Cabello, and Carvajal held a meeting at which they agreed that the defendant would take on additional duties coordinating drug-trafficking activities by the Cartel and the FARC. Indictment ¶ 14(g).

In addition to the foregoing, the Government anticipates that witness testimony at trial will further establish the defendant's participation and particular role in the charged conspiracies. For example, the Government anticipates that witness testimony will establish the following facts, in substance and among others, that specifically relate to the defendant. In 2007, the defendant helped provide security for Marín, one of the highest-ranking members of the FARC. The defendant was a personal friend of Marín and used his authority as the highest-ranking Venezuelan military official in the area to release FARC cocaine when it was seized at Venezuelan security checkpoints. Additionally, in 2008, the defendant attended a meeting with other members of the Cartel and drug traffickers associated with the FARC. At the meeting, attendees discussed ways in which the FARC and members of the Cartel could cooperate, including by allowing FARC aircraft transporting drugs to access landing strips along the Venezuela-Colombia border, providing weapons to the FARC, and facilitating the movement of FARC members across the Venezuela-Colombia border with the necessary paperwork. At another meeting in 2008 at the Venezuelan presidential palace, Chávez instructed Cabello, Carvajal, and other high-ranking

members of the Cartel to "flood" the United States with drugs, appointing Cabello to lead this effort. Carvajal also told the group that he would speak to the defendant about the defendant's new assignment, which was managing efforts by other military personnel to facilitate cocaine trafficking in Venezuela. Around the same time, at a meeting between the defendant and a drug trafficker associated with the FARC, the defendant stated that the purpose of the meeting was to affirm the commitment of the Venezuelan military to assisting the FARC. The defendant further stated that Venezuelan military radar would not be used to intercept FARC drug aircraft. Following the meeting, the defendant placed a Venezuelan military officer under his command in charge of the day-to-day relationship with the FARC and its associated drug traffickers. The officer thereafter regularly consulted with the defendant to obtain his permission to engage in activities designed to assist the FARC. In 2014, the defendant attended a meeting at which he discussed the FARC's continued drug-trafficking activities near the Venezuela-Colombia border.

## II.   The Government's Discovery Productions

On July 22, 2020, the Court entered a protective order governing the production of unclassified discovery material in this case. *See* Dkt. No. 31. Since then, the Government has produced voluminous unclassified discovery to the defendant that exceeds the requirements of Rule 16 of the Federal Rules of Criminal Procedure, *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny. To date, the Government has made seven productions of unclassified discovery material to the defendant, totaling over 105 gigabytes of data, which are summarized below.

On June 30, 2020, the Government produced the following materials:

- the Indictment;

- DEA reports and attachments related to the defendant's arrest;

- U.S. Marshals Service intake forms for the defendant; and

- the complaint in *United States v. Adel El Zabayar*, 20 Mag. 5469 (S.D.N.Y.), in which a co-conspirator of the defendant is charged.

On September 4, 2020, the Government produced the following materials:

- search warrants and accompanying affidavits for various electronic accounts, including accounts used by the defendant;

- materials related to the cocaine-importation conspiracy charged in *United States v. Hernandez-Solarte, et al.*, 18 Cr. 262 (VEC), in which Hernández and three other individuals associated with the FARC are charged, including audio and video recordings, draft translations of transcripts, DEA reports, and documents received pursuant to a Mutual Legal Assistance Treaty ("MLAT") request from Colombia;

- publicly available video and audio recordings of members of the charged conspiracies, including the defendant;

- materials related to the cocaine-importation conspiracy charged in *United States v. Flores*, 15 Cr. 765 (PAC), in which two of Maduro's nephews were convicted, including trial transcripts and exhibits, suppression hearing transcripts and exhibits, audio and video recordings, phone records, business records, and draft translations;

- subpoena returns obtained during the course of the investigation of the defendant and his co-conspirators;

- materials related to the cocaine-importation conspiracy charged in *United States v. Walid Makled-García*, S1 09 Cr. 614 (RWS), in which Walid Makled-García, an alleged large-scale narcotics trafficker allegedly associated with the Cartel and the FARC, is charged, including DEA reports, audio recordings, draft translations, and other materials obtained from Venezuela;

- documents memorializing statements that the defendant made to law enforcement; and

- data obtained pursuant to search warrants from the defendant's two Instagram accounts and the defendant's Twitter account.

On November 24, 2020, the Government produced the following materials:

- search warrants and accompanying applications for various electronic accounts, including accounts believed to be used by the defendant;

- additional documentation relating to the defendant's arrest, including items seized incident to his arrest;

- additional subpoena returns from various entities and an accompanying index;

- materials related to the 5.6-ton cocaine shipment discussed in Indictment ¶ 15(d), including DEA reports about the seizure; photographs taken in connection with the seizure; and data and information related to the aircraft used to transport the cocaine;

- materials related to a May 10, 2009 seizure of approximately 1,645 kilograms of cocaine in Honduras, including law enforcement reports and other documentation; photographs taken in connection with the seizure; a report related to the aircraft used to transport the cocaine; and indictment 09 Cr. 529 (DAB), in which two individuals arrested in connection with the seizure are charged;

- materials related to the 1.3-ton cocaine shipment discussed in Indictment ¶ 15(i), including DEA reports about the seizure; photographs taken in connection with the seizure; and documentation provided by foreign law enforcement;

- materials received through a DEA tip line regarding the charges contained in the Indictment;

- materials related to Cabello, including business and financial documents and related photographs;

- various other recordings, financial records, and emails obtained during the course of the investigation; and

- the complaint in *Silvercorp USA, Inc. v. Rendon*, a civil litigation regarding alleged efforts to overthrow the Maduro regime in Venezuela, in which the defendant's alleged role in those efforts is discussed.

