**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| United States of America<br><br>    -  v. -<br><br>Nicolás Maduro Moros,<br>Diosdado Cabello Rondón,<br>Huge Armando Carvajal Barrios,<br>    a/k/a/ "El Pollo,"<br>Clíver Antonio Alcalá Cordones,<br>Luciano Marín Arango,<br>    a/k/a "Ivan Marquez," and<br>Seuxis Paucis Hernández Solarte,<br>    a/k/a "Jesús Santrich,"<br><br>            Defendants. | S2 11 CR. 205 (AKH) |

**REPLY IN SUPPORT OF DEFENDANT CLIVER ALCALÁ CORDONES' MOTION TO DISMISS THE INDICTMENT, FOR A BILL OF PARTICULARS, AND FOR THE PRODUCTION OF *BRADY* MATERIAL**

César de Castro
Valerie Gotlib
**The Law Firm of César de Castro P.C.**
111 Fulton Street – 602
New York, NY 10038
(631) 460-3951
cdecastro@cdecastrolaw.com
vgotlib@cdecastrolaw.com

Adam S. Kaufmann
Cristián Francos
Diane M. Camacho
**Lewis Baach Kaufmann Middlemiss PLLC**
The Chrysler Building
405 Lexington Avenue, 64th Floor
New York, NY 10174
(212) 826-7001
adam.kaufmann@lbkmlaw.com
cristian.francos@lbkmlaw.com
diane.camacho@lbkmlaw.com

*Attorneys for Defendant,*
*Clíver Antonio Alcalá Cordones*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................... ii

I. THE GOVERNMENT'S OPPOSITION IS LEGALLY UNSOUND, INCONSISTENT WITH ITS OWN INDICTMENT, AND IGNORES CRITICAL FACTS ESTABLISHING THAT, EVEN IF TRUE, GENERAL ALCALÁ CORDONES WAS EXECUTING VENEZUELA'S FOREIGN POLICY AND IS ENTITLED TO IMMUNITY ............................................................................................. 1

    A. The Government Conceded that General Alcalá Cordones was an Official of the Venezuelan Government at the Time he was Alleged to Have Participated in the Conspiracy ................................................................................. 2

    B. The Government's Assertion That Criminal Acts Can Never Constitute Official Conduct is Wrong ........................................................................................ 5

    C. The Court Has Authority to Determine Immunity Regardless of the Government's Position ............................................................................................ 11

    D. The Government's Argument That Immunity Should be Denied Because Venezuela Has Not Requested Immunity is Specious ........................................... 15

II. THE GOVERNMENT'S OPPOSITION UNDERSCORES WHY A BILL OF PARTICULARS IS NECESSARY TO PERMIT GENERAL ALCALÁ CORDONES TO PREPARE HIS DEFENSE .................................................................. 16

CONCLUSION ....................................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*Belhas v. Ya'alon*,
   515 F.3d 1279 (D.C. Cir. 2008) ............................................................6, 7

*Dogan v. Barak*,
   932 F.3d 888 (9th Cir. 2019) ...................................................................7

*Fed. Republic of Germany v. Philipp*,
   141 S. Ct. 703 (2021) ..............................................................................14

*Filartiga v. Pena-Irala*,
   630 F.2d 876 (2d Cir. 1980) ....................................................................6

*Giraldo v. Drummond Co.*,
   808 F. Supp. 2d 247 (D.D.C. 2011), *aff'd*, 493 F. App'x 106 (D.C. Cir. 2012) ...................6, 7

*Kadic v. Karadzic*,
   70 F.3d 232 (2d Cir. 1995) ......................................................................6

*Kashef v. BNP Paribas S.A.*,
   925 F.3d 53 (2d Cir. 2019) ......................................................................6

*Kiobel v. Royal Dutch Petroleum Co.*,
   569 U.S. 108 (2013) ................................................................................14

*Matar v. Dichter*,
   563 F.3d 9 (2d Cir. 2009) ........................................................................13

*Omari v. Ras Al Khaimah Free Trade Zone Auth.*,
   No. 16-CV-3895, 2017 WL 3896399 (S.D.N.Y. Aug. 18, 2017), *aff'd sub*
   *nom.*, *El Omari v. Kreab (USA) Inc.*, 735 F. App'x 30 (2d Cir. 2018) .....................3

*Rasul v. Myers*,
   512 F.3d 644 (D.C. Cir.), *vacated*, 555 U.S. 1083 (2008), *reinstated*, *Rasul v.*
   *Myers*, 563 F.3d 527 (D.C. Cir. 2009) .................................................. 7-8

*Republic of Philippines v. Marcos*,
   806 F.2d 344 (2d Cir. 1986) ....................................................................5

*Samantar v. Yousuf*,
   560 U.S. 305 (2010) ................................................................................15

