UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ x
UNITED STATES,                           :
                                         :
                                         :
                                         :     ORDER AND OPINION
        -against-                        :     DENYING MOTION TO
                                         :     DISMISS
                                         :
                                         :     11 Cr. 205 (AKH)
CLIVER ANTONIO ALCALA CORDONES,          :
                                         :
                   Defendant.            :
                                         :
------------------------------------------------------------ x
```

ALVIN K. HELLERSTEIN, U.S.D.J.:

    Defendant Cliver Antonio Alcala Cordones ("Defendant") is charged with

(1) participating in a narco-terrorism conspiracy, in violation of U.S.C. § 960a; (2) participating

in a cocaine-importation conspiracy, in violation of 21 U.S.C. § 963; (3) possession of

machineguns and destructive devices, 18 U.S.C. §§ 924(c)(1)(A), 924(c)(1)(B)(ii), 2; and (4)

conspiracy to possess machineguns and destructive devices, in violation of Title 18, United

States Code, Section 924(o). See Indictment (Dkt. No. 11).  Defendant moves to dismiss the

indictment under the doctrine of foreign official immunity; for a bill of particulars; and, for an

order requiring the government to disclose information in its possession regarding the

Defendant's alleged "involvement in anti-Maduro activities as well as the identities of witnesses

who have failed to indicate [Defendant's] involvement in the alleged conspiracy," under *Brady v.

Maryland*, 373 U.S. 83 (1963) and Fed. R. Crim. P. 5(f). *See* Memorandum in Support ("Mot."),

Dkt. No. 71.  For the reasons provided below, the motion is denied.

## BACKGROUND

### I.    Factual Allegations

    On March 5, 2020, a grand jury indicted Defendant on charges stemming from his

participation in a corrupt and violent conspiracy[1] involving the Cártel de Los Soles, or "Cartel of the Suns," (the "Cartel"), and the Fuerzas Armada Revolucionarias de Columbia (the "FARC"), from 1999 until 2020. Indictment, ¶ 1, Dkt. No. 11. The Cartel was a Venezuelan drug-trafficking organization comprised of high-ranking Venezuelan officials—including parts of the military, intelligence apparatus, legislature, and judiciary—to facilitated the importation of tons of cocaine into the United States. *Id.* ¶ 3. The former President of Venezuela, Hugo Rafael Chávez Frias was a leader of the Cartel until his death in 2013. *Id.* ¶ 7. Following Chavez's death, one of Defendant's alleged coconspirators—Nicolás Maduro Moros ("Maduro") assumed the presidency and continued to lead the Cartel. *Id.* Under Maduro's leadership, the Cartel trafficked massive quantities of cocaine not only for financial gain, but also to weaponize the drug by "flooding" the United States with it, thereby inflicting the drug's harmful and addictive effects on users in this country. *Id.* ¶ 4.

For decades, the FARC was one of the largest cocaine producers in the world, operating cocaine fields and laboratories in Colombia and Venezuela. *See id.* ¶ 2. The FARC also has directed violent acts against U.S. persons and property in foreign jurisdictions, including but not limited to Colombia. *Id.* ¶ 11. For example, the FARC leadership ordered the kidnap and murder of U.S. citizens and an attack on U.S. interests in order to dissuade the United States from continuing efforts to fumigate FARC coca fields and disrupt the FARC's manufacturing and distribution of cocaine and cocaine paste. *Id.* Based on these activities, in 1997, the U.S. Department of State designated the FARC a Foreign Terrorist Organization, and the FARC remained so designated until November 30, 2021. *Id.*

---

[1] Defendant's charged coconspirators include: Nicolás Maduro Moros ("Maduro"), Diosdado Cabello Rondón ("Cabello"), Hugo Armando Carvajal Barrios, a/k/a "Ell Pollo" ("Caraval"), Luciano Marín Arango a/k/a "Ivan Marquez" ("Marín"), and Seuxis Paucis Hernández Solarte ("Hernández").

For over 20 years, the FARC and the Cartel worked together to produce and distributed massive quantities of cocaine. Starting in 1999, the FARC purported to negotiate peace with the Colombian government but simultaneously agreed with leaders of the Cartel to move cocaine-production operations to Venezuela under the protection of the Venezuelan government. *Id.* ¶ 14(a). The FARC began to cultivate cocaine on farms in the region surrounding the Colombia-Venezuela border. *Id.* ¶ 14(b). The FARC and the Cartel dispatched cocaine from Venezuela, often to the United States, via transshipment points in Central America and the Caribbean, including Honduras. *Id.* ¶ 14(c). Maritime shipments were dispatched north from Venezuela's coastline, and air shipments were often dispatched from clandestine airstrips in Apure State, Venezuela.

