THE LAW FIRM OF

# CÉSAR DE CASTRO, P.C.

ATTORNEY AT LAW

The District
111 Fulton Street - 602
New York, New York 10038
631.460.3951 Office
646.285.2077 Mobile
646.839.2682 Fax
cdecastro@cdecastrolaw.com
cdecastrolaw.com

January 8, 2024

*Via* **ECF**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re: *United States v. Alcalá Cordones,* 11 Cr. 205 (AKH)

Dear Judge Hellerstein,

In March 2020, former Venezuelan General Cliver Alcalá Cordones was living in the Colombian countryside planning and training for a revolution to overthrow the corrupt and tyrannical president of Venezuela, Nicolás Maduro. He was leading a group of like-minded former Venezuelan soldiers with strong support from members of the international community to militarily oust Maduro and return democracy to his country. He was doing so because of his love of his country. General Alcalá was organizing and leading his soldiers but was in desperate need of financial and political support from outside sources and governments. General Alcalá had little to no money to continue to feed, train, and arm the soldiers. He had little to no money to support his own family. He was not living the life of an exiled corrupt Latin American leader rich with the spoils of monies corruptly earned. His family lived in a small rental apartment in a small town in Colombia and he drove an old model Nissan; they lived day by day, month by month. They had been forced to flee Venezuela when a prior armed rebellion, which General Alcalá had also led, had been exposed and crushed by the Maduro regime. Then in March 2020, on the eve of another planned armed rebellion, he received a call from United States law enforcement agents assigned to the United States embassy in Colombia. The agents gave him a choice. He could either board a plane to face charges of narcotics trafficking in the United States or be arrested in Colombia where he would be imprisoned (and subject to reprisal from the deadly Venezuelan intelligence agency) until he was extradited to the United States. He chose the former. His men, without his leadership, carried out the military operation a few weeks later. The operation failed and his men were either killed or captured and imprisoned, many of them reportedly tortured.

General Alcalá arrived in the United States in March 2020, at the very outset of the global pandemic and the unprecedented lockdowns in United States detention centers. He arrived in New York at the height of the panic surrounding COVID-19, most of which, in the United States, was focused on the incredible number of infections and deaths in New York. He arrived in New York when everyone was fleeing New York. And he arrived in New York to be detained in a jail without access to his family from which he derives his strength. When he arrived in New York, he very quickly realized that he was facing charges related to his alleged conduct more than thirteen years earlier, when he was a general in the Venezuelan Army. He immediately accepted responsibility for his role in providing weapons and aid to the Revolutionary Armed Forces of Colombia ("FARC") when he was a member of the Venezuelan Army under the command of President Hugo Chávez but denied any and all involvement in narcotics trafficking or in directly aiding or supporting the FARC or any other individuals in their narcotics trafficking activities.

On June 29, 2023, after lengthy negotiations with the government, General Alcalá pled guilty, pursuant to a plea agreement, for providing aid to the FARC when he was a general. He did not plead to any conduct involving narcotics trafficking. We respectfully submit that this Court should sentence General Alcalá to no more than 72 months' imprisonment. Seventy-two months' imprisonment appropriately factors: (1) the unduly harsh pretrial detention conditions to which he was subjected; (2) his role in the offense; (3) his history and characteristics, including his age; (4) that sentencing him to any more than 72 months' imprisonment would create an unwarranted sentencing disparity with other material support cases; and (5) that after completing his sentence, at best he will be subject to a prolonged period in immigration detention until he can secure asylum in a safe country or at worst imprisonment and potential death if he is deported to Venezuela.

Through the PSR, this submission, and the letters submitted in support of General Alcalá, the Court will learn that he is fundamentally a good person and an individual who served his country's military for 30 years. He lives, bleeds, and cries for his country and has desperately fought for its return to democracy, peace, and prosperity. General Alcalá never raised any arms directly against the United States or acted in any way against the ideals or citizens of this country. The conduct underlying his guilty plea, while criminal in the United States, were the actions of a general following the direct orders of his superior officers and the President of Venezuela, Hugo Chávez. He recognizes the authority and power of this United States court to punish him for that conduct, however, we submit that the goals of sentencing require this Court to sentence General Alcalá to no more than 72 months' imprisonment.

I.   **The Pre-Sentence Investigation Report and the United States Sentencing Guidelines' Advisory Range and Sentencing Recommendation**

In the plea agreement, the parties stipulated to a United States Sentencing Guidelines ("Guidelines") range of 360 months' imprisonment, with no mandatory minimum sentence. The calculation contained in the Presentence Investigation Report ("PSR") accurately mirrors the Guidelines calculation contained in the plea agreement.

The Probation Office recommends that the Court apply an advisory Guidelines sentence of 360 months' imprisonment followed by three years' supervised release. We disagree with this recommendation and respectfully submit that the appropriate sentence for General Alcalá is 72 months' imprisonment followed by three years' supervised release.

In addition to failing to adequately consider all (let alone wholly disregarding some of) the relevant Section 3553(a) factors, all of which are discussed in detail below, the Probation Office's recommendation is flawed for two reasons. First, it relies on conduct proffered by the government which General Alcalá adamantly denies. General Alcalá disputes each of the allegations made in paragraphs 13 through 19 of the PSR and asks the Court to order the Probation Office to remove paragraphs 13 through 19 from the PSR. General Alcalá pled guilty to providing material support and weapons to the FARC knowing that FARC members engaged in, *inter alia*, drug trafficking. Thus, while General Alcalá admits that he provided material support and weapons to the FARC knowing that FARC members engaged in drug trafficking, he unequivocally denies that he personally engaged in any type of conduct that constituted or directly facilitated drug trafficking. Paragraph 12 of the PSR, to which General Alcalá has no objection, accurately describes General Alcalá's offense conduct. General Alcalá disputes that he engaged in any of the conduct alleged in paragraphs 13 through 19 of the PSR. By considering such conduct the Probation Office is permitting irrelevant and false information to influence its recommendation as to the appropriate sentence for the conduct to which General Alcalá pled guilty.