8

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

## DISCUSSION

### I. Applicable Law

#### A. Foreign Official Immunity

When a case involves a foreign official, as opposed to a foreign state, "the issue of immunity is governed by the common law, not the Foreign Sovereign Immunities Act," 28 U.S.C. §§ 1330, 1602 *et seq.* (the "FSIA"). *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019) (citing *Samantar v. Yousuf*, 560 U.S. 305, 325 (2010)); *accord Broidy v. Glob. Risk Advisors LLC*, No. 19-CV-11861, 2021 WL 1225949, at *5 (S.D.N.Y. Mar. 31, 2021).

"The common law recognizes both a 'status-based' immunity, which is absolute and awarded to sitting heads of state, and a 'conduct-based' immunity, a more qualified immunity that may be awarded to individuals for acts undertaken in an official capacity on behalf of a government (regardless of current tenure)." *Omari v. Ras Al Khaimah Free Trade Zone Auth.*, No. 16-CV-3895, 2017 WL 3896399, at *10 (S.D.N.Y. Aug. 18, 2017), *aff'd sub nom.*, *El Omari v. Kreab (USA) Inc.*, 735 F. App'x 30 (2d Cir. 2018); *see Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir.

---

█████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

2009) ("Common law recognizes the immunity of former foreign officials.  At the time the FSIA was enacted, the common law of foreign sovereign immunity recognized an individual official's entitlement to immunity for acts performed in his official capacity.  An immunity based on acts— rather than status—does not depend on tenure in office." (citations and internal quotation marks omitted)); *accord In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181, 185 (S.D.N.Y. 2015) (holding that the common law "distinguishes between two types of immunity: (1) 'status-based' immunity [such as] that awarded to sitting heads-of-state and (2) 'conduct-based' immunity that is awarded to individuals acting on behalf of a sovereign government"); *Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272, 277 (S.D.N.Y. 2015).  This form of "conduct-based immunity" is also frequently referred to as "foreign official immunity."  *See, e.g.*, *Appel v. Hayut*, No. 20-CV-6265, 2021 WL 2689059, at *5 (S.D.N.Y. June 30, 2021).

Courts deciding whether to grant foreign official immunity to a former foreign official distinguish between "official acts performed within the scope of his duty," for which he may be entitled to immunity, and "private acts where the officer purports to act as an individual and not as an official," for which he is not. *Yousuf v. Samantar*, 699 F.3d 763, 775 (4th Cir. 2012) (alterations and internal quotation marks omitted).  "A foreign official or former head-of-state will . . . not be able to assert this immunity for private acts that are not arguably attributable to the state, such as drug possession or fraud." *Id.*; *cf. In re Doe*, 860 F.2d 40, 45 (2d Cir. 1988) ("[W]ere we to reach the merits of the issue, we believe there is respectable authority for denying head-of-state immunity to a former head-of-state for private or criminal acts in violation of American law."); *In re Est. of Ferdinand Marcos, Hum. Rts. Litig.*, 25 F.3d 1467, 1472 (9th Cir. 1994) ("A lawsuit against a foreign official acting outside the scope of his authority does not implicate any of the foreign diplomatic concerns involved in bringing suit against another

10

government in United States courts."); *Richardson v. Att'y Gen. of the Brit. Virgin Islands*, No. CV-2008-144, 2013 WL 4494975, at *16 (D.V.I. Aug. 20, 2013) (granting foreign official immunity in part because there was "no indication that [the foreign official] undertook private or criminal acts in violation of American law").

When courts analyze whether a former foreign official was acting "within the scope of his duty," such that he may be entitled to immunity, they have frequently asked—including when addressing the question in the context of the FSIA, before the Supreme Court clarified that foreign official immunity is governed by the common law in *Samantar*—whether the acts of the official violated the domestic law of the relevant foreign sovereign, and whether or not that sovereign "expressly ratified the defendant's actions and affirmed that the defendant was acting pursuant to his official duties." *Matar v. Dichter*, 500 F. Supp. 2d 284, 292 (S.D.N.Y. 2007), *aff'd*, 563 F.3d 9 (2d Cir. 2009); *see Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1106 (9th Cir. 1990) ("[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions.  The officer is not doing the business which the sovereign has empowered him to do." (alterations and internal quotation marks omitted)); *Doe v. Qi*, 349 F. Supp. 2d 1258, 1287 (N.D. Cal. 2004) (holding that former foreign officials were not immune where their "alleged human rights violations" were "prohibited by" and "inconsistent with Chinese law," notwithstanding that Chinese government appeared "to have covertly authorized but publicly disclaimed" those actions); *Doe v. Bolkiah*, 74 F. Supp. 2d 969, 973–74 (D. Haw. 1998) (holding that former foreign official was not immune for alleged recruitment of "numerous women . . . to perform unlawful acts of prostitution," which "illicit acts . . . would fall outside the scope of any of his official duties"); *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1198 (S.D.N.Y. 1996) (holding that former foreign official was not immune, in part because he did not "claim that