*Baloco ex rel. Tapia v. Drummond Co.*,
   640 F.3d 1338 (11th Cir. 2011) ..............................................................8

ii

*In re Terrorist Attacks on September 11, 2001,*
    122 F. Supp. 3d 181 (S.D.N.Y 2015) ........................................................................12, 15

*In re Terrorist Attacks on September 11, 2001,*
    714 F.3d 118 (2d Cir. 2013) ..............................................................................................8

*United States v. King,*
    No. 10 Cr. 122 (JGK), 2011 WL 1630676 (S.D.N.Y. Apr. 27, 2011) ...................................17

*United States v. Noriega,*
    746 F. Supp. 1506 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997) ...............6, 8, 9, 10

*United States v. Turkiye Halk Bankasi A.S.,*
    16 F.4th 336 (2d Cir. 2021) .............................................................................................13

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) .................................................................................................8

*Verlinden B.V. v. Cent. Bank of Nigeria,*
    461 U.S. 480 (1983) .........................................................................................................13

*Yousuf v. Samantar,*
    699 F.3d 763 (4th Cir. 2012) ...........................................................................................12

**Statutes**

18 U.S.C. § 2340A .....................................................................................................................7

Foreign Sovereign Immunities Act ......................................................................................12, 13

Torture Victim Protection Act of 1991 ........................................................................................8

I. **THE GOVERNMENT'S OPPOSITION IS LEGALLY UNSOUND, INCONSISTENT WITH ITS OWN INDICTMENT, AND IGNORES CRITICAL FACTS ESTABLISHING THAT, EVEN IF TRUE, GENERAL ALCALÁ CORDONES WAS EXECUTING VENEZUELA'S FOREIGN POLICY AND IS ENTITLED TO IMMUNITY**

The government's opposition to General Alcalá Cordones' motion to dismiss the Indictment is fatally flawed in four critical ways. First, the argument that General Alcalá Cordones' conduct was private rather than official relies on conclusory language and omits clear facts proving otherwise. Second, it erroneously argues that criminal conduct can never be performed in a defendant's official capacity, however, the Indictment clearly alleges that all relevant actors in the Chavez/Maduro governments were executing the Venezuelan government's well-planned foreign policy of engaging in narco-terrorism against the United States through a sub-division allegedly called the Cartel de Los Soles. Third, the foreign official immunity doctrine does not require that the foreign state submit a request for immunity. This non-dispositive factor warrants little to no consideration by the Court in light of the current state of the Venezuelan government and its relationship (or lack thereof) with the United States. And fourth, the Department of Justice is not entitled to absolute deference on all immunity determinations; the United States Constitution's separation of powers unequivocally prohibits a rule of absolute deference to the Executive on claims for conduct-based immunity.[1]

Given these significant shortcomings, the government's Opposition fails to present any meaningful response to General Alcalá Cordones' motion to dismiss the indictment. Conversely, in both the memorandum of law submitted in support of his motion to dismiss, General Alcalá

---

[1] As a preliminary matter, it should be noted that the government's memorandum of law often conflates head of state immunity and the act of state doctrine with foreign official conduct immunity. While the two doctrines are similar, act of state precedent should not stand as binding precedent for this matter.

Cordones conclusively establishes that the conduct described in the government's allegations falls squarely within the scope of his official duties as a military officer of Venezuela, and that he is therefore entitled to immunity from prosecution pursuant to the doctrine of foreign official immunity.  As such, General Alcalá Cordones has established his right to dismissal of the charges against him in the underlying indictment.[2]

### A.    The Government Conceded That General Alcalá Cordones Was An Official of the Venezuelan Government At the Time He Was Alleged to Have Participated in the Conspiracy

The government does not dispute that General Alcalá Cordones was an official of the Venezuelan government or that he was acting under orders or direction of governmental superiors at the time of the alleged conspiracy.[3]  In one breath it alleges that the conduct of the co-conspirators alleged in the Indictment was part of a plan at the highest levels of the Venezuelan government, and in the next breath it alleges that General Alcalá Cordones acted in his private capacity while acting at the direction of his military superiors.  Furthermore, the government leaves

---

[2] Even if the Court determines that it requires additional information on this issue, General Alcalá Cordones has at minimum sufficiently established his right to an evidentiary hearing on the question of immunity.

[3] At the outset of its argument, the government complains that "As an initial matter, the defendant does not even appear to claim that he is entitled to immunity for the charged cocaine-importation offense. In his Motions, the defendant 'adamantly rejects any allegation of having engaged in narco-trafficking.' . . . The defendant cannot simultaneously deny his participation in the narcotics-importation conspiracy and argue that it was within the scope of his duty." Opp. at 19.  Surely, the government is aware that the court must assume the facts alleged by the government to be true for purposes of a motion to dismiss. It is for this reason that General Alcála Cordones, while unequivocally maintaining his innocence as to all of the charges against him, argues that even assuming the factual allegations by the government are true, the conduct alleged would have been part and parcel of his official military duties. There is an obvious distinction between the statement that a particular type of task constituted part of the duties of an officer of his rank, and the statement that he himself engaged in those tasks with the intent to participate in a narco-terrorism conspiracy. This is basic. He could have undertaken duties alleged in indictment without such conduct being part of a narco-terrorism conspiracy.  Hence the application of the doctrine.

out a crucial fact common in all of its allegations against General Alcalá Cordones, that not only was he a member of the Venezuelan military when he allegedly attended various meetings, but also, he was directed to attend by his military superiors and attended the meetings in uniform.