In order to ensure safe transport, members and associates of the FARC and the Cartel paid bribes that ultimately benefitted Defendant and his coconspirators who worked in the Venezuelan government. *Id.* ¶ 14(d). Defendant, Maduro, Cabello, Carvajal, and other high-ranking members in the Venezuelan government, coordinated with the FARC to transport and distribute those cocaine shipments. *Id.* ¶ 14(e). They also caused large quantities of previously seized cocaine to be sold to drug traffickers in exchange for millions of dollars; interfered with drug-trafficking investigations and pending criminal cases in Venezuela and elsewhere; and helped provide the FARC with military-grade weapons, including machineguns, ammunition, rocket launchers, and explosive equipment. *Id.* Defendant played an important role in facilitating the foregoing activities. For example, in 2008, Defendant, Cabello, and Carvajal held a meeting at which they agreed that Defendant would take on additional duties coordinating drug-trafficking activities by the Cartel and the FARC. *Id.* ¶ 14(g).

The government anticipates that at trial, witness testimony will further establish Defendant's participation and particular role in the charged conspiracies, including that in 2007, Defendant helped provide security for coconspirator Lucian Marín Arango ("Marin"), one of the

highest-ranking members of the FARC.  *See* Memorandum in Opposition to Motion to Dismiss

("Opp."), Dkt No. 79.  Defendant was a personal friend of Marin and used his high-ranking

military authority to release FARC cocaine seized at a Venezuela checkpoint.

Additionally, in 2008, Defendant attended a meeting with other members of the

Cartel and drug traffickers associated with the FARC, where attendees discussed ways in which

the Cartel and FARC could cooperate, including by allowing FARC aircraft transporting drugs to

access landing strips along the Venezuela-Colombia border, providing weapons to the FARC,

and facilitating the movement of FARC members across the Venezuela-Colombia border with

necessary paperwork.  And at another 2008 meeting at the Venezuelan presidential palace,

Chávez instructed Cabello, Carvajal, and other high-ranking members of the Cartel to "flood"

the United States with drugs, appointing Cabello to lead this effort.  Carvajal also told the group

that he would speak with Defendant about Defendant's new assignment—managing efforts by

other military personnel to facilitate cocaine trafficking in Venezuela.

About the same time, Defendant also met with a FARC-associated drug trafficker,

the purpose of which meeting was to affirm the commitment of the Venezuela military to

assisting the FARC.  Defendant further stated that the Venezuelan military order would not be

used to intercept FARC drug aircraft.  Following the meeting, Defendant placed a Venezuelan

military officer under his command in charge of the day-to-day relationship with the FARC and

its associated drug traffickers.  The officer regularly consulted with Defendant to obtain

permission to engage in activities to assist the FARC.  In 2014, Defendant attended a meeting at

which he discussed the FARC's continued drug-trafficking activities near the Venezuela-

Colombia border.

## II.     The Government's Discovery Production

On July 22, 2020, I entered a protective order governing the production of

unclassified discovery material.  *See* Dkt. No. 31.  To date, the Government has made seven

productions of unclassified discovery material, totaling over 105 gigabytes of data.

On June 30, 2020, the Government produced:

- the Indictment;
- DEA reports and attachments related to the defendant's arrest;
- U.S. Marshals Service intake forms for the defendant; and
- the complaint in *United States v. Adel El Zabayar*, 20 Mag. 5469 (S.D.N.Y.), in which a co-conspirator of the defendant is charged.

On September 4, 2020, the Government produced:

- search warrants and accompanying affidavits for various electronic accounts, including accounts used by the defendant;
- materials related to the cocaine-importation conspiracy charged in *United States v. Hernandez-Solarte, et al.*, 18 Cr. 262 (VEC), in which Hernández and three other individuals associated with the FARC are charged, including audio and video recordings, draft translations of transcripts, DEA reports, and documents received pursuant to a Mutual Legal Assistance Treaty ("MLAT") request from Colombia;
- publicly available video and audio recordings of members of the charged conspiracies, including the defendant;
- materials related to the cocaine-importation conspiracy charged in *United States v. Flores*, 15 Cr. 765 (PAC), in which two of Maduro's nephews were convicted, including trial transcripts and exhibits, suppression hearing transcripts and exhibits, audio and video recordings, phone records, business records, and draft translations;
- subpoena returns obtained during the course of the investigation of the defendant and his co-conspirators;
- materials related to the cocaine-importation conspiracy charged in *United States v. Walid Makled-García*, S1 09 Cr. 614 (RWS), in which Walid Makled-García, an alleged large-scale narcotics trafficker allegedly associated with the Cartel and the FARC, is charged, including DEA reports, audio recordings, draft translations, and other materials obtained from Venezuela;
- documents memorializing statements that the defendant made to law enforcement; and
- data obtained pursuant to search warrants from the defendant's two Instagram accounts and the defendant's Twitter account.

On November 24, 2020, the Government produced the following materials:

- search warrants and accompanying applications for various electronic accounts, including accounts believed to be used by the defendant;
- additional documentation relating to the defendant's arrest, including items seized incident to his arrest;
- additional subpoena returns from various entities and an accompanying index;
- materials related to the 5.6-ton cocaine shipment discussed in Indictment ¶ 15(d), including DEA reports about the seizure; photographs taken in connection with the seizure; and data and information related to the aircraft used to transport the cocaine;
- materials related to a May 10, 2009 seizure of approximately 1,645 kilograms of cocaine in Honduras, including law enforcement reports and other documentation; photographs taken in connection with the seizure; a report related to the aircraft used to transport the cocaine; and indictment 09 Cr. 529 (DAB), in which two individuals arrested in connection with the seizure are charged;
- materials related to the 1.3-ton cocaine shipment discussed in Indictment ¶ 15(i), including DEA reports about the seizure; photographs taken in connection with the seizure; and documentation provided by foreign law enforcement;
- materials received through a DEA tip line regarding the charges contained in the Indictment;
- materials related to Cabello, including business and financial documents and related photographs;
- various other recordings, financial records, and emails obtained during the course of the investigation; and
- the complaint in *Silvercorp USA, Inc. v. Rendon*, a civil litigation regarding alleged efforts to overthrow the Maduro regime in Venezuela, in which the defendant's alleged role in those efforts is discussed.