Second, the Probation Office's recommendation fails to consider how the terrorism enhancement, while technically appropriate, exponentially increases the advisory Guidelines range. *See United States v. Stewart*, 590 F.3d 93, 153 (2d Cir. 2009) (Calabresi, J., concurring) ("When the terrorism enhancement is applied, it has dramatic consequences on the applicable Guidelines range because it automatically increases both the offense level of a crime and the defendant's Criminal History Category."). Without the terrorism enhancement, General Alcalá would have a total offense level of 28 and a CHC I, resulting in an advisory Guidelines range of 78 to 97 months' imprisonment. The application of the terrorism enhancement has the effect of quadrupling General Alcalá's advisory Guidelines range. While this exponential increase is understandable and warranted in certain cases, in cases like this where the defendant did not seek to directly harm the United States, its interests or its nationals, the advisory Guidelines range recommends a punishment that is disproportionately severe to the actual offense conduct. *See United States v. Thavaraja*, 740 F.3d 253, 257 (2d Cir. 2014) (affirming district court's sentence, which was 55% lower than the advisory Guidelines range, as substantively reasonable and noting that the district court properly exercised its discretion in varying so far below the Guidelines where the district court noted that the facts of the case were unusual because while it carried a "banner of terrorism" it involved people who "pose[d] no direct threat to the United States" but still mandated a severe sanction in the United States because the United States does not "in any way underwrite or care to underwrite terrorist activities anywhere in the world.").

It is undisputed that the seriousness of many terrorism cases often provides good reasons to place defendants in the highest criminal history category. *See United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) (finding that terrorists with no prior criminal behavior "are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."). However, those concerns are largely absent here. As an initial matter, the

3

terrorist organization that General Alcalá materially support, the FARC, is no longer deemed a terrorist organization by the United States. Regardless, as discussed in detail below, General Alcalá committed the offense conduct in his capacity as a soldier following the orders of his superiors. He is no longer a soldier and will never be in a position to act as one again. Every aspect of General Alcalá's life is consistent with that of a peaceful, law-abiding man devoted to his family and willing to make sacrifices to assist those in need. Furthermore, he has been a model inmate during the almost four years that he has been incarcerated pending resolution of this matter despite the unduly harsh conditions of his confinement. Simply put, he is not an individual who needs prolonged incapacitation to accomplish the goals of sentencing.

We believe that the appropriate sentence for General Alcalá is no more than 72 months' imprisonment. Such a sentence constitutes a severe sanction for the offense conduct that General Alcalá has pled guilty and accepted responsibility for while acknowledging that both his role in the offense and his personal history and characteristics distinguish him from defendants deserving of increased penalties for terrorism related offenses.

## II.    General Alcalá Has Been Subjected to Unduly Harsh and Sub-Standard Conditions While Being Incarcerated for the Entirety of the COVID-19 Pandemic

While not a sentencing factor under 18 U.S.C. § 3553(a), this Court should factor and downwardly vary on the ground that General Alcalá was incarcerated for the entire COVID-19 pandemic. Like all defendants detained during the COVID-19 pandemic, General Alcalá's detention has been unduly harsh by no fault of his own or, in most cases, the facility in which he has been imprisoned. Being imprisoned during the COVID-19 pandemic was not only terrifying, but also much more difficult and punitive than any other time in modern penological history. The constant security lockdowns and general conditions during the global pandemic taken together with the fact that General Alcalá has no one in the United States except his counsel to visit him these past 1,402 days, have been grueling, punitive, and unnecessarily harsh. General Alcalá experienced and survived the longest and most punitive series of system-wide and individual facility lockdowns in Bureau of Prisons history due to the COVID-19 pandemic and he should receive a substantial variance.

Substandard pre-sentence housing conditions is certainly relevant to a defendant's sentencing. For example, pre-pandemic, judges in this Circuit have considered the substandard conditions in the 11-South Unit of MCC and adjusted sentences accordingly. *See United States v. Behr*, No. S1 03 Cr. 1115 (RWS), 2006 WL 1586563 *5 (S.D.N.Y. Jun. 9, 2006) (imposing time-served sentence where defendant housed in MCC's 11-South Housing Unit). Harsh pre-sentencing conditions constitute collateral punishment that warrants a sentencing variance because "the punitive aspects of the defendant's confinement are increased and the deterrent effect of the defendant's confinement is also increased." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009); *see also United States v. Francis*, 129 F. Supp. 2d 612, 616-19 (S.D.N.Y. 2001) (downwardly departing because defendant spent more than thirteen months in substandard conditions including, overcrowding and inadequate hygiene).

More specifically and particularly relevant are the courts in this District and the Eastern District of New York that have varied downward as a result of the onerous pre-sentence detention conditions during COVID-19. *See, e.g., United States v. Battle*, 20 Cr. 349 (EK) (E.D.N.Y.)