11

the acts of torture he is alleged to have committed . . . are not prohibited by the laws of Ghana"); *Xuncax v. Gramajo*, 886 F. Supp. 162, 176 & n.10 (D. Mass 1995) (holding that acts of former foreign official "exceed[ed] anything that might be considered to have been lawfully within the scope of [his] official authority," in part because there was "no suggestion that either the past or present governments of Guatemala characterizes the actions . . . as officially authorized" (internal quotation marks omitted)).[3]

Further, in the analogous context of the act-of-state doctrine, the Second Circuit has held that, "[t]o qualify as 'official,' an act must be imbued with some level of formality, such as authorization by the foreign sovereign through an official 'statute, decree, order, or resolution,'" and that "acts that flagrantly violate a foreign state's own laws cannot, at the same time, constitute official acts entitled to deference." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 60–61 (2d Cir. 2019) (quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695 (1976))); *see United States v. Noriega*, 746 F. Supp. 1506, 1522 (S.D. Fla. 1990) (rejecting act-of-state defense for former Panamanian military officer charged with narcotics trafficking, holding that defendant's "alleged drug trafficking and protection of money launderers could [not] conceivably constitute public action taken on behalf of the . . . state," as indictment did not allege that defendant committed such acts "in furtherance of . . . state policy or to serve some overriding national interest," and rejecting defendant's argument that "[t]he fact that [he] is alleged to have utilized his official position to engage in criminal activity . . . cast[s] his actions in public light," because

---

[3] *See Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247, 250 (D.D.C. 2011) ("rules that appellate courts developed for foreign official immunity under the FSIA may be correct as a matter of common-law principles" (internal quotation marks omitted) (citing *Samantar*, 560 U.S. at 322 n.17)), *aff'd*, 493 F. App'x 106 (D.C. Cir. 2012); *accord Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 234 (D.D.C. 2018), *aff'd*, No. 18-7170, 2019 WL 668339, at *1 (D.C. Cir. Feb. 15, 2019)).

"government officials are as capable of exploiting their positions of power for private, selfish ends as they are for public purpose"; the court further explained that "[t]he inquiry is not whether Noriega used his official position to engage in the challenged acts, but whether those acts were taken on behalf of Noriega instead of Panama"); *see also Filartiga v. Pena-Irala*, 630 F.2d 876, 889 (2d Cir. 1980) (discussing act-of-state doctrine and expressing "doubt whether action by a state official in violation of the Constitution and laws of the Republic of Paraguay, and wholly unratified by that nation's government, could properly be characterized as an act of state"); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir. 1988) (discussing act-of-state doctrine and stating that "[o]ur courts have had no difficulty in distinguishing the legal acts of a deposed ruler from his acts for personal profit that lack a basis in law").

Courts do not determine the applicability of immunity doctrines like foreign official immunity in a vacuum.  Rather, as the Second Circuit has explained, courts "'defer[ ] to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities.'"  *Matar*, 563 F.3d at 14 (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983)).  That deference flows from the recognition that cases in which those doctrines are asserted "typically raise[ ] 'questions of policy rather than of law,'" and are "'for diplomatic, rather than legal discussion.'"  *Matar*, 563 F.3d at 13 (alterations omitted) (quoting *The Schooner Exch. v. McFaddon*, 11 U.S. 116, 146 (1812)); *see Doe*, 860 F.2d at 45 (noting that "the judicial branch is not the most appropriate one to define the scope of immunity for heads-of-state"; that "the executive branch naturally has greater experience and expertise in" "the field of foreign relations"; and that "flexibility to react quickly to the sensitive problems created by conflict between individual private rights and interests of international comity are better resolved by the executive,

13

than by judicial decision").  Thus, in a criminal case in which the defendant invoked the common law of foreign sovereign immunity, the Second Circuit held that "the decision to bring criminal charges would have necessarily manifested the Executive Branch's view that no sovereign immunity existed," indicating that the defendant is not immune under common law.  *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 351 (2d Cir. 2021).  Similarly, the Eleventh Circuit held that head-of-state immunity did not apply where "[t]he Executive Branch [did] not merely refrain[ ] from taking a position" on the matter, but "manifested its clear sentiment that [the defendant] should be denied head-of-state immunity," by "pursuing [the defendant's] capture and . . . prosecution."  *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997).

In addition to the decisions of the Executive Branch, courts also consider the decisions of the foreign sovereigns that the claims of immunity implicate.  "The diplomatic representative of the implicated sovereign may request that the State Department make a suggestion of immunity, and if the State Department agrees immunity is appropriate, the district court typically dismisses the case on that ground."  *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 798 (D.C. Cir. 2021); *see, e.g.*, *Matar*, 563 F.3d at 14 (holding that foreign official was entitled to immunity because State Department and Justice Department had filed Statement of Interest recognizing official's entitlement to immunity and urging that case be dismissed on immunity grounds).