The government correctly observes that official immunity only applies to acts undertaken in an official capacity on behalf of a government. Opp. at 9 (citing *Omari v. Ras Al Khaimah Free Trade Zone Auth.*, No. 16-CV-3895, 2017 WL 3896399, at *10 (S.D.N.Y. Aug. 18, 2017), *aff'd sub nom.*, *El Omari v. Kreab (USA) Inc.*, 735 F. App'x 30 (2d Cir. 2018)). The government then attempts to gloss over the immunity issues by claiming, in conclusory fashion, that General Alcalá Cordones' conduct was private, not official. But this argument wholly fails to address the nature of the conduct at issue, the policies of the foreign sovereign, and the scope of General Alcalá Cordones' official duties. Most importantly, it ignores the government's own allegations. For example, the government repeatedly states that General Alcalá Cordones provided "military-grade" weapons to the FARC. See, *e.g.*, Opp. at 5 (citing Indictment ¶ 14(e)). If this were true, this conduct falls squarely within the official duties of a uniformed general. Indeed, it is hard to imagine conduct more purely sovereign than a nation-state determining which side, in a conflict of armed combatants, it will support, and nothing more inherently official than a uniformed soldier carrying out such a policy. As alleged in the Indictment, the defendants' actions were designed to further the sovereign policies of Venezuela.

The new information provided by the government in its Opposition only serves to further demonstrate the official nature of General Alcalá Cordones' alleged conduct.[4] Opp. at 4–5. For

---

[4] As discussed further in the Bill of Particulars section, this is the first time, after two years, that the government has provided any information about General Alcalá Cordones' alleged activities. And, as discussed below, the government has done so in woefully inadequate fashion.

example, the government now claims it will show that at some time around 2008, General Alcalá Cordones met with an individual associated with the FARC "to affirm the commitment of the Venezuelan military to assisting the FARC."  Opp. at 6.  Astoundingly, they would label this an overt act in furtherance of a criminal conspiracy.  However, the statement reflects the sovereign policy of Venezuela to support the FARC.  A communication by a military officer of such policy is not a criminal act; it is an official act warranting immunity.  Similarly, the government alleges it will prove that General Alcalá Cordones provided security to a FARC official in 2007.  Opp. at 5.  It is well-documented that in 2007 Venezuela was heavily involved in attempting to broker a peace accord between the FARC and the Colombian government.  Providing security to the participants in these negotiations, which necessarily involved members of the FARC, fell within the duties of an officer of the Venezuelan military and is, again, an act immune from prosecution. The government also alleges a series of meetings allegedly attended by General Alcalá Cordones (Opp. at 5–6), all of which involved General Alcalá Cordones receiving orders and "assignments" from superior officers.  The government chooses to call every interaction with the FARC a narcotics interaction, but that ignores both geopolitical realities and Venezuela's sovereign policies.[5]  These are examples of official conduct that the government attempts to bootstrap into a narcotics conspiracy.  The Court is not required to share the government's myopic and selective view.

---

[5] For example, the government accuses General Alcalá Cordones of providing military-grade weapons to the FARC but fails to consider or address the fact that on at least one occasion, weapons were offered following negotiations and in exchange for the release of kidnapping victims whom the FARC had held hostage.  *See, e.g.*, Hugh Bronstein, *Venezuela to help in release of Colombia hostages*, Reuters (Dec. 26, 2007), https://www.reuters.com/article/us-colombia-hostages-plan/venezuela-to-help-in-release-of-colombia-hostages-idUSN2636561820071226; The Associated Press, *Colombian rebels give 2 hostages to Venezuela* (Jan. 10, 2008)  https://www.denverpost.com/2008/01/10/colombian-rebels-give-2-hostages-to-venezuela/.

It is evident that the sovereign policies of Venezuela, and Venezuela's relationship with the FARC, were sources of contention with the United States.  While the United States may disagree with Venezuela's policies, it may not prosecute the execution of those policies as crimes in the United States.  The execution of the sovereign's decision by its officers and agents, while not to the United States' liking, is exactly the conduct protected by foreign official immunity. None of the arguments to the contrary are availing.

## B.    The Government's Assertion that Criminal Acts Can Never Constitute Official Conduct Is Wrong

The government argues that foreign official immunity cannot apply to conduct that causes a violation of United States criminal laws or the criminal laws of the foreign state.  To accept that proposition would negate the entire concept of foreign official conduct immunity.  The analysis regarding foreign official conduct immunity is whether, assuming a violation of United States criminal laws occurred, the defendant may be held criminally responsible for the allegedly illegal conduct carried out as part of his official duties.  If the commission of a federal crime eviscerates foreign official immunity, then the doctrine is moot.