In addition, the Government produced additional materials (redacted here) on an attorneys'-eyes-only basis.

Defendant now moves to dismiss the indictment based on foreign sovereign immunity; and if the motion is denied, for a bill of particulars and an order instructing the Government to produce material evidence favorable to Defendant.

## DISCUSSION

**I.     Motion to Dismiss the Indictment**

Defendant moves to dismiss the indictment, arguing that he is entitled to immunity from prosecution under the common law. He contends that when he engaged in the charged conduct, he acted in his official capacity as a uniformed military officer of Venezuela and in furtherance of Venezuela's foreign sovereign policy. *See* Mot. at 12–13. Therefore, he claims that he is entitled to foreign official, or conduct-based, immunity. I hold that Defendant is not immune from prosecution.

Where a case involves a foreign official, rather than a foreign state, the common law, rather than the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1601 *et seq.*, governs questions of immunity. *See Samantar v. Yousuf*, 560 U.S. 305, 322–24 (2010). Even if a suit is not governed and barred by the FSIA, it still may be barred by foreign official immunity under the common law. *Id.* at 324.

Under the common law, a "two-step procedure [is] typically followed when a foreign official assert[s] immunity." *Id.* at 312. First, "the diplomatic representative of the sovereign c[an] request a 'suggestion of immunity' from the State Department." *Id.* at 311 (citation omitted). If the State Department grants the request, "the district court surrender[s] its jurisdiction." *Id.* Second, "'in the absence of recognition of the immunity by the Department of State,' a district court 'ha[s] authority to decide for itself whether all the requisites for such immunity exist[].'" *Id.* (quoting *Ex Parte Republic of Peru*, 318 U.S. 578, 587 (1943)). There is no indication that Venezuela has sought a suggestion of immunity for Defendant Cordones. Accordingly, I must decide for myself whether such immunity exists. *See id.*

Customary international law has long distinguished between two types of immunities: status-based immunity, afforded to sitting heads-of-state, and conduct-based immunity, afforded to other foreign officials, past or present, acting on behalf of a foreign

government. *See In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181, 185–86

(S.D.N.Y. 2015) (citing *Moriah v. Bank of China, Ltd.*, 107 F. Supp. 3d 272, 277 (S.D.N.Y

2015)). Defendant claims that he is entitled to conduct-based immunity.

      Conduct-based immunity recognizes "an individual official's entitlement to

immunity for '*acts* performed in his official capacity.'" *Matar v. Dichter*, 563 F.3d 9, 14 (2d

Cir. 2009) (emphasis added) (quoting Restatement (Second) of Foreign Relations Law of the

United States § 66(f) (1965)); *Heaney v. Gov't of Spain*, 445 F.2d 501, 504 (2d Cir. 1971)

(quoting § 66(f) (1965)) ("[T]he immunity of a foreign state extends to any other 'official or

agent of the state with respect to acts performed in his official capacity if the effect of exercising

jurisdiction would be to enforce a rule of law against the state.'"). Thus, "the relevant inquiry

focuses on the official's acts, and not the official's status." *In re Terrorist Attacks*, 122 F. Supp.

3d at 188. In deciding whether a foreign official is entitled to immunity, "a district court

inquire[s] 'whether the ground of immunity is one which it is the established policy of the [State

Department] to recognize.'" *Samantar*, 560 U.S. at 312 (alterations in original) (quoting

*Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945)); *see also Matar v. Dichter*, 563 F.3d 9,

14 (2d Cir. 2009) (quoting *Hoffman*, 324 U.S. at 35) ("[W]e must look to common law to

determine (a) whether former officials are entitled to immunity under the common-law . . . and

(b) if so, whether [the former official] is entitled to immunity 'in conformity to the principles

accepted by the department of the government charged with the conduct of our foreign

relations.'").

      In the context of criminal prosecutions, however, the Second Circuit has held that

an instrumentality of a foreign sovereign is not immune from prosecution under the common

law, reasoning that "[a]t common law, sovereign immunity determinations were the prerogative

of the Executive Branch; thus, the decision to bring criminal charges would have necessarily

manifested the Executive Branch's view that no sovereign immunity existed." *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 351 (2d Cir. 2021).