4

(harsh conditions tantamount to unearned disciplinary segregation or worse); *United States v. Carpenter*, 18 Cr. 362 (GRB) (E.D.N.Y.) ("I am going to find that the Guidelines have not and at this point in history cannot have considered the effects of COVID and the other problems at MDC on the quality of incarceration."); *United States v. Latney*, 18 Cr. 606 (JS)(E.D.N.Y.) (custody during COVID abnormally harsh); *United States v. Edwards*, 20 Cr. 618 (VLB) (S.D.N.Y.) (custody during COVID "unusually harsh"); *United States v. Martinez*, 18 Cr. 669 (JPO) (S.D.N.Y.) (time spent in MCC during COVID equivalent to 1.5 to 2 times the normal time); *United States v. Browning*, 20 Cr. 002 (VSB) (S.D.N.Y.) (not the fault of the BOP but concluding that there was no question that the time was more difficult); *United States v. Diaz*, 20 Cr. 305 (DLC) (S.D.N.Y.) (downward variance based on MDC COVID conditions); *United States v. Paulino*, 19 Cr. 607 (AJN) (S.D.N.Y.) (downwardly varying based on COVID prison conditions); *United States v. Rodriguez*, 19 Cr. 817 (LAK) (S.D.N.Y.) (same); *United States v. Amado-Ortiz*, 19 Cr. 923 (JMF) (S.D.N.Y.) (same).

In early 2020, the COVID-19 global pandemic descended upon New York, and it crushed inmates all over the country, and especially those housed in New York. At points of his detention, the lockdowns partially lifted, only to be revived due to additional COVID-19 outbreaks possibly related to new COVID-19 variants. The pandemic and its necessary lockdowns and quarantines robbed many of us of important aspects of our lives, but for General Alcalá and his family and friends, they had to endure these uncertain times with extremely limited to no contact with those from which they derive their strength and resolve. Accordingly, this Court should consider the harsh pretrial detention conditions to which General Alcalá has been subjected. The conditions have been substandard, unduly harsh, and we request that the Court factor them into its sentence.

**III.     General Alcalá's Role in the Offense, History and Characteristics, and an Analysis of the Sentences in Similar Cases Reveals That a Sentence of No More Than 72 Months' Imprisonment Is Sufficient But Not Greater Than Necessary to Achieve the Goals of Sentencing**

After the Court considers the conditions under which General Alcalá has been detained for the majority of the past four years, the Court must then turn to the factors of sentencing under § 3553(a) and the goals of sentencing, namely rehabilitation, deterrence, and just punishment. The Court should have no concerns nor is there any real threat that General Alcalá poses a danger to the United States or is there any real risk that he has not been deterred. General Alcalá is sixty-two years old having served virtually his entire adult life as a member of the Venezuelan Army, rising to the rank of Major General. His role in the offense was to carry out the orders of then President Chávez to provide support and aid to the FARC. He did not do so for any personal gain nor is there any credible evidence that General Alcalá enjoyed any enrichment from the offense. To the contrary, when he was arrested in Colombia, he and his men planning to militarily oust President Maduro were virtually penniless. He has no riches to which to return – his family has struggled to survive ever since he was arrested. He also has no country to which to return. A return to Venezuela would mean certain arrest and potential death for opposing the current regime. Furthermore, any sentence greater than 72 months' imprisonment considering General Alcalá's role in the offense and history and characteristics, would result in an unwarranted sentencing disparity. While General Alcalá unequivocally accepts responsibility for his offense conduct, he is distinguishable from the vast majority of material support

defendants who commit crimes with the intent of causing grievous levels of harm and suffering to the United States and its citizens, and thus, deserving of a substantial downward variance to prevent an unwarranted sentencing disparity.  A substantial downward variance is further warranted because General Alcalá, unlike the majority of defendants facing deportation after completing their sentence, faces at best a prolonged period in immigration detention until he can secure asylum in a safe country or at worst imprisonment and likely torture and/or death after being deported to Venezuela.  Accordingly, we respectfully submit that the Court should sentence General Alcalá to no more than 72 months' imprisonment.

       1.     <u>General Alcalá's Role in the Offense Warrants a Significant Downward Variance</u>

General Alcalá has pled guilty to two offenses not charged in the superseding indictment.  He pled guilty to the charges contained in superseding information S3, namely, the Provision of Material Support and Resources to a Designated Foreign Terrorist Organization (the FARC) and Receipt and Transfer of Firearms for Use in a Federal Crime of Terrorism (by the FARC).  The crimes to which General Alcalá has pled guilty are certainly very serious, however, his role in those offenses do not warrant a Guidelines sentence or anything near a Guidelines sentence, but rather support a substantial downward variance.

As we expect the government to concede, the evidence shows that at all times General Alcalá provided any support, aid, or weapons to the FARC, he did so as a general in the Venezuelan army at the direction of his superiors, namely President Chávez.  While this fact does not absolve him from responsibility or criminal liability before a United States court, it certainly is a significant fact warranting consideration by the Court in determining the appropriate sentence.  General Alcalá was not a private citizen bearing arms or assisting those who bore arms against the United States for some personal ideological reason or for personal gain.  He is not the same as a civilian who is accused of joining or supporting a terrorist organization.  He was a uniformed member of the armed forces of a sovereign nation, and as such his interactions and dealings with the FARC were conducted within the rubric of Venezuelan sovereign policy.  General Alcalá's provision of food, medicine, weapons, and any other aid to the FARC was all undertaken as part of Venezuelan policy as directed by then President Chávez.  The conflict between the FARC and the nation of Colombia was of particular import to Venezuela, which shares a 1400-mile border with Colombia.  Dealings with the FARC were a matter of both foreign policy and domestic security, and General Alcalá's actions in this regard were entirely within the scope of his official duties.  The decision by Chávez and Venezuela's civilian leadership to provide military and other support to the FARC had nothing to do with the United States but rather was a matter of regional foreign and domestic security policy.