Moreover, it is not only the action, but also the inaction, of the implicated foreign sovereign that can be relevant for determining whether immunity applies.  As the D.C. Circuit recently explained, where the foreign sovereign "on whose behalf the defendant[ ] purportedly acted" does not "indicate[ ] any interest in th[e] case, whether by requesting a formal suggestion of immunity or otherwise," it "weighs heavily against immunity."  *Broidy Cap. Mgmt. LLC*, 12 F.4th at 800.  The D.C. Circuit concluded that "State Department practice suggests" that a foreign

14

sovereign's "apparent silence on [a] case" is an important factor in assessing immunity. *See id.*; *see also Noriega*, 117 F.3d at 1212 (holding that, "even if th[e] court had to make an independent determination regarding the propriety of" head-of-state immunity, it would not grant it, in part because "Panama has not sought immunity for Noriega").

### B.   Bill of Particulars

The proper scope and function of a bill of particulars is to provide sufficient information about the nature of the charge to enable a defendant to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense. Fed. R. Crim. P. 7(f); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). A bill of particulars is required "'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *United States v. Wedd*, No. 15-CR-616, 2016 WL 1055737, at *3 (S.D.N.Y. Mar. 10, 2016) (quoting *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999)). That is because "[t]he purpose of the bill of particulars is to avoid prejudicial surprise at trial and give [a] defendant sufficient information to meet the charges against him." *Wedd*, 2016 WL 1055737, at *3. Thus, "a bill of particulars is not a discovery device and should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense." *United States v. Yun Lee*, No. 13-CR-290, 2013 WL 4889178, at *1 (S.D.N.Y. Sept. 9, 2013) (internal quotation marks omitted); *accord United States v. Dames*, 380 F. Supp. 2d 270, 274 (S.D.N.Y. 2005).

In this Circuit, "demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied." *United States v. Santana*, No. 13-CR-147, 2015 WL 5781413, at *2 (S.D.N.Y. Oct. 1, 2015) (internal quotation marks omitted). "It is well settled that defendants need not know the means by which it

is claimed they performed acts in furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove their criminal acts.  Details as to how and when the conspiracy was formed, or when each participant entered it, need not be revealed before trial." *United States v. Parris*, No. 13-CR-17, 2014 WL 2745332, at \*5 (S.D.N.Y. June 17, 2014).  That is particularly true "[i]n the context of prosecutions of narcotics conspiracies," where "courts have consistently refused to grant a bill of particulars requesting the following kinds of information: (1) when the conspiracy was formed; (2) when the defendant joined the conspiracy; and (3) how the Government alleges the defendant performed acts in furtherance of the conspiracy." *United States v. Santiago*, 174 F. Supp. 2d 16, 35 (S.D.N.Y. 2001); *see United States v. Campo Flores*, No. 15 Cr. 765, 2016 WL 5946472, at \*11 (S.D.N.Y. Oct. 12, 2016) (in case charging narcotics-importation conspiracy, holding that Government had "no obligation" to provide the "when," "where," and "with whom" of conspiracy).

Courts routinely deny motions for bills of particulars where, as here, the charging instrument is a speaking indictment.  *See, e.g.*, *United States v. Carroll*, No. 19-CR-545, 2020 WL 1862446, at \*6 (S.D.N.Y. Apr. 14, 2020) (finding "no basis for a bill of particulars" where "[t]he charges against the defendants are explained in detail in a lengthy speaking indictment, and the charges track the language of the applicable statutes while stating the time and place in approximate terms of the charged conspiracy"); *United States v. Shkreli*, No. 15-CR-637, 2016 WL 8711065, at \*5 (E.D.N.Y. Dec. 16, 2016) (denying motion for bill of particulars in part because "the Superseding Indictment is a detailed 'speaking' indictment"); *Wedd*, 2016 WL 1055737, at \*3 (denying motion for bill of particulars in part because "the Indictment is a 'speaking' Indictment that provides a significant amount of detail as to the Government's theory of the case and the nature of the proof that will underlie the charges at trial," including "a

chronology of the formation of the scheme" and "approximate dates of key events that were part of the scheme"); *United States v. Marcos*, No. 87-CR-598, 1989 WL 156289, at *2 (S.D.N.Y. Dec. 21, 1989) (describing "[t]he suggestion that the Indictment is vague or confusing" as "inaccurate and misleading" where indictment was "a speaking indictment which provides [the defendant] with many particulars of the type and extent of the alleged criminal activities").

Where, as here, the Government has produced voluminous and itemized discovery, that provides another basis for denying a motion for a bill of particulars. *See, e.g.*, *Carroll*, 2020 WL 1862446, at *6 (holding that "the provision of voluminous discovery in combination with some guidance about what is most relevant can vitiate a need for further particulars"); *United States v. Lobo*, No. 15-CR-174, 2017 WL 1102660, at *2 (S.D.N.Y. Mar. 22, 2017) (denying bill of particulars in part because Government produced discovery including "videos obtained by . . . confidential sources," "draft translations of transcripts of the meeting," and "search warrant affidavits that describe its investigation and evidence"); *United States v. Heatley*, 994 F. Supp. 483, 488 (S.D.N.Y. 1998) (denying motion for bill of particulars in part because of "the extensive discovery the Government . . . has given to the defendants," which in conjunction with indictment was "more than sufficient to avoid surprise at trial and double jeopardy").