Illegality, by itself, does not automatically render official conduct private.  There is a crucial distinction to be made, which the government attempts to gloss over, between acts taken in a defendant's official capacity, "which may be protected from judicial scrutiny even if illegal under [foreign domestic] law," and acts which are purely private in nature and therefore not entitled to such protection.  *Marcos*, 806 F.2d at 359 (where defendant asserted head of state immunity, court noted that "[a]lthough the distinction between public and private acts of a foreign official may be difficult to determine, our courts have repeatedly done so.").

In support of its argument, the government relies upon cases that are materially distinguishable from the facts and posture of the instant case.  For example, the government relies

upon *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 60–61 (2d Cir. 2019) (vacating dismissal on *act of state doctrine* grounds and remanding to district court for further proceedings), and *United States v. Noriega*, 746 F. Supp. 1506, 1522 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997) (head-of-state and act-of-state immunity case holding that defendant's "alleged drug trafficking and protection of money launderers could [not] conceivably constitute public action taken on behalf of the . . . state."). Opp at 19. In *Kashef*, the defendants attempted to raise an act of state defense, a ground on which General Alcalá Cordones is not moving. The defense was rejected because the defendants failed to make any showing that the alleged acts of torture had been undertaken pursuant to any official statute or decree. 925 F.3d at 61.[6] Moreover, *Kashef* and the cases on which it relies (*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) and *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995)) are cases involving the act of state doctrine and do not involve claims for foreign official immunity.

These cases stand in stark contrast to decisions which actually address the foreign official immunity doctrine in the context of conduct that allegedly violated United States or foreign domestic law. For example, in *Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247 (D.D.C. 2011), *aff'd*, 493 F. App'x 106 (D.C. Cir. 2012), a case involving the foreign official immunity doctrine, the district court rejected outright the plaintiff's contention that criminal acts could not constitute official conduct for purposes of a foreign official immunity analysis, finding that "such a rule would eviscerate the protection of foreign official immunity and would contravene federal law on foreign official immunity." 808 F. Supp. 2d at 250. Similarly, in *Belhas v. Ya'alon*, 515 F.3d 1279 (D.C. Cir. 2008), the D.C. Circuit affirmed dismissal on foreign official immunity grounds,

---

[6] Such formal showings of authority are a requisite for act of state cases but are not noted in foreign official conduct immunity decisions.

finding immunity despite the fact that plaintiff's claims alleged conduct, if true, would have violated United States criminal law, foreign domestic criminal law, and international criminal law.[7]

Notably, in both *Giraldo* and *Belhas*, the conduct alleged was not mere "garden-variety" crimes but acts in violation of "international *jus cogens* human rights norms," taken "in violation of [the defendant's] position and not in pursuance of it." *Giraldo*, 808 F. Supp. 2d at 250; *Belhas*, 515 F.3d 1279 (affirming district court dismissal on foreign official immunity where plaintiff alleged war crimes, extrajudicial killing, crimes against humanity, and cruel, inhuman or degrading treatment). Plainly, such acts would constitute criminal conduct under United States and foreign domestic law, and even under customary international law as well. Nevertheless, the courts in both cases flatly rejected the plaintiff's contention that "illegal acts . . . are not within official immunity." *Giraldo*, 808 F. Supp. 2d at 250.[8] Such acts of *jus cogens* are not presented in the instant case.

Ironically, despite global disdain against immunizing torture, the United States has taken the position that acts of torture committed by United States intelligence officers were sufficiently related to their official duties such that immunity attached notwithstanding that torture is a crime

---

[7] Even assuming a violation of foreign law did preclude immunity, General Alcalá Cordones has not been charged by Venezuela with any crimes and the indictment neither alleges nor has the government indicated what laws of Venezuela it will prove that General Alcalá Cordones violated or that the conduct at issue did violate Venezuelan law. Indeed, it is difficult to fathom that much of the conduct alleged could violate *any* country's law. Certainly, a government providing military support to allied combatants would not constitute commission of a crime domestically, much less in a foreign jurisdiction. Criminalizing this behavior upends centuries of the law of war.