Defendant argues that he was acting on behalf of his sovereign and in furtherance of Venezuela's foreign policy.  However, the Government has brought charges against Defendant and his coconspirators, thereby manifesting its view that Defendant is not entitled to immunity.  And if an instrumentality of a sovereign is not entitled to immunity, *see Turkiye Halk Bankasi*, 16 F.4th at 351, an agent, acting on that sovereign's behalf, cannot be entitled to immunity.  *See also Broidy Capital Mgmt. LLC v. Muzin*, 12 F.4th 789, 802 (D.D.C. 2021) (recognizing that the State Department might hesitate to recognize derivative immunity of agents of a foreign sovereign, even where the sovereign itself is presumptively immune); *cf. Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 465 (4th Cir. 2000) (finding that FSIA immunity extended to private contractors acting at the direction of a foreign sovereign).  Although I am not required to defer to the Executive Branch's views on whether I may exercise jurisdiction, *see In re Terrorist Attacks*, 181 F. Supp. 3d at 186 ("District courts are empowered to determine common law sovereign immunity without input from the Executive Branch."); *Hoffman*, 324 U.S. at 34–35 ("In the absence of recognition of the claimed immunity by the political branch of the government, the courts may decide for themselves whether all the requisites of immunity exist."), I am required to apply the law set forth by the Court of Appeals for this Circuit.  And under *Turkiye Halk Bankasi*, I must reject Defendant's claim of immunity.

Even if *Turkiye Halk Bankazi* were not controlling, I would still find deference to the Executive Branch appropriate here.  In the context of criminal prosecutions, the decision to bring criminal charges to enforce the laws of the United States falls squarely within the Government's "broad discretion as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (citation and quotation marks omitted); *see also United States v. Armstrong*, 517 U.S. 456, 464–65 (1996) (explaining that the Attorney General and United States Attorneys

retain "broad discretion" to enforce the Nation's criminal laws"). Absent evidence of discriminatory enforcement, or selective-prosecution that would violate statutory or constitutional rights, the Supreme Court has stated that "the decision to prosecute is particularly ill-suited to judicial review[]" and "generally rests entirely in [the prosecutor's] discretion." *Id.* And Defendant does not argue that he is the subject of selective prosecution, nor does he even dispute engaging in the conduct charged. He argues only that he cannot be held to answer for that conduct in this Court. But this alone is an insufficient basis for me to challenge or otherwise review the Government's decision to bring the instant charges. "[S]o long as the prosecutor has probable cause to believe that [Defendant] committed an offense designed by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury" is not one I may freely question. *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

Moreover, I would further note that rejecting Defendant's claim to immunity is wholly consistent with the underpinnings of the doctrine of foreign official immunity. At common law, courts typically deferred to the Executive Branch when deciding whether to take jurisdiction over foreign sovereigns and their instrumentalities. *See Matar*, 563 F.3d at 14. That deference flowed from the recognition that cases involving claims of immunity "typically raise[] 'questions of policy rather than of law,'" and are "'for diplomatic, rather than legal discussion." *Id.* at 13 (quoting *The Schooner Exch. v. McFaddon*, 11 U.S. 116, 146 (1812)). Although Article III courts have a "virtually unflagging" obligation to exercise the jurisdiction conferred upon them, *see Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69 (2013); *Cohens v. Virginia*, 19 U.S. (19 Wheat.) 264, 404 (1821) (stating that federal courts "have no more right to decline the exercise of jurisdiction which given, than to usurp that which is not given"), where cases involved foreign sovereigns and officials, courts have abstained from exercising their jurisdiction to avoid becoming embroiled in, or interfering with foreign policy or diplomatic affairs.

No such risk presents here.  The Government chose to bring the instant charges, and implicit in that decision, is its belief that the "questions" are legal, rather than political.  I therefore conclude that Defendant is not entitled to foreign official immunity under Circuit precedent, and that this finding accords with both traditional separation of powers principles and the underpinnings of foreign official immunity doctrine.

Notwithstanding the foregoing analysis, Defendant rejects *Turkiye Halk Bankasi* as controlling precedent, contending that it involved only the commercial activities exception under the FSIA.  *See* Reply, at 13 n.12, Dkt. No. 86.  He argues, instead, that Section 66(f) of the Restatement (Second) of Foreign Relations Law (1965) supplies the proper test.  Under Section 66(f), immunity attaches where (i) the actor is a public minister, official, or agent of the foreign state; (ii) the acts in question were performed in his official capacity; and (iii) the exercise of jurisdiction would serve to enforce a rule of law against the foreign state.  Defendant concedes that in *Samantar*, the Supreme Court "express[ed] no view on whether Restatement § 66 correctly sets out the scope of the common law immunity applicable to current or former foreign officials."  *See* 560 U.S. at 321 n.15.  However, he claims that appellate and trials courts have almost universally embraced Section 66 when confronted with questions of foreign official immunity.  Although Defendant cites a number of cases, he has not cited—nor have I found— any cases from this Circuit, applying Section 66(f) factors.  Nevertheless, Defendant argues that under Section 66(f), he is entitled to immunity.

Defendant's arguments are unpersuasive.  To begin, his reading of *Turkiye Halk Bankasi* is incorrect.  At the end of the opinion, the court succinctly summarized its holdings, the third of which states unequivocally that "an instrumentality of a foreign sovereign[] is not entitled to immunity from criminal prosecution at common law."  16 F.4th at 351.  But even assuming that Defendant is correct, and that Section 66(f) is the correct test to apply, I would still deny Defendant's motion, finding that he was not acting in his official capacity.