The allocution language of his plea agreement with the government and his statements at his change of plea hearing reflects this reality.  General Alcalá admitted the following:

> Beginning in or about 2006, the defendant, while a General in the National Bolivarian Armed Forces of Venezuela, provided support to the FARC, under the direction of Hugo Chávez, among others, knowing that FARC members engaged in drug trafficking and kidnappings to support the FARC's goals, including by: (i) preventing FARC members and associates from being arrested by Venezuelan law enforcement or being engaged by the Venezuelan military; (ii) providing

> protection, including freedom of movement and freedom from interference, for FARC members and associates that the defendant knew trafficked cocaine; and (iii) providing weapons to the FARC, including approximately 20 grenades and two grenade launchers intended for Luciano Marín Arango, a/k/a "Ivan Marquez," and Rodrigo Londoño Echeverri, a/k/a "Timochenko."

Plea Agreement at 2; *see also* Plea Transcript at 19-23.

We expect that the government will argue that the Court should consider "relevant conduct" or evidence of General Alcalá's involvement in narcotics trafficking as charged in the superseding indictment. First, the Court has already rejected the government's approach by declining to set a *Fatico* hearing in the parties scheduling call with the Court on October 30, 2023. Second, General Alcalá has steadfastly denied any participation in drug trafficking since well before his arrest in this case and has maintained that position throughout the prosecution of his case. As noted by the government in its response to the defense's renewed motion for *Brady* materials, it produced notes to the defense of November 2013, April 2014, and July 2014 meetings with General Alcalá and United States law enforcement where he both admitted providing support to the FARC in performance of his duties as a general and denied any participation in drug trafficking. *See* Government's June 15, 2022 Opposition, at 7-8. And, of course, he pled guilty to charges related to his provision of support to the FARC while a member of the Venezuelan armed forces and *not* narcotics related offenses.

Furthermore, as noted in Section I above, even the Probation Department relies on conduct proffered by the government which General Alcalá adamantly denies. General Alcalá disputes each of the allegations made in paragraphs 13 through 19 of the PSR regarding allegations of his involvement in narcotics trafficking. General Alcalá pled guilty to providing material support and weapons to the FARC knowing that FARC members engaged in, *inter alia*, drug trafficking, but nothing more than that. He unequivocally denies that he personally engaged in any type of conduct that constituted or directly facilitated drug trafficking and considering such conduct would be inappropriate, a belief that we understand the Court shares.

Accordingly, the Court should consider only the crimes to which General Alcalá has pled guilty and that his role in those offenses was to act pursuant to orders of his superior, the President of Venezuela, and as part of Venezuela's foreign policy with regard to an internecine dispute on its border, to substantially vary downward the appropriate sentence for General Alcalá.

    2.    <u>General Alcalá's History and Characteristics Establish He Has Led the Honorable Life of a Loyal Venezuelan Soldier, Patriot, and Dedicated Family Man</u>

General Alcalá's public image while a general was that of a strong, loyal and fierce patriot committed to the ideals of the Venezuelan state as articulated by former Venezuelan President Hugo Chávez. He was a Major General and leader to thousands of soldiers. After President Chávez's death, the rise of President Maduro, and General Alcalá's retirement from the Venezuelan Army, his public image remained that of a patriot and a fierce and passionate opponent of President Maduro and his policies. Publicly, he was viewed as a former soldier who openly accused President Maduro and his administration of twisting the ideals of the Venezuelan

7

democracy, openly calling the administration a band of criminals.  That passionate public image, both before and after his military service, represented the professional ideals of a man committed to doing what he considered was best for the Venezuelan people.  But General Alcalá was also a very private man in his personal life.  A man deeply devoted to his family.  He is the core and most important part of his immediate and large extended family.  His importance to his whole family cannot be overstated.  General Alcalá, no matter how important his military position or notoriety and amount of time it kept him physically away from his family, maintained his close connections to his family and involvement in raising his children.  He is everything to his children, including his eight-year-old daughter from whom he has been separated to close to four years.  He enjoys an incredible support network despite being physically separated from them for close to four years with no personal contact.

We have obtained approximately 28 letters in support of General Alcalá from his family and others in Venezuela that speak to his selflessness, devotion to family, and his extraordinary professional abilities.  Unfortunately, because of General Alcalá's fierce opposition to President Maduro (his alleged co-defendant in the superseding indictment), all but three of his supporters have conditioned the use of their letters on the letters being filed under seal out of real fears of reprisal.  Anyone viewed as supporting General Alcalá in Venezuela is considered an enemy of the state – like the soldiers he led that attempted to unseat the current government who remain imprisoned under the harshest and most torturous conditions.[1]

General Alcalá's story is one of dedication, strength, incredible work ethic, discipline, loyalty, and love.  He has lived a life of achievement but by staying true to his ideals.  For that he has gained the support, loyalty, and love of many that in this dark time in his life have served to guide and support him.  General Alcalá looks forward to that time where he can reunite with his family and live the modest life that he has envisioned raising and supporting his family.  General Alcalá is the proud father to three children whose lives in which he is actively involved.  His family has always served as his compass and reason for life.  But they need him just as much – his middle daughter suffers health issues for which she needs the assistance and support of her father.