The same is true where, as here, the Government commits to producing Jencks Act material well before trial. *See, e.g.*, *United States v. Huff*, No. 12-CR-750, 2014 WL 7192410, at *2 (S.D.N.Y. Dec. 17, 2014) (denying motion for bill of particulars and ordering production of Jencks Act material four weeks before trial); *United States v. White*, No. 13-CR-255, 2015 WL 72183, at *2 (W.D.N.Y. Jan. 6, 2015) (denying motion for bill of particulars where Government committed to providing Jencks Act material two weeks before trial); *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir.) (affirming denial of motion for bill of particulars in part because defendant

"was in possession of the Jencks' material and tape recordings of [a key witness] several weeks in advance of his testimony"), *modified*, 801 F.2d 378 (11th Cir. 1986).

The extremely limited nature of the circumstances in which it is appropriate for a court to grant a motion for a bill of particulars is in part a reflection of the legitimacy and weight of the Government's interest in avoiding potential witness safety risks attendant to disclosures beyond those required by Rule 16, *Giglio*, and *Brady*. *See United States v. Gotti*, No. 02-CR-743, 2004 WL 32858, at *9 (S.D.N.Y. Jan. 6, 2004) (denying defendant's request for disclosure of identities of co-conspirators, witnesses, and victims because "Government has a legitimate concern about the safety of those individuals it intends to call at trial"). Additionally, detailed inquiries into the Government's evidence through bills of particulars far in advance of trial unduly restrict the Government's ability to present additional proof to the jury derived from its ongoing investigation and trial preparation. *See United States v. Jimenez*, 824 F. Supp. 351, 363 (S.D.N.Y. 1993) (holding that bill of particulars may not be used "to foreclose the Government from using proof it may develop as the trial approaches"). Furthermore, "[t]he danger of defendants tailoring their testimony to explain away the Government's case, which has been disclosed in advance, is not unreal." *United States v. Cimino*, 31 F.R.D. 277, 279 (S.D.N.Y. 1962).

## II.  Argument

### A.  The Defendant Is Not Entitled to Foreign Official Immunity

The defendant is not entitled to foreign official immunity for three reasons. First, the defendant was not acting in his official capacity when committed the offenses alleged in the Indictment. Second, the absence of any request by Venezuela for foreign official immunity for the defendant weighs heavily against immunity. Third, the Court should defer to the view of the Executive Branch that the defendant is not entitled to foreign official immunity.

      **i.**    **The Defendant Is Not Entitled to Foreign Official Immunity Because He Was Not Acting in His Official Capacity When He Committed the Offenses Alleged in the Indictment**

The defendant is not entitled to foreign official immunity because he was not acting in his official capacity as a Venezuelan government official when he engaged in the cocaine-trafficking, narco-terrorism, and weapons offenses alleged in the Indictment.  As an initial matter, the defendant does not even appear to claim that he is entitled to immunity for the charged cocaine-importation offense.  In his Motions, the defendant "adamantly rejects any allegation of having engaged in narco-trafficking."  Def.'s Mot. 1; *see also id.* at 4 ("Over the course of his career, [the defendant] was steadfast and unwavering in his opposition to narco-trafficking . . . .").  The defendant cannot simultaneously deny his participation in the narcotics-importation conspiracy and argue that it was within the scope of his duty.  Regardless, participating in a conspiracy to import massive quantities of cocaine into the United States plainly was not undertaken in the defendant's official capacity.  *See Samantar*, 699 F.3d at 775 (foreign official cannot assert immunity for "private acts that are not arguably attributable to the state, such as drug possession").  Nor could the defendant make any legitimate "claim that the acts of" drug trafficking "he is alleged to have committed . . . are not prohibited by the laws of" Venezuela.  *See Cabiri*, 921 F. Supp. at 1198; *see also Kashef*, 925 F.3d at 60–61 ("acts that flagrantly violate a foreign state's own laws cannot, at the same time, constitute official acts entitled to deference").  Much like Noriega, the defendant is a former foreign military official who abused his position to engage in large-scale narcotics trafficking, and he is clearly not entitled to immunity for that activity.  *See Noriega*, 746 F. Supp. at 1522 ("[defendant's] alleged drug trafficking and protection of money launderers could [not] conceivably constitute public action taken on behalf of the . . . state").

The defendant's claim of immunity for the alleged narco-terrorism and weapons offenses fares no better and fails on both factual and legal grounds. Essentially, the defendant argues that, because he and some of his co-defendants held positions in the Venezuelan government, and because certain of those co-defendants were more powerful than he was, then he must have been acting in his official capacity when he purportedly followed their instructions in engaging in the alleged criminal conduct. *See generally* Def.'s Mot. 13. Specifically, the defendant focuses on his alleged 2008 meeting with Carvajal and Cabello and argues that "the sole act tying [him] to the criminal charges is a meeting with a superior ranking officer and a government official." *Id.*

The argument is easily rejected. As the Indictment and the other evidence described above make clear, when the defendant and his co-conspirators met in 2008, and at other points during the conspiracies, they were meeting not in their official capacities, but in their private capacities, as members and associates of the Cartel plotting to violate not only U.S. law, but also Venezuelan law, insofar as it criminalizes drug trafficking. Indeed, this principle is at the very core of the crimes alleged in this case. Instead of legitimately exercising the sovereign power of Venezuela, the defendant and other Venezuelan officials comprising the Cartel "abused the Venezuelan people and corrupted the legitimate institutions of Venezuela—including parts of the military, intelligence apparatus, legislature, and the judiciary—to facilitate the importation of tons of cocaine into the United States." Indictment ¶ 3.