[8] In yet another case, *Dogan v. Barak*, 932 F.3d 888, 892 (9th Cir. 2019), the 9th Circuit affirmed the district court's dismissal on foreign official immunity grounds, thereby affirming the lower court's rejection of plaintiff's assertion that foreign official immunity did not apply to extrajudicial killings and acts of torture committed by a foreign official, and instead found that immunity for such acts will indeed apply where the foreign sovereign "embraces" the official's conduct.

under United States law (18 U.S.C. § 2340A).  *See Rasul v. Myers*, 512 F.3d 644, 658–59 (D.C. Cir. 2008), *vacated*, 555 U.S. 1083 (2008) ("remanded . . . for further consideration in light of" *Boumediene v. Bush,* 553 U.S. 723 (2008)), *reinstated, Rasul v. Myers*, 563 F.3d 527, 528 (D.C. Cir. 2009).[9]  The government fails to explain why the standard it applies to the conduct of employees of the United States government should not apply in equal measure to the conduct of foreign officials.[10]

---

[9] In enacting the Torture Victim Protection Act of 1991, Congress itself has recognized in related contexts that acts which would otherwise amount to a criminal conduct or violations of U.S., foreign, and/or international law can nevertheless constitute official conduct, as well as the extremely broad scope of a public servant's "official capacity" more generally.  *See, e.g., Baloco ex rel. Tapia v. Drummond Co.*, 640 F.3d 1338, 1345 (11th Cir. 2011) (examining the TVPA liability regime, whereby a foreign official who commits acts of torture or extrajudicial killings may nevertheless be deemed to have been acting under actual or apparent authority or color of law).  If criminal acts by U.S. intelligence agents can fall within the scope of their official duties entitling them to immunity, then the same must hold true for alleged criminal acts by foreign officials equally tied to the performance of their official duties.

[10] To expand on an argument from the Motion to Dismiss about United States generals sending weapons to Saudi Arabia that end up in the hands of the Yemeni government (Mot. at 17), the problems with government's argument are well illustrated by considering their application in reverse, to United States military commanders.  For example, in Afghanistan in the 1980's, U.S. generals carried out United States foreign policy to arm mujahideen in their struggle against the Soviet Union, notwithstanding that many of the mujahideen were deeply involved in the heroin trade. *See e.g.*, Gretchen Peters, *How Opium Profits the Taliban*, United States Institute of Peace, Peaceworks No. 62 (August 2009),  https://www.usip.org/sites/default/files/resources/taliban_opium_1.pdf ("A system swiftly developed in which large landowners and drug merchants would hire mujahideen to protect their drug shipments. Rebels used drug earnings to support the resistance. According to former mujahideen commanders and fighters interviewed for this project, many resistance commanders profited from the exploding poppy market to some extent—most commonly by taking a cut of goods passing through their control zones.").  The U.S. generals provided weapons to narcotics traffickers pursuant to U.S. policy.  That does not make them drug traffickers.  From the Soviet perspective, the U.S. generals were also supporting terrorists.  "[O]ne man's terrorist is another man's freedom fighter."  *In re Terrorist Attacks on September 11, 2001,* 714 F.3d 118, 125 (2d Cir. 2013) (quoting *United States v. Yousef*, 327 F.3d 56, 106–108 (2d Cir. 2003)).

The government's reliance on *Noriega* is particularly misplaced.  At the trial court level, *Noriega* engaged in a substantive analysis of both act of state and head of state immunity claims and denied both claims, finding that Noriega was neither the head of the Panamanian state nor acting in its official public interest.  746 F. Supp at 1522.  Specifically, the court ruled that the defendant failed to demonstrate his actions were in furtherance of any state purpose; his sole motive was profit.  Conversely, the facts in this case include ample proof that that General Alcalá Cordones' involvement with the FARC was pursuant to official policies of Venezuela, as set forth in the motion to dismiss.

There are other differences between *Noriega* and the instant matter as well.  First, Noriega was *the* de facto ruling power in Panama (although for purposes of head of state immunity he was denied head-of-state status).  Here, General Alcalá Cordones may have been a senior military officer, but he was still required to follow orders of his superior officers and civilian leadership (such as Carvajal and Chávez).  Unlike Noriega, General Alcalá Cordones did not create policy nor is there an allegation that he acted as a head of state; rather, he followed the policy of his country.

Moreover, unlike in *Noriega*, there are no specific details put forth by the government that General Alcalá Cordones undertook any of his alleged conduct for personal gain. As discussed below, the *Noriega* court expressly noted that defendant's "protection of money launderers" was an indication he was acting in a personal capacity.  *Noriega*, 746 F. Supp. at 1522.  In the instant matter, the government does not assert any facts indicating that General Alcalá Cordones received narcotics proceeds, held offshore accounts, protected money launderers, or otherwise benefitted personally.  Indeed, the facts known to the government tell a different story.  The government agents who took General Alcalá Cordones into custody in Colombia saw exactly where he was

living and the lifestyle he maintained: a small rental apartment shared with his wife and baby daughter, an inexpensive car purchased with a loan. It was anything but luxurious. He was organizing a planned armed incursion on a shoestring budget against the very people whom the government claims are his contemporaneous coconspirators. This is a crucial gap in the government's case. In the context of a case alleging that military acts constituted criminal conduct, the absence of facts suggesting personal benefit is telling.

More fundamentally, the *Noriega* court expressly noted the lack of proof that narcotics trafficking was a public action:

> The Court fails to see how Noriega's alleged drug trafficking and protection of money launderers could conceivably constitute public action taken on behalf of the Panamanian state. Certainly no evidence has been presented to this effect, despite Defendant's burden of proof on the issue.