In determining whether a foreign official is acting in an official capacity such that he may be entitled to foreign official immunity, courts look to a number of factors, including whether "the officer purports to act as an individual and not as an official," "whether an action against the foreign official is merely a disguised action against the nation that he or she represents," and "whether an action against the official would have the effect of interfering with the sovereignty of the foreign state that employs the official." *See Oussama El Omari v. Ras Al Khaimah Free Trade Zone Auth.*, No. 16-CV-3895, 2017 U.S. Dist. LEXIS 136172, at *30 (S.D.N.Y. Aug. 17, 2017) (citing *Park v. Shin*, 313 F.3d 1138, 1144 (9th Cir. 2002), and *Heaney v. Gov't of Spain*, 445 F.2d 501, 504 (2d Cir. 1971)).

Defendant argues that the charged conduct was undertaken in his official capacity as a uniformed military official.[2] He argues that the only detailed act alleged in the Indictment, attributed to him, is that he attended a meeting with Carvajal and Cabello, his military and political superiors. And at that meeting, the Indictment states that Defendant was assigned additional "duties." According to Defendant, attending meetings and undertaking "duties" are quintessential acts of a military official. Moreover, as a subordinate officer, Defendant contends that he was neither free to disagree with, nor reject, orders from his superiors. Therefore, any consummated "agreement" at that meeting was not a conspiratorial act but rather an official act and part of Defendant's duties as a Venezuelan military official. Defendant argues similarly as to his alleged conduct in support of the FARC—that Venezuela's support of the FARC, and his interactions and dealings with the FARC, were conducted within the rubric of Venezuelan foreign policy.

---

[2] Defendant contends that he acted pursuant to orders of his superiors, including Nicolás Maduro Moro, whom he regards to be the President of Venezuela. Thus, he claims immunity for narcotics trafficking — conduct considered criminal by the United States as well as by Venezuela. The United States has no formal diplomatic relations with Venezuela and does not recognize Maduro to be President. *See* U.S. DEP'T OF STATE, U.S. RECOGNITION OF VENEZUELA'S 2015 NATIONAL ASSEMBLY AND INTERIM PRESIDENT GUAIDÓ, https://www.state.gov/u-s-recognition-of-venezuelas-2015-national-assembly-and-interim-president-guaido/ (recognizing Juan Guaidó as interim President of Venezuela). I hold that a rogue official of a rogue state is not entitled to immunity against a criminal prosecution.

Defendant makes much of the fact that his acts were taken pursuant to his high-ranking military position; however, Defendant cannot bootstrap a claim for status-based immunity into a claim for conduct-based immunity. Conduct-based immunity focuses on the acts, not the status, and therefore, the question is whether the alleged "acts" are conceivably attributable to the state. *See Yousuf v. Samantar*, 699 F.3d 763, 775 (4th Cir. 2012).

As the Second Circuit has noted, "acts that flagrantly violate a foreign state's own laws cannot, at the same time, constitute official acts entitled to deference." *Kashef v. BNP Paribas S.A.* ,925 F.3d 53, 60–61 (2d Cir. 2019). Defendant is charged with engaging in conduct that violated both U.S. and Venezuelan law. For example, the Government alleges that Defendant gave security to Marin and helped free FARC cocaine seized by Venezuelan officials. Presumably, those confiscating officers were enforcing Venezuelan law, whereas Defendant's intervention was meant to thwart the application of that law. Likewise, the Government alleges that Defendant agreed to help facilitate the movement of FARC cocaine across the Venezuela-Colombia border by providing necessary paperwork—again conduct directed at circumventing, rather than upholding, applicable law. It strains credulity to say that Defendant was engaged in official conduct—to the benefit of the state or in furtherance of some overriding national interest. *See United States v. Noriega*, 746 F. Supp. 1506, 1522 (S.D. Fla. 1990). While Defendant's position of power may have enabled him to engage in the charged conduct, his mere *status* as a high-ranking general does not make his *conduct* official (or worthy of deference). Most charitably, Defendant argues that his conduct was an abuse of power, but this does not render his conduct "official" or immune from prosecution. Thus, the result is the same under both *Turkiye Halk Bankasi* and Section 66(f)—Defendant is not immune from criminal prosecution.

In sum, I find that Defendant is not entitled to foreign official immunity because the Executive Branch has manifested its intent that no immunity applies; exercising jurisdiction

will not interfere with foreign policy; and, Defendant was not engaged in "official acts."

Accordingly, the motion to dismiss is denied.

## II.    Motion for a Bill of Particulars

Plaintiff argues that if I deny his request for dismissal, I should order the

Government to produce a detailed bill of particulars, including the names of unindicted

coconspirators and trial witnesses, so that he can adequately prepare for, and avoid surprise at,

trial. Despite the Government's having produced millions of pages of documents, and hundreds

of hours of audio and video recordings, Defendant argues that he has seen no evidence

demonstrating his involvement in the charged conspiracy, other than an allegation in the

Indictment stating that he attended a meeting fourteen years ago. Defendant claims that he is

entitled to a bill of particulars because despite the length of the Indictment and years of conduct

it addresses, it lacks detail regarding the acts allegedly committed by Defendant. I hold that no

bill of particulars is warranted.

"Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek

a bill of particulars in order to identify with sufficient particularity the nature of the charge

pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise,

and to interpose a plea of double jeopardy should he be prosecuted a second time for the same

offense." *United States v. Almaleh*, No. 17-CR-25, 2022 U.S. Dist. LEXIS 35260, at *6

(S.D.N.Y. Feb. 28, 2022) (quoting *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir.

1987)). "A bill of particulars should be required only where the charges of the indictment are so

general that they do not advise the defendant of the specific acts of which he is accused." *Id.* at

*6–7 (quoting *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), *aff'd*, 875 F.2d

857 (2d Cir. 1989)). "It is not enough that the information would be useful to the defendant; if

the defendant has been given adequate notice of the charges against him, the government is not required to disclose additional details about its case. The court must be cognizant of the fact that a bill of particulars confines the government's evidence at trial to the particulars furnished." *Id.* at \*7 (quoting *United States v. Payden*, 613 F. Supp. 800, 816 (S.D.N.Y. 1985)). "Therefore, the proper test in deciding whether a bill of particulars should be required of the Government is whether the bill of particulars is *necessary* for the defense, not whether it would aid the defendant in his preparation." *Id.* (quoting *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (emphasis added)). A bill of particulars is not a general investigative tool, discovery device or means to compel the government to disclose evidence or witnesses to be offered at trial." *United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001).

"Whether to grant a bill of particulars rests within the sound discretion of the district court," *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984) (citation omitted), after considering "the totality of the information available to the defendant—through the indictment, affirmations, and general pre-trial discovery." *United States v. Thompson*, No. 13-CR-378, 2013 U.S. Dist. LEXIS 172623, at \*7 (S.D.N.Y. Dec. 3, 2013) (citation omitted); *see also United States v. Binday*, 908 F. Supp. 2d 485, 497 (S.D.N.Y. 2012) ("If the information the defendant seeks 'is provided in the indictment or in some acceptable alternate form,' such as discovery or other correspondence, no bill of particulars is required." (quoting *Bortnovsky*, 820 F.2d at 572)).

A bill of particulars is not warranted in this case because Defendant has been adequately apprised of the nature and charges against him through the charging document, discovery, and court filings. Courts routinely deny motions for bills of particulars where, as here, the charging document is a speaking indictment. *See, e.g., United States v. Carroll*, No. 19-CR-545, 2020 WL 1862446, at \*6 (S.D.N.Y. Apr. 14, 2020) (finding "no basis for a bill of particulars" where "[t]he charges against the defendants are explained in detail in a lengthy

speaking indictment, and the charges track the language of the applicable statutes while stating the time and place in approximate terms of the charged conspiracy"); *United States v. Shkreli*, No. 15-CR-637, 2016 WL 8711065, at *5 (E.D.N.Y. Dec. 16, 2016) (denying motion for bill of particulars in part because "the Superseding Indictment is a detailed 'speaking' indictment"); *Wedd*, 2016 WL 1055737, at *3 (denying motion for bill of particulars in part because "the Indictment is a 'speaking' Indictment that provides a significant amount of detail as to the Government's theory of the case and the nature of the proof that will underlie the charges at trial," including "a chronology of the formation of the scheme" and "approximate dates of key events that were part of the scheme"). Here, Defendant was charged pursuant to a 28-page speaking indictment, replete with detailed facts and circumstances about the charged conspiracies. It is, by no means, "so general" that it fails to "advise the defendant of the specific acts of which he is accused." *United States v. Wedd*, No. 15-CR-616, 2016 WL 1055737, at *3 (S.D.N.Y. Mar. 10, 2016) (quoting *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1997)).

The Government's discovery production, to date, also weighs against granting the motion. The Government has provided Defendant with voluminous discovery and has committed to producing Jencks Act materials well before trial. *See United States v. Huff*, No. 12-CR-750, 2014 WL 719410, at *2 (S.D.N.Y. Dec. 17, 2014) (denying motion for bill of particulars and ordering production of Jencks Act materials four weeks before trial). As described above, the productions include materials related to three cocaine shipments; search warrants relating to Defendants' electronic accounts and the fruits of the searches; complaints in related charged cases; subpoena returns from various entities; materials received through a DEA tip line regarding the charges contained in the Indictment; materials related to Cabello, including business and financial documents and related photographs; and, various other recordings, financial records, and emails obtained during the course of the investigation. Contrary to Defendant's suggestion, "the mere existence of 'mountains of documents' does not entitle [him]

to a bill of particulars." *United States v. Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010); *see also United States v. Blakstad*, No. 19-CR-486, 2020 U.S. Dist. LEXIS 188133, at *11 (S.D.N.Y. Oct. 9, 2020) ("[G]iven the details contained within the [g]overnment's production and the manner in which it is organized, this production makes any potential bill of particulars of limited marginal use, and certainly not necessary for [the defendant's] defense.").