General Alcalá was born in 1961 in Caracas, Venezuela.  He lost his mother at a very young age (she was only 33 years old) and since his parents were divorced at the time, General Alcalá, at the age of 12, moved into his grandparents' loving home.  His grandparents raised Cliver and his five siblings.  Even though Cliver was not the oldest, his siblings looked to him as the head of the family even at that young age.  He was a natural leader able to make his siblings feel safe and inspired them to go on to do great things.  These characteristics served him well in his lengthy,

---

[1] We have not attached all the letters in support at this time given the writers' real concerns of reprisal by the Maduro government.  It has been communicated by almost all writers that they fear imprisonment or worse if their support of General Alcalá is made public.  Accordingly, if the Court permits the letters to be filed under seal, we will provide them to the Court in hard copy or *via* email.  The government has no objection to these letters being filed under seal.

However, we have attached three letters to this public filing.  Those letter writers reside in the United States and are United States citizens.  Therefore, they do not share the other letter writers' fears of reprisals by the Maduro regime.

incredibly successful, and inspirational military career. Only five years after his mother's death, at the age of seventeen, Cliver enrolled in the Venezuelan military academy and thereafter dedicated his entire professional career to serving Venezuela as a member of the Venezuelan Army. Over the course of his career, General Alcalá was steadfast and unwavering in his opposition to narco-trafficking and other forms of illicit trade, including illegal mining operations and gem smuggling. He retired in July 2013, having completed thirty years of military service and having achieved the rank of Major General.

As noted above, General Alcalá's military career started in 1978, when he was only seventeen years old. At the military academy, he met future Venezuelan President Hugo Chávez. Lieutenant Chávez was one of the officers in charge of the incoming cadets. Lieutenant Chávez was a young lieutenant and both he and then-Cadet Alcalá specialized in tank operations. In 1983, Lieutenant Chávez was in charge of the basic course in tank operations. It was General Alcalá's final course at the military academy.

General Alcalá graduated from the military academy in July 1983. In 1984, he was sent to Fuerte Mara (a military city) to the battalion Bravos de Apure (an armored battalion within Fuerte Mara) for three and a half years. In 1986, he was promoted to Lieutenant. In 1987, he returned to the military academy as an officer and platoon advisor. In 1988, he attended an advanced course in tank operations. General Alcalá finished first in his class and in 1989 he returned to Fuerte Mara where he was assigned to command a company for the first time. In 1990, he was promoted to Captain.

In 1991, General Alcalá was assigned to command a cavalry unit called Escuadrón de Caballeria Leonardo Infante. From 1992 to 1994, General Alcalá left Venezuela for the first time and served as deputy military attaché to the Venezuelan embassy in the Dominican Republic. In 1994, he was promoted to Major and returned to Venezuela. He was then sent to Elorza to command the "602 Grupo de Caballería Motorizada Francisco Farsan". He remained there until 1996. From 1997 to 1998, General Alcalá attended the Course of Estado Mayor, a specialized course necessary for Commanders and members of the military's Joint Chiefs of Staff. For the rest of 1998, he commanded the 61st Brigade of Cavalry in Biroaca, Estado Apure.

In December of 1998, Chávez was elected President of Venezuela. President Chávez asked General Alcalá to serve as his personal military aide, a position that he held until September 2000. Among other functions, he was in charge of the coordination of President Chávez's visits to other countries, for example the visit to the United Nations in New York and the Organization of American States in Washington, D.C. In 1999, he was promoted to Lieutenant Colonel while still working as military aide to President Chávez.

In 2000, General Alcalá was sent to command the tank battalion of Zulia, called Bravos de Apure. On April 11, 2002, there was an attempted coup launched against President Chávez. General Alcalá defended President Chávez and assumed command of the Battalion Ayala and was promoted to Colonel. In the investigation following the attempted coup, it was concluded that the Metropolitan Police of Caracas had killed a number of civilians and General Alcalá was assigned to assume control of the Metropolitan Police for one year, from 2003-2004.

9

In 2004, General Alcalá was assigned to command an elite battalion in charge of security for the Venezuela Ministry of Defense. In 2006, he was promoted to Brigadier General and was transferred to Zulia, where he commanded the 11th Brigade of Maracaibo for one year. While there, in late 2006, there was an increase of FARC incursions into Venezuela and increased FARC kidnappings of Venezuelan citizens. To address these issues, General Alcalá was ordered by President Chávez to initiate contact with the FARC. President Chávez did not want the FARC to kidnap Venezuela citizens or to engage in operations on Venezuelan soil. In addition, President Chavez sought a relationship with the FARC leadership to address security issues and to foster peace talks between Colombia and the FARC. There had been protests by the Colombian government because FARC operatives were alleged to hide in Venezuela. President Chávez also did not want the Colombian army to chase the FARC onto Venezuelan soil. The prior general in Maracaibo did little to stop these activities and President Chávez expected General Alcalá to deliver results. President Chávez frequently bypassed General Alcalá's chain of command to communicate directly with General Alcalá about these border concerns. General Alcalá's job was to deliver the message that the FARC was to refrain from kidnapping Venezuelan citizens and stay within its own territory. President Chávez's policy goal at that time was to maintain adequate contact with the FARC and with the Colombian government – he wanted to position himself politically as the guarantor of the peace process between the FARC and Colombia.

Between 2007 and 2010, General Alcalá was the commander of the 41st Armored Brigade in Valencia. He was promoted to Division General. Between 2010 and 2012, he commanded the 4th Armored Division in Maracay, the most important armored division in Venezuela. In 2012, General Alcalá was transferred and given command of all of the Guayana region (52% of the country) and was promoted to Major General. He focused on combating illegal mining and especially illicit trafficking of gold and diamonds.