Moreover, the 2008 meeting is far from "the sole act tying [the defendant] to the criminal charges." Def.'s Mot. 13. The defendant committed many other acts in furtherance of the charged offenses, as described above, *supra* at 5–6, and as the Government will prove at trial. The defendant's participation in the charged conspiracies included, among other things, releasing FARC cocaine when it was seized at Venezuelan security checkpoints; allowing FARC aircraft

transporting drugs to access landing strips along the Venezuela-Colombia border; facilitating the movement of FARC members across the Venezuela-Colombia border with the necessary paperwork; managing efforts by other military personnel to facilitate cocaine trafficking in Venezuela; arranging that Venezuelan military radar would not be used to intercept FARC drug aircraft; and otherwise enabling the FARC's drug trafficking near the Venezuela-Colombia border. Most if not all of the foregoing conduct involved drug trafficking. To the extent that it did, it was undertaken in violation of not only U.S. but also Venezuelan law, and therefore plainly fell outside the scope of the defendant's official duties as a military officer.

The mere fact that some of the defendant's co-conspirators also were government officials, and may have outranked him, hardly entitles him to immunity. Just as a single official can commit private criminal acts outside the scope of his duty, so too can a group of officials do so together. As the *Noriega* court explained in rejecting a similar argument, "[t]he fact that [a defendant] utilized his official position to engage in criminal activity does not . . . cast his actions in a public light; as we well know, government officials are as capable of exploiting their positions of power for private, selfish ends as they are for public purpose." *Noriega*, 746 F. Supp. at 1522. Put differently, "[t]he inquiry is not whether [the defendant] used his official position to engage in the challenged acts, but whether those acts were taken on behalf of [the defendant] instead of [Venezuela]." *Id.*; *cf. Marcos*, 862 F.2d at 1361 (an official's "acts for personal profit that lack a basis in law" are not entitled to immunity). Far from supporting any claim of immunity, the fact that the defendant, Carvajal, Cabello, and other co-conspirators were high-ranking Venezuelan officials and acted in concert only underscores just how extensive and deeply rooted their corruption was.

At bottom, the defendant is charged with trafficking ton-quantities of cocaine and arming a terrorist group.  He does not have any viable immunity claim for that conduct, which was not "conceivably" within his official duties.  *See Noriega*, 746 F. Supp. at 1522.  Consistent with that self-evident conclusion, and further undermining the defendant's immunity claim, is the fact that Venezuela has never made any effort to "expressly ratif[y] the defendant's actions and affirm[ ] that the defendant was acting pursuant to his official duties."  *See Matar*, 500 F. Supp. 2d at 292. Indeed, there is "no suggestion that either the past or present governments of [Venezuela] characterizes the actions . . . as officially authorized".  *See Xuncax*, 886 F. Supp. at 176 & n.10 (internal quotation marks omitted).

In sum, when the defendant committed the criminal acts that underlie the charges against him, he was acting in his private and not his official capacity, on behalf of himself and his co-conspirators and not Venezuela.  Insofar as those acts involved drug trafficking, they violated not only U.S. but also Venezuelan law.  Venezuela has neither ratified nor affirmed those acts.  For all those reasons, the defendant was acting outside the scope of his duty and is therefore not entitled to foreign official immunity.

### ii.   The Absence of Any Request by Venezuela for Foreign Official Immunity for the Defendant Weighs Heavily Against Immunity

Further reinforcing the conclusion that the defendant is not entitled to immunity is the fact that Venezuela, the foreign sovereign "on whose behalf the defendant[ ] purportedly acted," *see Broidy Cap. Mgmt. LLC*, 12 F.4th at 800, and to whom the "immunity protecting [former] foreign officials [like the defendant] for their official acts ultimately belongs," *see Wultz v. Bank of China Ltd.*, 32 F. Supp. 3d 486, 494 (S.D.N.Y. 2014) (internal quotation marks omitted), "has not indicated any interest in the case, whether by requesting a formal suggestion of immunity or otherwise," *see Broidy Cap. Mgmt. LLC*, 12 F.4th at 800.  Venezuela's failure to even attempt to

intervene on the defendant's behalf "weighs heavily against immunity."   *See id.* (alterations and internal quotation marks omitted).