*Noriega*, 746 F. Supp. at 1522. This is in marked contrast to the instant case, where the government has alleged that cocaine trafficking was the policy of the Maduro and Chávez regimes:

> Under the leadership of MADURO MOROS and others, the *Cártel de Los Soles* sought not only to enrich its members and enhance their power, but also to "flood" the United States with cocaine and inflict the drug's harmful and addictive effects on users in this country. Thus, whereas most drug-trafficking organizations in South and Central America have sought to recede from their roles in importing narcotics into the United States in an effort to avoid U.S. prosecution, the *Cártel de Los Soles*, under the leadership of MADURO MOROS and others, prioritized using cocaine as a weapon against America and importing as much cocaine as possible into the United States.

S.S.I. ¶ 4.

Thus, the facts alleged by the prosecution assert put forth the extraordinary proposition that the charged narcotics conspiracy itself was an aspect of official policy of the State of Venezuela. Unlike the case in *Noriega*, here we see an affirmative assertion from the prosecution that it was the policy of Venezuela to send cocaine to the United States, to "weaponize" cocaine, even to the extent of acting unlike other narcotics importation groups in Central and South America. Thus,

according to the prosecution, this was not even a clear-thinking, profit-driven enterprise. Rather, it was a foreign policy tool wielded by the civilian leadership of Venezuela against the United States. In such circumstance, we submit that absent proof of personal gain (and the indictment plainly lacks any such facts), an official who acted to further such government policy is entitled to foreign official conduct immunity.

> ### C. The Court Has Authority to Determine Immunity Regardless of the Government's Position.

Although the government's immunity determinations may be entitled to deference in status-based immunity cases, no such deference is required in cases involving conduct-based immunity, and the government is therefore incorrect in arguing that its immunity determination is entitled to absolute deference in this case. In fact, if the government's position were to be accepted, the result would be that the common law doctrine could have no application in criminal cases, since, in any criminal case, the government has *ipso facto* elected not to recognize the acts as sovereign. Thus, the exception would completely subsume the rule. This cannot be. Common law immunity doctrines exist and are applied in both civil and criminal cases, and the Supreme Court has repeatedly held that common law doctrines are preserved absent specific acts of Congress to abrogate or overturn them. *See* Defendant's Memorandum of Law in Support of Motion to Dismiss (ECF No. 71) ("Mot.") at 10 n.6.

Commentators have noted the distinction between status-based immunity (*e.g.* head of state immunity) and conduct-based immunity (act of state and foreign official immunity) in terms of the deference owed to executive determinations. *See generally* Chimène I. Keitner, *The Common Law of Foreign Official Immunity*, 14 Green Bag 2d 61, 75 (2010). "Although courts have deferred to Executive suggestions of *status*-based immunity for foreign officials, this does not compel the same level of deference to Executive suggestions of *conduct*-based immunity from the jurisdiction

11

of U.S. courts." *Id.*  The underlying rationale is that Executive's determination as to the status of a foreign official as head of state derives from its constitutional authority in Article II, section 3 to receive ambassadors, and thus must be afforded the utmost deference. *Id.* at 71.  There is no similar constitutional provision requiring such deference in the context of conduct-based immunity determinations.[11]

The Fourth Circuit expressly noted this distinction in *Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012), after the Foreign Sovereign Immunities Act ("FSIA") issue had been decided by the Supreme Court and the case remanded for further proceedings on the applicability of common law head-of-state and foreign official immunity.  The State Department submitted an *amicus* brief arguing that "federal courts owe absolute deference to the State Department's view of whether a foreign official is entitled to sovereign immunity on either ground." *Id.* at 769.  In examining the two doctrines, the Fourth Circuit held that "[u]nlike head-of-state immunity and other status-based immunities, there is no equivalent constitutional basis suggesting that the views of the Executive Branch control questions of foreign official immunity.  Such cases do not involve any act of recognition for which the Executive Branch is constitutionally empowered; rather, they simply involve matters about the scope of defendant's official duties." *Id.* at 773.  The Fourth Circuit went on to note that the Executive can weigh in on conduct-based immunity issues, but its position is not controlling. *Id.*; *see also In re Terrorist Attacks on September 11, 2001*, 122 F. Supp. 3d 181, 186 (S.D.N.Y 2015) ("District courts are empowered to determine common law sovereign immunity without input from the Executive Branch"); Ingrid Wuerth, *Foreign Official Immunity*

---

[11] See also, Peter B. Rutledge, *Samantar, Official Immunity and Federal Common Law*, 15 Lewis & Clark L. Rev. 589, 605 (2011) ("[I]t is constitutionally suspect, at best, to suppose that the [determination of official immunity] depends on an executive determination (as opposed to judicial determination).").