Defendant argues that the law is clear that the Government cannot respond to a motion for a bill of particulars by gesturing at voluminous discovery already produced. He cites a string of cases, including *United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1997), and *United States v. Savin*, No. 00-CR-45, 2001 U.S. Dist. LEXIS 2445 (S.D.N.Y. 2001), in which courts found that voluminous discovery necessitated the bill of particulars. Defendant's reliance is mistaken, however, as those cases are readily distinguishable.

*Bortnovsky* involved an alleged scheme to defraud through the submission of false and inflated insurance claims for burglary losses. The government introduced evidence at trial of 12 burglaries and provided defense counsel with over 4,000 documents in discovery, but only four burglaries were alleged to be fabricated and only three documents were alleged to be false. *Bortnovsky*, 820 F.2d at 574. Therefore, the Second Circuit found that it was error to deny a bill of particulars identifying which of the insurance claims for burglary losses were fraudulent and which of the many invoices submitted were falsified. *See id.* at 575.

Similarly, in *Savin*, the court found a bill of particulars warranted as to the defendant's request for disclosure of his "alleged role" in a conspiracy to commit wire fraud. *See id.* at *10–11. There, the indictment alleged that the defendant pilfered client money through an unspecified series of "intercompany transfers" without identifying the amounts, dates, means, corporate entities, or coconspirators involved. The government provided 100,000 pages of discovery, but the court found this insufficient because the defendant was entitled to detailed notice of the conspiracy and the means and methods of the conspiracy. *Id.* at *11.

Unlike the circumstances here, "*Bortnovsky* and [similar cases] presented the quintessential 'needle in a haystack' problem to defendants who were faced with sifting through thousands of legitimate transactions in an attempt to discover which transactions the government sought to prove were fraudulent." *United States v. Kahale*, 789 F. Supp. 2d 359, 376 (E.D.N.Y. 2009), *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012); *see also United States v. Rose*, No. 19-CR-789, 2021 U.S. Dist. LEXIS 98784, at *15 (S.D.N.Y. May 24, 2021) (collecting cases denying requests for bills of particulars identifying allegedly false documents and transactions where most or all activity was alleged to have been illegal). Here, the discovery does not appear to contain mountains of documents involving legitimate or legal conduct. Consequently, Defendant need not wade through "to determine what conduct the Government sought to prove was illegal." *See United States v. Rose*, No. 19-CR_789, 2021 U.S. Dist. LEXIS 98784, at *15 (S.D.N.Y. May 24, 2021) (collecting cases denying requests for bills of particulars identifying allegedly false documents and transaction where most or all activity was alleged to have been illegal).

Moreover, the Government has produced not only voluminous but also itemized discovery, further aiding Defendant in his trial preparation. "[I]n our adversarial system, it is incumbent on the defense to review the discovery for itself to determine its significance; it is not the role of the government to tell the defense everything that is important and why." *United States v. Ray*, No. 20-CR-110, 2021 U.S. Dist. LEXIS 139880, at *3 (S.D.N.Y. July 27, 2021).

Although Defendant acknowledges that the disclosure of unnamed and unindicted coconspirators is not "routine," he nevertheless asks me to compel production of this information. However, demands for this type of information—where, when, and with whom the Government will charge the defendant with conspiring—are routinely denied by courts in this Circuit. *See, e.g., United States v. Santana*, No. 13-CR-147, 2015 WL 5781413, at *2 (S.D.N.Y. Oct. 1, 2015) (cleaned up). "It is well settled that defendants need not know the means by which

it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove their criminal acts. Details as to how and when the conspiracy was formed, or when each participant entered it, need not be revealed before trial." *United States v. Parris*, No. 13-CR-17, 2014 WL 2745332, at *5 (S.D.N.Y. June 17, 2014). That is particularly true "[i]n the context of prosecutions of narcotics conspiracies," where "courts have consistently refused to grant a bill of particulars requesting the following kinds of information: (1) when the conspiracy was formed; (2) when the defendant joined the conspiracy; and (3) how the Government alleges the defendant performed acts in furtherance of the conspiracy." *United States v. Santiago*, 174 F. Supp. 2d 16, 35 (S.D.N.Y. 2001); *see also United States v. Campo Flores*, No. 15 Cr. 765, 2016 WL 5946472, at *11 (S.D.N.Y. Oct. 12, 2016) (holding that in case charging narcotics-importation conspiracy, the Government had "no obligation" to provide the "when," "where," and "with whom" of conspiracy).

Moreover, when faced with requests for bills of particulars identifying unindicted coconspirators, courts must consider factors including the "duration and breadth of the alleged conspiracy," "whether the Government otherwise has provided adequate notice" of the identities of co-conspirators, "the volume of pre-trial discovery," and any risk to the alleged coconspirators or the Government's investigation." *United States v. Nachamie*, 91 F. Supp. 2d 552, 557 (S.D.N.Y. 2000). Having considered these factors, I find that they do not weigh in favor of compelling the disclosures Defendant seeks.

Although the charged conspiracies allegedly spanned over two decades and were broad in scope, the Government has "provided adequate notice" of some of Defendant's coconspirators (including those charged in the Indictment). The Government also has produced substantial pre-trial discovery. Its disclosures identify some key dates, as well as the means and methods by which Defendant and his coconspirators allegedly carried out the conspiracies. The

Government's opposition brief includes further details of evidence it intends to offer against Defendant. *See* Opp. at 5–6.