General Alcalá served under former Venezuelan President Hugo Chávez until his death in office in March 2013, at which time General Alcalá's alleged co-conspirator, Nicolás Maduro Moros, assumed the office of the presidency. General Alcalá had no interest in being part of Maduro's government. He doubted that Maduro would be an effective leader and was suspicious of Maduro's fidelity to the democratic ideals that General Alcalá had supported in his long career. As such, he declined Maduro's offers of two separate embassy-based positions and retired from the army just four months after Maduro took office, which coincided with his achieving thirty years of military service.

There can be no dispute that General Alcalá has been a public and notorious foe of Maduro and his government allies for many years. After retiring in 2013, General Alcalá became a vocal and outspoken critic of the Maduro regime. At that time, he joined the leading civil anti-Maduro movement ("Plataforma de Defensa Ciudadana de la Constitución" (Platform for the Defense of the Constitution) and began publicly (on social media and in the news media) calling Maduro and his henchmen corrupt, crooks, dishonest, and criminals. General Alcalá's opposition to Maduro soon escalated, and by 2017, with the knowledge of the United States government, General Alcalá began actively planning his first attempt to remove Maduro and his cronies from office through military intervention. These were not theoretical debates about democratic change, these were plans for armed insurrection against a regime and its leadership. The first such attempt was planned for March 2018, but the Venezuelan government learned of the plan

and crushed it. Many of the Venezuelan military officers recruited by General Alcalá and others to participate in the rebellion were imprisoned and many were reportedly tortured. General Alcalá eluded capture and fled to Colombia, but he did not give up his efforts to overthrow Maduro by armed rebellion.

General Alcalá spent the following years planning a second armed conquest against President Maduro in which he and his men were once again ready to lay down their lives to remove Maduro and his henchmen from office. The plan involved an armed insurrection, with General Alcalá using his contacts and reputation within the Venezuelan officer corps to rally troops to their cause. The plan had the backing of opposition leader Juan Guaidó. However, the plan fell apart when the United States government indicted him in this case. On the eve of launching the operation, General Alcalá was contacted by United States law enforcement agents in Colombia who informed him he had been indicted in the United States. The agent informed General Alcalá that he could either board a private jet bound for New York or be held in a Colombian jail where he would no doubt be targeted by the Venezuelan intelligence services for assassination. Left with little choice, General Alcalá agreed to accompany the agent back to the United States. At the time of his arrest, he had $3,000 in a bank account, lived in a small rental apartment with his wife and four-year old daughter, and drove an old Nissan.

Although deprived of General Alcalá's leadership, his dedicated fellow soldiers carried on with the planned action. Without General Alcalá's participation, the hoped-for rallying of disaffected Venezuelan troops never came to fruition, and the action was doomed to failure. All of the soldiers in the insurrection were either killed or captured, and many were imprisoned and subject to torture (including General Alcalá's own nephew).

General Alcalá has been detained in the United States since March 2020, almost four years. He has not had a single disciplinary infraction. From the outset, General Alcalá was willing to admit to his conduct providing support to the FARC when he was a general serving under President Chávez. However, negotiations stalled because of the government's unwillingness to accept that General Alcalá was not involved in narcotics trafficking. However, in June 2023, the government accepted the defense's proposal that General Alcalá be permitted to plead guilty to offenses involving his provision of aid to the FARC as part of his duties in the Venezuelan military.

General Alcalá's history and circumstances support a variance. His history and circumstances establish that he has led an admirable and honorable life. His crimes providing support to the FARC do not define him or his legacy, and we urge the Court to see and recognize that and vary substantially on this basis as well.

3.   General Alcalá's Age Warrants a Variance

At sixty-two years old, General Alcalá presents a low risk of recidivism. The relationship between age and crime is one of the most solid within the field of criminology. *See* Cornelius, Caitlin V.M. and Christopher J Lynch, *Aging Out of Crime:Exploring the Relationship Between Age and Crime with Agent Based Modeling*, Society for Modeling & Simulation International (SCS) (2017), *available at* https://scs.org/wp-content/uploads/2017/06/6_Final_Manuscript.pdf.

11

Statistically, older adults are far less likely than younger offenders to recidivate after release. *See* U.S. Sent. Comm., *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017), p. 3 *available at* https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders ("Age exerted a strong influence on recidivism across all sentence length categories. Older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed."). As a first-time offender who has had no disciplinary infractions while incarcerated, General Alcalá is in the category of defendants least likely to reoffend after his release. *See* U.S. Dep't of Justice Off. Of Inspector Gen., *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, p. 41 (Revised Feb. 2016), *available at* https://oig.justice.gov/reports/2015/e1505.pdf. At sixty-two, General Alcalá is unlikely to reoffend, has no desire to reoffend, and as such, does not need further incarceration for the purpose of specific deterrence.

In addition to constituting as harsher punishment for General Alcalá due to his age, prolonged incarceration will also be an unnecessary financial burden to the United States government. Older prisoners are also much more expensive for the BOP to maintain because of health and mobility issues. *See* U.S. Dep't of Justice Off. Of Inspector Gen., *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, pp. 10-16 (Revised Feb. 2016), *available at* https://oig.justice.gov/reports/2015/e1505.pdf. Inmates over the age of 55 cost approximately three times more to incarcerate than an average adult inmate. *See* Williams BA, Goodwin JS, Baillargeon J, Ahalt C, Walter LC, *Addressing the Aging Crisis in U.S. Criminal Justice Healthcare*, J Am Geriatr Soc. 2012 Jun; 60(6):1150-1156, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3374923/?report=reader.

General Alcalá's age supports a substantial downward variance.

4. <u>Sentencing General Alcalá to a Guidelines Sentence Despite His Role in the Offense and His Personal History and Characteristics Would Create an Unwarranted Sentencing Disparity</u>

Next the Court should take the sentences of defendants convicted of Material Support and consider those against General Alcalá's conditions of confinement, role in the offense, and history and characteristics. We are confident that when the court does that, it will agree that anything more than 72 months' imprisonment would create an unwarranted sentencing disparity. It is undisputed that there are defendants sentenced for committing the crime of providing material support for whom decades of incapacitation is the only way to achieve the goals of sentencing. *See, e.g., United States v. Ibrahim*, 529 F. App'x 59, 65 (2d Cir. 2013) (holding that the district court's Guidelines sentence, which applied the terrorism enhancement, was substantively reasonable for a defendant who after trial was "convicted of conspiring to explode pipelines and jet-fuel tanks at JFK Airport in order to kill countless Americans and other travelers, disrupt air travel, and harm the American economy"). For such defendants, the so-called "terrorism" enhancement in U.S.S.G. §3A1.4(a) is not only reasonable but necessary. General Alcalá is not such a defendant, yet the terrorism enhancement vaults his advisory Guidelines to a draconian range of 360 months' imprisonment.

It is now well settled that the Guidelines are only advisory, that they are only one of many statutory factors to be considered, that they are not entitled to any greater weight than the other statutory factors and that they are not entitled to any presumption of reasonableness. *See generally Gall v. United States,* 552 U.S. 38 (2007).  The Guidelines range here does not resemble anything approaching a reasonable sentence.  *See generally* James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 LAW & INEQ. 51, 57-58 (2010) (explaining how the terrorism enhancement results in sentences "often disproportionate to the conduct of conviction").  When the Court considers the other Section 3553(a) factors, primarily General Alcalá's role in the offense and his personal history and characteristics, it will be evident that a substantial downward variance from the advisory Guidelines range is necessary to prevent an unwarranted sentencing disparity between General Alcalá and those defendants who commit crimes with the intent of causing grievous levels of harm and suffering to the United States.

While not completely analogous, General Alcalá's case is comparable in many ways to the defendants in *United States v. Thavaraja, et al.,* 06 Cr. 616 (RJD) (E.D.N.Y).  In sentencing one of the defendants in *Thavaraja*, Judge Dearie made the following statement which profoundly summarizes the perils of a blanket application of a Guidelines sentence including the terrorism enhancement:

> The thought occurred to me that in this country, notwithstanding our understandable reaction to such things and this understandable and needed prosecution, so that the country does not stand in any way support by action or inaction of terrorism anywhere in the world, in this country, one size does not fit all.  I think we have to be very careful before we throw out the word 'terrorism' and 'terrorist' or 'support for terrorism,' lest we fail to take into account the full picture of the individual[.]

*United States v. Thavaraja*, 12-4330, ECF No. 53-2 at 158:8-18, Sentencing Transcript of Murugesu Vinayagamoorthy dated Apr. 27, 2011.

Six of the seven defendants sentenced in *Thavaraja* were convicted of providing material support to a designated foreign terrorist organization.  Below is a chart summarizing their sentences.

| **Defendant** | **Convicted Offense(s)** | **Term of Imprisonment** |
|---|---|---|
| Pratheepan Thavaraja | Material Support<br>Conspiracy to Defraud the U.S. | 108 months |
| Murugesu Vinayagamoorthy | Material Support | Time Served (56 months) |
| Vijayshanthar Patpanathan | Material Support | Time Served (53 months) |
| Karunakaran Kandasamy | Material Support<br>Money Laundering | Time Served (approx. 60 months) |
| Suresh Sriskandrajah | Material Support | 24 months |
| Ramanan Myvaganam | Material Support | Time Served (34 months) |

The terrorist organization to which the defendants in *Thavaraja* provided material support was the Liberation Tigers of Tamil Eelam ("LTTE"), "a militant separatist group in northern Sri Lanka that sought to establish an independent Tamil state." *United States v. Thavaraja*, 740 F.3d 253, 255 (2d Cir. 2014). The material support the defendants provided to LTTE occurred during an ongoing decades long civil war between LTTE and the Sri Lankan government, a civil war during which there were "apparent serious human rights violations on both sides of the conflict." *Id.* (internal quotations omitted). The lead defendant, Pratheepan Thavaraja, is the defendant most similarly situated to General Alcalá. Mr. Thavaraja was the only defendant to have committed the offense conduct while physically present in Sri Lanka. He was extradited to the United States to be prosecuted in connection with the case, prior to his extradition he had never been to the United States. Mr. Thavaraja's offense conduct was summarized as follows:

> Pratheepan was the principal procurement officer for the LTTE from 2002 to 2006. At the direction of the LTTE leadership, he purchased at least $20 million worth of military-grade weapons (including anti-aircraft guns, rocket launchers, and explosives) and materials used to make suicide bombs. Weapons with serial numbers matching those in Pratheepan's purchase orders were discovered among weapon caches confiscated from the LTTE by the Sri Lankan government. Pratheepan also played a role in a scheme to bribe State Department officials to remove the LTTE from the foreign terrorist organization list. He relayed messages between the LTTE leadership and operatives in the United States who were arranging the bribe with undercover government agents. *Id.* at 256

While Mr. Thavaraja's Guidelines range would have been 360 months to life, it was reduced to 240 months' imprisonment because of the applicable statutory maximums. *See id.* at 257. The district court sentenced Mr. Thavaraja to a term of 108 months' imprisonment, approximately 55% below the Guidelines range after accounting for the statutory maximum and approximately 70% below the Guidelines range before accounting for the statutory maximum.

The government appealed the district court's imposition of Mr. Thavaraja's 108-month sentence, as substantively unreasonable. The Second Circuit affirmed the district court holding that based on the "[the defendant's] history and characteristics, the nature and circumstances of his crimes, and all of the relevant factors…the sentence imposed by the district court was not substantively unreasonable." *Id.* at 263. The Second Circuit went on to conclude "that the sentence imposed…reflect[ed] thoughtful and principled consideration by a conscientious district judge of all the factors relevant to an individualized determination of a fair and just sentence." *Id.*

The district court applied the substantial downward variance in sentencing Mr. Thavaraja based on the following mitigating circumstances: (1) he was not motivated by power or self-aggrandizement but by a desire to help the people of his native country; (2) his actions had to be evaluated in the context of the conflict that they occurred amidst; (3) his actions, while carrying the banner of terrorism, were not directed at the United States; (4) he did not have a criminal record; (5) he accepted full responsibility for his crimes; (6) he had been a model inmate for the entirety of his presentence detention; (7) he was an educated person of substance and decency; (8) he was not in the United States voluntarily but had been arrested in a foreign country and separated from his loved ones before being extradited to the United States (note that General

14

Alcalá came voluntarily to the United States and did not force extradition proceedings); and (9) the uncertain future he faced because of the likelihood he would be deported after completing his sentence and the fear of reprisal in his home country. *See id*. at 260-61. Each of these circumstances applies to General Alcalá, and the Court should rely on them in reaching a similar result. However, there are also multiple circumstances that distinguish General Alcalá from Mr. Thavaraja that warrant the Court applying an even greater downward variance than the district court did in *Thavaraja*.

First, General Alcalá, unlike Mr. Thavaraja, served almost four years of pretrial detention subjected to the unduly harsh conditions caused by the unprecedented COVID-19 pandemic. Second, General Alcalá will be 25 years older than Mr. Thavaraja was at the time he is sentenced. Third, General Alcalá maintained a distinguished military career for decades and the entirety of his offense conduct was committed in furtherance of his service to Venezuela and at the direction of his superiors, namely, President Chávez. Fourth, while General Alcalá accepts responsibility for and admits that he provided material support to the FARC as part of his military service to Venezuela (as opposed to Mr. Thavaraja), he was never himself a member of a terrorist organization. Fifth and last, as discussed below, while both General Alcalá and Mr. Thavaraja at the time of their sentencings were men without a country facing dire consequences if deported to their home countries, Mr. Thavaraja had the potential of being granted asylum in the United States. These five circumstances distinguish General Alcalá from Mr. Thavaraja and warrant the Court applying a greater downward variance from his advisory Guidelines range than the district court did in *Thavaraja*. We respectfully submit that sentencing General Alcalá to anything more than 72 months' imprisonment would result in an unwarranted sentencing disparity.

     5.     <u>The Adverse Consequences of General Alcalá's Removal Should Be Considered by The Court in Determining What Sentence Is Sufficient to Achieve the Goals of Sentencing</u>

The Second Circuit recognizes that district courts may consider the consequences of deportation as a Section 3553(a) factor. *Thavaraja*, 740 F.3d at 262-63 ("In determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, 18 U.S.C. § 3553(a), a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family."). For General Alcalá, the consequences of his deportation are far more dire than those of the garden variety defendant awaiting deportation after serving his sentence. General Alcalá is further distinguishable from typical defendants subject to deportation after serving their sentences because he did not come to the United States legally or illegally. He agreed to be extradited from Colombia and prosecuted for offense conduct that did not occur here.

General Alcalá is a man without a country. Although he is a citizen of Venezuela he cannot go back there. And he currently has nowhere else to go. Deportation for General Alcalá means being delivered to Venezuela where all his family and friends have fled, to face certain albeit unjustified imprisonment and potential death. The only way that General Alcalá will be able to live his life safely after he completes his sentence is if he is able to find a country that will agree

15

to grant him political asylum, a process that if successful will likely take months, if not years. Notably, in the period between the completion of his sentence and either his removal to Venezuela or his ability to secure political asylum in a safe country, he will not be a free man but rather will be subject to prolonged immigration detention.

Without the assistance of the government, General Alcalá's ability to secure such asylum prior to being deported to Venezuela where he will be subject to horrific treatment and potential death, are bleak.  It is for this reason that we respectfully ask that Your Honor include language in General Alcalá's judgment recommending that his removal and deportation be deferred pending his ability to successfully secure political asylum in a country where he will be free from the dire perils that await him in Venezuela.[2]  Both the inevitability of this additional detention and the dire consequences of General Alcalá's deportation should be considered by the Court in determining what constitutes a sentence sufficient but not greater than necessary to accomplish the goals of sentencing.

### III.     Conclusion

For the foregoing reasons, it is respectfully submitted that the Court sentence General Alcalá to no more than 72 months' imprisonment.

Respectfully submitted,

/s/

César de Castro
Valerie A. Gotlib
Adam S. Kaufmann
Cristián Francos

cc:     All Parties (*via* ECF)

---

[2]  Based on a similar request by the defense in *Thavaraja* (discussed at length above), Judge Dearie included the following language in the defendant's judgment: "The Court strongly recommends that careful consideration be given to the question of removal in light of the genuine and understandable concern for the defendant's safety if he is sent back to Sri Lanka." *Thavaraja*, 06 Cr. 616 (RJD), ECF No. 491 at 4.

16