### iii.    The Court Should Defer to the View of the Executive Branch that the Defendant Is Not Entitled to Foreign Official Immunity

The Court should defer to the view of the Executive Branch that the defendant is not entitled to foreign official immunity, which the Executive Branch has "manifested" through "the decision to bring charges" against the defendant, *see Turkiye Halk Bankasi A.S.*, 16 F.4th at 351, and to "pursu[e] [his] capture and . . . prosecution," *see Noriega*, 117 F.3d at 1212.   The defendant's immunity motion principally "raise[s] questions of policy rather than of law," *see Matar*, 563 F.3d at 13 (alterations and internal quotation marks omitted), which the Executive Branch is best suited to answer.   For example, the defendant protests the supposed "criminalization of the possession of weapons by a soldier on his native soil" and "the execution of policy decisions of an elected civilian government."   Def.'s Mot. 7.   He also defends the "Bolivarian Revolution," the "Bolivarian bloc of nations," "Venezuela's support for the FARC," and Venezuela's "right to reject" the U.S. designation of the FARC as an FTO "and render its own policy determination." *Id.* at 14–16.   Those arguments show that the defendant's objections to the Indictment are "for diplomatic, rather than legal discussion."   *See Matar*, 563 F.3d at 13 (internal quotation marks omitted).   As discussed above, as a legal matter, application of foreign official immunity is unwarranted.   This criminal prosecution is about the defendant's participation in a conspiracy to import massive quantities of cocaine into the United States and arm insurgents with military-grade weapons.   The defendant's attempt to inject politics into the prosecution should be rejected, and it provides no basis for granting him immunity.

**B.   The Defendant Is Not Entitled to a Bill of Particulars**

The defendant's request for a bill of particulars is unwarranted and should be denied.  The detailed, 28-page speaking Indictment; the Government's production of voluminous discovery, much of which specifically relates to the defendant; the additional specific information about the defendant's involvement in the charged offenses that the Government has provided in this memorandum; and the Government's commitment to providing Jencks Act material at least 30 days before trial are collectively more than sufficient to ensure that the defendant has "sufficient information to meet the charges against him" and "avoid prejudicial surprise," which are the purposes that a bill of particulars may serve.  *See Wedd*, 2016 WL 1055737, at *3.  Because those purposes are already served by the information described above, the defendant's motion for a bill of particulars is tantamount to an impermissible "fishing expedition" designed "to force the government to reveal all its evidence before trial," *United States v. Donovan*, No. 20-CR-374, 2021 WL 5819915, at *4 (E.D.N.Y. Dec. 6, 2021) (internal quotation marks omitted), which the Court should reject.

The information that the Government has provided to the defendant, and that will be supplemented through the production of additional Jencks Act material in advance of trial, provide ample notice to the defendant of the case against him, and the role that the Government alleges the defendant played in the charged offenses.  Among other things, that information specifies many of the acts that the defendant undertook in furtherance of those offenses; the defendant's primary co-conspirators in the offenses, including the five co-defendants named in the Indictment, Chávez, and the FARC leaders with whom the defendant collaborated on behalf of the Cartel; and the approximate dates of key events.  For example, as described above, the Government's evidence includes that the defendant helped provide security for Marín in 2007; released FARC cocaine

when it was seized at Venezuelan security checkpoints; attended a meeting with other members of the Cartel and drug traffickers associated with the FARC in 2008, at which attendees discussed ways in which the FARC and members of the Cartel could cooperate, including by allowing FARC aircraft transporting drugs to access landing strips along the Venezuela-Colombia border, providing weapons to the FARC, and facilitating the movement of FARC members between Colombia and Venezuela with the necessary paperwork; attended another meeting with a drug trafficker associated with the FARC in 2008, at which the defendant stated that the purpose of the meeting was to affirm the commitment of the Venezuelan military to assisting the FARC, and that Venezuelan military radar would not be used to intercept FARC drug aircraft; placed a Venezuelan military officer under his command in charge of the day-to-day relationship with the FARC and its associated drug traffickers, and consulted with that officer regarding activities designed to assist the FARC; and attended a meeting at which he discussed the FARC's continued drug-trafficking activities near the Venezuela-Colombia border in 2014.

The foregoing information, which as noted includes anticipated witness testimony, exceeds the requirements of Rule 16, *Brady*, and *Giglio*, and is more than sufficient to afford the defendant with adequate notice of the case against him, including the nature of the conspiracy and alleged co-conspirators, under the well-established law of this Circuit set forth above. *See, e.g.*, *United States v. Helbrans*, No. 19 Cr. 497 (NSR), 2021 WL 2873800, at *18 (S.D.N.Y. July 8, 2021) (denying defense request for disclosure of identities of co-conspirators "because such information must only be disclosed if and when the Government chooses to call such individuals as witnesses at trial"); *United States v. Horge*, No. 19 Cr. 96 (LTS), 2020 WL 6273932, at *3 (S.D.N.Y. Oct. 26, 2020) (denying defense request for disclosure of identities of co-conspirators, finding that the Government—through the charging instruments, discovery, and court filings—had provided the

defendant "with sufficient information to identify the charges against him, prepare for trial, prevent surprise, and to interpose a plea of double jeopardy"); *United States v. Ivanova*, No. 11 Cr. 614 (VM), 2014 WL 11510255, at *2 (S.D.N.Y. Mar. 19, 2014) (denying request for disclosure of identities of co-conspirators and holding that "information about the identities of other alleged conspirators treads impermissibly into the 'with whom' specifics of the charges, which is beyond the scope of a bill of particulars"). In short, the Government's has provided information, and will provide additional information in advance of trial, to ensure the defendant can effectively prepare his defense, while also protecting legitimate Government interests such as the safety of its witnesses. *See Gotti*, 2004 WL 32858, at *9; *Jimenez*, 824 F. Supp. at 363. Additionally, the Government's commitment to producing Jencks Act material 30 days before trial, well in advance of what is required by law, further establishes that the defendant's motion for a bill of particulars is meritless. *See Huff*, 2014 WL 7192410, at *2; *White*, 2015 WL 72183, at *2; *Rosenthal*, 793 F.2d at 1227. Further, the Government will follow its customary practice of marking and producing trial exhibits in advance of trial, which will serve as another safeguard ensuring that the defendant has an adequate opportunity to prepare his defense. *See United States v. Rigas*, 258 F. Supp. 2d 299, 304-05 (S.D.N.Y. 2003) (pretrial disclosure of trial exhibits can be factor supporting denial of request for bill of particulars).

A bill of particulars may not be used "as a general investigative tool for the defense." *Yun Lee*, 2013 WL 4889178, at *1. The defendant's request amounts to that and should be denied.

## C.  The Defendant's Motion to Compel Additional Discovery Is Without Merit

Lastly, the defendant requests that the Court order the Government to disclose information in its possession regarding the defendant's alleged "involvement in anti-Maduro activities as well as the identities of witnesses who have failed to indicate [the defendant's] involvement in the

alleged conspiracy." Def.'s Mot. 29–31.   As described above, and contrary to the inaccurate assertion in the Motions that "[n]o such information has been disclosed," Def.'s Mot. 29, the Government made substantial productions of such information.  *See supra* at 8–9.  As the Court is aware, the Government has also committed to making substantial productions of classified materials in this case.  *See* Dkt. No. 77 (protective order, pursuant to Classified Information Procedures Act, authorizing Government to provide defense counsel with classified substitutions).

With respect to the defense's motion to compel the disclosure of witness identities, the Government has not identified any witness statements in its possession in which a witness affirmatively stated that the defendant was not involved in a drug trafficking conspiracy and/or was not involved in a conspiracy to provide support to the FARC.  If the Government identifies any such statements, it will produce them.

The Government notes, however, that it is not required to provide all witness statements where the witness did not identify the defendant as a member of the charged conspiracies.  The Government's investigation into the Cartel and the FARC is significantly broader than its investigation into the defendant and has included numerous interviews of individuals involved in different aspects of those group's activities. As a result, the Government has interviewed a substantial number of witnesses who did not have any basis to know the defendant, and therefore often were not asked about the defendant, such that the fact that they did not affirmatively identify the defendant as a participant in the charged offenses is not probative or exculpatory. *See, e.g.*, *United States v. Galestro*, No. 06 Cr. 052 (ARR), 2008 WL 2783360, at *16–17 (E.D.N.Y. July 15, 2008) (recognizing the distinction under *Brady* between statements "by a speaker who had a 'specific connection' to [a] defendant and the event at issue," which would be subject to disclosure, and "general statements by a speaker lacking such connection that would not, when viewed in

context, be in any way probative or exculpatory" (internal quotation marks omitted)); *United States v. Sims*, 808 F. Supp. 607, 615 (N.D. Ill. 1992) ("Since [the defendant] made a general request for any communication of any informant or witness that did not mention [the defendant], the evidence must be disclosed only if 'obviously exculpatory' or if 'the omitted evidence would create a reasonable doubt as to the defendant's guilt.'" (quoting *United States v. Agurs*, 427 U.S. 97, 107–13 (1976))).  Consistent with the foregoing, the Government will produce on a rolling basis any statements that it identifies made by witnesses "who have failed to indicate [the defendant's] involvement in the alleged conspiracy," *id.*, and who, based on the Government's investigation, would have had some basis to know whether the defendant was involved.

In the defendant's Motions, he quotes from a 2014 email that defense counsel sent to an Assistant U.S. Attorney who was formerly assigned to this case, in which defense counsel described a "witness" who supposedly "corroborates much of what [the defendant] has been saying about his own lack of involvement in trafficking."  Def.'s Mot. 31; *see* Def.'s Mot. Ex. C.  The Government is currently unaware of but attempting to determine the identity of the witness to whom defense counsel referred.  The Government has asked defense counsel to identify the witness, but defense counsel has not yet done so.  The Government will continue to work with defense counsel to attempt to identify the witness so that the Government can review any statements the witness may have made and determine whether any such statements fall within its discovery obligations.  If any such statements are discoverable, the Government will produce them.

Finally, as noted above, the Government will provide all Jencks Act materials, including non-testifying witness statements, at least 30 days before trial.  The Government is aware of, and will continue to comply with, its obligations under Rule 16, *Brady*, and *Giglio*.  The defendant's motion to compel additional discovery should be denied.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Government respectfully requests that the Court deny the

defendant's Motions.


Dated: New York, New York
February 11, 2022

<div style="margin-left: 50%;">

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York


By:   <u>/s/                           </u>
Jason A. Richman
Benjamin Woodside Schrier
Kyle A. Wirshba
Assistant United States Attorneys

</div>