*Determinations in U.S. Courts: The Case Against the State Department*, 51 Va. J. Int'l L. 915, 932–33 (2011) (noting that conduct-based immunities bear only a tenuous relationship to the Executive's exclusive recognition powers under the Constitution, and explaining that courts have accorded immunity to states not recognized by the executive branch, and have denied immunity to unrecognized states without relying on the fact of non-recognition by the Executive as determinative). The distinction between status-based and conduct-based determinations is well grounded in separation of powers and due process principles. One claim derives from the Executive's constitutionally grounded determination of the status of the individual's relationship to the United States. The other derives from an assessment of the facts and circumstances in which the alleged conduct occurred.

The government cites to *Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009) for the proposition that with respect to foreign official immunity, General Alcalá Cordones' objections are on diplomatic rather than legal grounds. Opp. at 23. *Matar* involved a lawsuit against the director of an Israeli security agency who allegedly engaged in targeted assassinations in Gaza, including a military bombing mission that resulted in the deaths and injuries to residents of an apartment building there. The Second Circuit upheld the dismissal of the case on act of state grounds, ruling that the defendant was acting within the scope of his official duties. Just so here. General Alcalá Cordones was a public official engaged in the performance of his official duties in his own country. Contrary to the government's conclusory characterizations, these are not diplomatic or policy concerns; they are facts demonstrating the applicability of common law immunity.[12]

---

[12] Other cases relied upon by the government to establish that deference is owed to the Executive also miss the mark. *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 351 (2d Cir. 2021), cited in Opp. at 14, 23, involved the rejection of a claim of immunity under the FSIA because the defendant bank's conduct fell well within the commercial activities exception to the

The government's insistence that General Alcalá Cordones is attempting to interject policy issues over legal issues (Opp. at 23) is baffling.  The points raised are not "policy issues," they are facts that the government would prefer to ignore.  The simple fact is that whether the conduct at issue reflected Venezuelan policy at the time it was performed controls the legal issue of whether that country's official can be prosecuted for carrying out such policy within Venezuela, regardless of whether the conduct transgressed the criminal laws of the United States.  Thus, the arguments advanced by General Alcalá Cordones are not arguments of diplomacy, they are facts.  The government has clasped tight its blinders and refuses to look at these facts, which is ironic given its statement that "[c]ourts do not determine the applicability of immunity doctrines like foreign official immunity in a vacuum."  Opp. at 13.  We agree.  The Court should look at the context and at the actual facts, as opposed to the government's characterization of those facts.

The government may wish to label the FARC for purposes of United States policy as nothing more than a narcotics trafficking gang.  However, that does not require any other country to view the FARC through the same lens, nor does it mean that the United States may prosecute foreign officials for treating the FARC differently.  As the Supreme Court has recognized, "United States law governs domestically but does not rule the world."  *Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703, 714 (2021) (citing *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013).  The fact is that the FARC was a quasi-governmental and military organization,

---

Foreign Sovereign Immunities Act.  So too *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983), cited in Opp. at 13, also involved the commercial activities exception to the FSIA.

operating within Venezuela at times, and has gone on to be recognized as a political bloc through the Colombian peace process.[13]  These realities are ignored by the government.

Other key facts are similarly ignored by the government in this case.  It is a fact that General Alcalá Cordones is indicted for possessing and distributing weapons in Venezuela where he was a uniformed soldier.  It is a fact that General Alcalá Cordones was a soldier in a country that never considered the FARC a terrorist organization.  The government attempts to sweep away those facts, but it is those facts that demonstrate why General Alcalá Cordones is entitled to common law immunity.  The government simultaneously ignores the import of General Alcalá Cordones' official position as a soldier while bootstrapping the performance of his sworn duties into a criminal conspiracy.

### D.    The Government's Argument That Immunity Should Be Denied Because Venezuela Has Not Requested Immunity Is Specious

The government argues that because the Venezuelan government has not requested immunity for General Alcalá Cordones, the Court should deny his application.  However, request by a foreign government is not a condition precedent for a finding of immunity.  The lack of a request of immunity is irrelevant.  In the absence of such a request, "a district court has authority to decide for itself whether all the requisites for such immunity exist."  *In re Terrorist Attacks on September 11, 2001*, 122 F. Supp. 3d at 185 (quoting *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010)) (finding that the court was required to determine immunity where no formal request for immunity had been submitted).  This makes sense because foreign regimes may change and under the doctrine, the foreign official acting under the direction of one regime does not become

---

[13] It is ironic that General Alcalá Cordones is being prosecuted for his involvement with the FARC when members of the FARC itself have long since been granted amnesty by the Colombian government.

vulnerable to prosecution simply because the foreign government later changes.  As the government is aware, the United States has no formal relations with Venezuela.  It does not recognize the sitting government and has in fact charged its head of state in this same indictment.  The United States government has acknowledged an interim president who lacks the constitutional authority and actual power to act on behalf of the state.  Moreover, the clear reality is that the United States government would not defer to *anyone* from Venezuela requesting immunity for General Alcalá Cordones and it is disingenuous to pretend otherwise.

## II.  THE GOVERNMENT'S OPPOSITION UNDERSCORES WHY A BILL OF PARTICULARS IS NECESSARY TO PERMIT GENERAL ALCALÁ CORDONES TO PREPARE HIS DEFENSE

In its opposition, the government has conceded the inadequacy of its millions of pages of disclosures and its "speaking" Indictment by proffering additional general conclusory allegations and committing to providing Jencks Act disclosures thirty days prior to trial.

In the Opposition, the government notes the voluminous discovery produced to date and asserts it includes materials that "specifically relate" to General Alcalá Cordones (Opp. at 24).  What the government fails to note is that none of the discovery specifically relates to the criminal charges or to General Alcalá Cordones' involvement in them.  The materials are, overwhelmingly, useless benign data barely relevant to any issues in this case.  Similarly, as noted in our initial brief, despite the length of the indictment and the years of conduct it addresses, it provides virtually no detail regarding the criminal acts alleged to be committed by General Alcalá Cordones.  If the government believed otherwise, it would not have presented the additional information it did in its opposition.  *See* Opp. at 5-6.  It would have presented the information in a complete and comprehensive manner, not as a casual paragraph buried in an opposition brief.  And, even the information that was presented constitutes nothing more than general conclusory allegations.  The

16

government provides no details, no evidentiary support, and no corroborative information. Notably, despite repeated requests by the defense over the past two years, including a formal request for a bill of particulars, prior to filing its opposition the government refused to disclose any information to the defense despite clearly possessing responsive information referenced in the Opposition. One cannot help but ask, what other responsive, material information does the government possess that it has failed to turn over? The Court should require the government to expand on this vague and non-factual production.

These issues become even more critical based on the government's commitment to providing Jencks Act material thirty days prior to trial. This is not something that the United States Attorney's Office for the Southern District of New York ("SDNY USAO") does unless absolutely necessary. *See. e.g., United States v. King*, No. 10 Cr. 122 (JGK), 2011 WL 1630676, at *7 (S.D.N.Y. Apr. 27, 2011) (approving a one-week-prior-to-trial schedule for disclosure of Jencks Act materials in complicated embezzlement, tax evasion, and money laundering case). As the Court knows, it is the practice of the SDNY USAO to provide Jencks Act material to the defense on the Friday before a Monday trial date. Notably, there is no mention in the government's opposition of the volume of the Jencks Act material it commits to disclosing thirty days before trial. However, in a garden-variety drug case in this District, that material is usually a hundred or more single-spaced pages. Given the length and breadth of the alleged conspiracy, it is likely that the Jencks Act material is one thousand or more single-spaced pages (depending on the number of witnesses the government intends to call from the hundreds of co-conspirators that have allegedly participated in this twenty-plus-year alleged conspiracy).

Critically, by agreeing to produce the likely voluminous Jencks Act material thirty days in advance of trial, the government has acknowledged that General Alcalá Cordones needs additional

17

information in order to prepare for trial.  At the same time, the government asks the Court to order that after sitting in jail for nearly two years, General Alcalá Cordones will only receive the information necessary to mount his defense a mere thirty days before trial.  That will not be sufficient time to review and investigate the materials, much of which will likely involve pursuing investigative leads in Colombia and elsewhere in South and Central America.  One can readily anticipate the time will be inadequate given the scope of the indictment and the broad geographies it covers.  In order to safeguard General Alcalá Cordones' ability to mount a defense to the charges against him, the Court must require the government to provide him with a detailed bill of particulars, including the names of unnamed coconspirators and trial witnesses.  In the alternative, the Court should order the government to produce the Jencks Material in the next sixty days, with whatever safeguards and protective orders the Court finds appropriate, thus giving the defense a meaningful opportunity to prepare for trial.

## CONCLUSION

For the reasons set forth herein, General Alcalá Cordones' respectfully requests that this Court issue an Order dismissing the Indictment or certain counts thereof on government official immunity grounds and ordering the government to produce a detailed bill of particulars, including the names of unnamed coconspirators and trial witnesses.


Dated: February 25, 2022


_____/s/_____
César de Castro
Valerie Gotlib
**The Law Firm of César de Castro P.C.**
111 Fulton Street – 602
New York, NY 10038
(631) 460-3951
cdecastro@cdecastrolaw.com

18

vgotlib@cdecastrolaw.com

Adam S. Kaufmann
Cristián Francos
Diane M. Camacho
**Lewis Baach Kaufmann Middlemiss PLLC**
The Chrysler Building
405 Lexington Avenue, 64th Floor
New York, NY 10174
(212) 826-7001
Adam.Kaufmann@lbkmlaw.com
Cristian.Francos@lbkmlaw.com
Diane.Camacho@lbkmlaw.com

*Attorneys for Defendant,*
*Cliver Antonio Alcalá Cordones*