Although the disclosures do not provide everything that Defendant might want, *i.e.*, the names of all unindicted and uncharged co-conspirators, he has been provided sufficient particulars 'to conduct a meaningfully directed investigation of the relevant facts and circumstances to respond to the charges.'" *Almaleh*, 2022 U.S. Dist. LEXIS 35260, at *21 (quoting *Ray*, 2021 U.S. Dist. LEXIS 139880, at *3). Further, given the nature and circumstances of the allegations, there are legitimate concerns about witness safety and tampering. I therefore conclude that the *Nachamie* factors weigh against directing the Government to disclose the identities of all unindicted or uncharged coconspirators to Defendant. *See United States v. Horge*, No. 19 -CR-96, 2020 U.S. Dist. LEXIS 198523, at *10 n.3 (S.D.N.Y. Oct. 26, 2020). Accordingly, the motion for a bill of particulars is denied.

### III.    Motion to Compel Production of *Brady* Material

Plaintiff seeks an order requiring the Government to disclose information in its possession regarding Defendant's alleged "involvement in anti-Maduro activities as well as the identities of witnesses who have failed to indicate Defendant's involvement in the alleged conspiracy." Mot. at 29–31. Plaintiff claims that he made a specific and detailed demand to the Government on November 22, 2021 for Fed. R. Crim P. 5(f)/*Brady* material regarding witnesses and members of the United States government that were aware of Defendant's involvement in two coup attempts, and the planning of a third, against the government of his alleged coconspirator, Maduro, but the Government has failed to respond. *Id.* at 29 (citing Ex. A). Defendant believes that the Government is in possession of, but has failed to disclose witness statements, in which witnesses either affirmatively stated that Defendant was not involved in the conspiracy, or denied knowledge of his involvement, including a "witness" referenced in a 2014 email from defense counsel to an Assistant U.S. Attorney no longer assigned to this case. *Id.* at

29–31; Ex. C (attaching email).  I hold that no order compelling additional discovery is warranted at this time.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), and Fed. R. Crim. P. 5(f), the government has a duty to disclose favorable evidence to the accused where such evidence is material either to guilt or to punishment." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001).  Favorable evidence includes not only exculpatory evidence but also evidence useful to impeach the credibility of a government witness.  *See id.*

Assuming that the Government did not know already of its obligations under *Brady*, an order to that effect has been filed already on ECF.  *See* Dkt. No. 40.  The Order advised the Government of its obligations under *Brady*, and the possible consequences of violating those obligations, including that the Court may order further production; grant a continuance; impose evidentiary sanctions; or, even dismiss charges before trial or vacate a conviction after trial or a guilty plea.  *Id.*

The Government states that it already has made substantial productions of information (described above) and also has committed to making substantial productions of classified materials.  Opp., at 27 (citing Dkt. No. 77 (issuing a protective order pursuant to the Classified Information Procedures Act, authorizing the Government to provide dense counsel with classified substitutions)).

With respect to Defendant's motion to compel the disclosure of witness identities, the Government avers that it has not identified any witness statements in its possession, in which a witness affirmatively stated that Defendant was not involved in any of the charged conspiracies.  Opp. at 27.  The Government commits to producing, on a rolling basis, any

statements in its possession where a witness had a basis to know whether Defendant was involved in the conspiracies and failed to indicate his involvement. *Id.* at 28.[3]

With respect to the 2014 email, which references a "witness" who supposedly "corroborates much of what [Defendant] has been saying about his own lack of involvement in trafficking," the Government responds that it is currently unaware of, but attempting to determine, the identity of the witness referred to. *Id.* It has asked defense counsel to identify the witness, but defense counsel has not yet done so. The Government represents that it will continue to work with defense counsel to identify the witness, so that it can review the witness statements in its possession to determine whether any fall within its discovery obligations. If any such statements are identified and discoverable, the Government will produce them.

The Government appears to be in compliance with its obligations under Rule 16, *Brady*, and *Giglio*. The Government avers that it has no relevant and discoverable witness statements in its possession that are responsive to Defendant's request but has committed to producing any such statements on a rolling basis. The Government also has committed to working with defense counsel to identify the "witness" from the 2014 email. Finally, the Government has committed to providing Defendant with Jencks Act material, including non-testifying witness statements, at least 30 days before trial. Thus, at this time, no order is necessary, and the motion is denied.

---

[3] The Government notes that it does not have an obligation to produce all witness statements in which failed to affirmative indicate Defendant's participation in the alleged conspiracies. Opp. at 27. The Government interviewed witnesses that had no basis to know about Defendant and were not asked about his participation in the conspiracies. Thus, their failure to indicate Defendant's involvement, the Government maintains, is neither probative nor exculpatory, and therefore not *Brady* material. *See United States v. Galestro*, No. 06-CR-052, 2008 WL 2783360, at *16–17 (E.D.N.Y. July 15, 2008).

## CONCLUSION

For the reasons provided above, the motion is denied.  The Clerk of Court shall terminate the motion (Dkt. No. 71).

SO ORDERED.

Dated:      March 17 2022
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge