*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 15, 2024

Via ECF
The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

    Re: *United States v. Cliver Antonio Alcala Cordones*, S3 11 Cr. 205 (AKH)

Dear Judge Hellerstein:

  The Government respectfully submits this letter in advance of the defendant's sentencing, scheduled for January 18, 2024, and in response to the defendant's January 8, 2024 sentencing submission. (Dkt. 144 (the "Def. Mem.")).

  The defendant was a powerful Major General in the National Bolivarian Armed Forces of Venezuela, who, for years, provided broad and consistent support to the *Fuerzas Armadas Revolucionarias de Colombia* ("FARC"), a violent organization based in Colombia that was dedicated to the overthrow of the Colombian government and responsible for the production and distribution of the majority of the cocaine that eventually reached the United States. Through his high-ranking position in the Venezuelan military, including his command of thousands of heavily armed military officers, the defendant supported the FARC in myriad ways for years. For example, the defendant shielded FARC members and associates and their drug trafficking partners from interference by the Venezuelan military and law enforcement; supplied military-grade weapons to some of the most senior FARC commanders; stationed his men at dirt airstrips to protect planes loaded with tons of the FARC's cocaine for eventual distribution to the United States and elsewhere; and ensured that the Venezuelan military did not interdict loads of cocaine sourced from the FARC at vehicle checkpoints and at a major Venezuelan airport. In exchange, the defendant received millions of dollars in cocaine-fueled bribes. On June 29, 2023, the defendant pled guilty to a two-Count information, S3 11 Cr. 20 (AKH), Dkt. 115 ("S3 Information"), pursuant to a plea agreement ("Plea Agreement") in which the parties have stipulated that the applicable sentencing range under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") is 360 months' to life imprisonment. The U.S. Probation Office ("Probation") has recommended a within-Guidelines sentence of 360 months' imprisonment, and, as set forth below, such a sentence is appropriate based on the § 3553(a) factors.

  The defendant, in seeking a sentence of 72 months' imprisonment, points to various purported mitigating factors, including his personal background and age; claims that he was a patriot and was just following orders when he supported the FARC; his connections to family and friends; and the conditions of his incarceration during the COVID-19 pandemic. These alleged

mitigating factors do not justify the drastic variance the defendant seeks, and the defendant fails to adequately address, or fully acknowledge, the egregious nature of his criminal conduct. Motivated at least in part by greed, the defendant supported the FARC's operations for years, unleashing untold violence on innocent people and the trafficking of cocaine bound for the United States on a monumental scale. Now, as he seeks to minimize the gravity of this abhorrent conduct, the defendant seeks *leniency* from the Court because he claims he was merely a member of the army who was following orders and because, after years of this conduct, he broke with the Venezuelan regime and attempted to overthrow the government. These arguments evidence a troubling inability to accept full responsibility for his conduct and do not, in any way, account for the dramatic variance he now seeks. They also do not fully grapple with the reality of what he has done—the defendant was not merely a general who was following orders; he accepted millions of dollars in cocaine-fueled bribes to allow and help *tons* of poison transit to this country, while also arming the FARC so it could protect and grow its cocaine distribution network. Thus, and for the reasons to follow, the Government respectfully submits that a sentence of at least 360 months' imprisonment, which is within the stipulated Guidelines range, would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case.

## FACTUAL BACKGROUND

### I.     Offense Conduct

#### A.  The *Cartel de Los Soles* and the *Fuerzas Armadas Revolucionarias de Colombia*

The defendant—along with his co-defendants Nicolas Maduro Moros ("Maduro"); Diosdado Cabello Rondon ("Cabello"), the current head of Venezuela's National Constituent Assembly; and Hugo Armando Carvajal Barrios, a/k/a "El Pollo" ("Carvajal"), a general and the former head of Venezuela's Directorate of Military Intelligence—was a member of the *Cartel de Los Soles* or "Cartel of the Suns" (the "Cartel"). (Presentence Investigation Report ("PSR") ¶ 19). The Cartel was a Venezuelan organization comprised of high-ranking Venezuelan officials who abused their positions of power and corrupted the legitimate institutions of Venezuela to support the FARC and facilitate the importation of tons of cocaine.[1] (PSR ¶ 1). Not surprisingly, the defendants worked with the leadership of the FARC, including co-defendants Luciano Marin Arango, a/k/a "Ivan Marquez" ("Marin"), a then-member of the FARC's Secretariat (the FARC's highest leadership body), and Seuxis Paucis Hernandez Solarte a/k/a "Jesus Santrich" ("Santrich"), a then-member of the FARC's Central High Command (the FARC's second-highest leadership body).[2] And the Cartel has survived multiple regimes in Venezuela; the former President of Venezuela, Hugo Rafael Chavez Frias ("Chavez"), was a leader of the Cartel until his death in 2013, when Maduro took over. (*See* PSR ¶ 12; *see also* S2 Indictment) ¶ 7). The Cartel sought not only to traffic massive quantities of cocaine for financial gain, but also to weaponize cocaine by "flooding" the United States with it, thereby inflicting the drug's harmful and addictive effects on users in this country. (S2 Indictment ¶ 4).

---

[1] The name of the Cartel is a reference to the sun insignias affixed to the uniforms of high-ranking Venezuelan military officials who were members of the Cartel. (Dkt. 11 ("S2 Indictment") at 3).

[2] As the Court is aware, Santrich died in or about March 2022 (Dkt. 106), and Carvajal was extradited to the United States from Spain in July 2023 (Dkt. 119) and his case is pending. The remaining defendants have not been arrested.

The Honorable Alvin K. Hellerstein								Page 3
January 15, 2024

The FARC, which the United States Department of State (the "State Department") designated as a Foreign Terrorist Organization[3] ("FTO") in 1997, largely controlled the coca fields in Colombia and was one of the largest cocaine producers in the world for decades.[4] (PSR ¶ 11). The FARC has also perpetrated acts of violence, including against United States nationals and property. (PSR ¶ 11). For example, FARC leadership ordered FARC members to kidnap and murder U.S. citizens and to attack U.S. interests to dissuade the United States from continuing its efforts to disrupt the FARC's manufacture and distribution of cocaine. (PSR ¶ 11; *see also* S2 Indictment ¶ 11). As further detailed in Exhibits A and B, which are appended hereto, examples of the FARC's violence include kidnappings and murders over the course of multiple decades; detonating explosives in Bogota and elsewhere, resulting in dozens of deaths; and bombing an oil pipeline in June 2015, causing the worst environment disaster in Colombia's history. *See* State Department, Office of the Historian, Bureau of Public Affairs, "Significant Terrorist Incidents, 1961-2003: A Brief Chronology," https://2001-2009.state.gov/r/pa/ho/pubs/fs/5902. htm (last accessed Jan. 15, 2024) ("Ex. A") at 4, 6-8 (highlighting FARC attacks for the Court's ease of review); Ex. B, Stanford University, Center for International Security and Cooperation, Freeman Spogli Institute, "Mapping Militant Organizations "Revolutionary Armed Forces of Colombia" (last modified July 2019); available at https://cisac.fsi.stanford.edu/ mappingmilitants/profiles/revolutionary-armed-forces-colombia-farc (last accessed Jan. 15, 2024) ("Ex. B"), at 1-3.

For over 20 years, the FARC and the Cartel worked together to produce and distribute massive quantities of cocaine, including tons of cocaine to the United States. Starting in 1999, while the FARC purported to negotiate peace with the Colombian government, the FARC also agreed with leaders of the Cartel to move certain cocaine production operations to Venezuela under the protection of the Venezuelan government. (S2 Indictment ¶ 14(a)). FARC members and their associates began to cultivate coca leaves on farms in this region, such as southwest Colombia and in the mountain range spanning the Venezuela-Colombia border. (S2 Indictment ¶ 14(b)).

The FARC and the Cartel dispatched processed cocaine by sea and by air from Venezuela, often to the United States, via transshipment points in Central America and the Caribbean. (S2 Indictment ¶ 14(c)). Bribes were paid to individuals who worked in the Venezuelan government— such as the defendant, as described below—for protection from arrest and investigation, and for access to ports and airspace. (S2 Indictment ¶ 14(d)). In addition, members of the Cartel

---

[3] The FARC was delisted on November 30, 2021, many years after the defendant left Venezuela. *See* State Department, Press Statement (Nov. 30, 2021), *available at* https://www.state.gov/revocation-of-the-terrorist-designations-of-the-revolutionary-armed-forces-of-colombia-farc-and-additional-terrorist-designations/ (last accessed Jan. 15, 2024). Simultaneous to that delisting, the State Department designated two successor organizations, FARC-EP and Segunda Marquetalia, noting that Marin "is the founder and overall leader of" one of the two successor organizations, Segunda Marquetalia. *Id*.

[4] *See, e.g.*, Yagoub, M., "The FARC's Riches: List of Assets Fails to Reveal Guerillas' Total Wealth," *Insight Crime* (Aug. 29, 2017), *available at* https://insightcrime.org/news/analysis/farc-riches-yearly-income-up-to-580-million/ (last accessed Jan. 15, 2024) (stating that, "[w]hile the FARC always denied direct involvement in drug trafficking, it has been the financial bedrock of their revolution").

The Honorable Alvin K. Hellerstein  Page 4
January 15, 2024

coordinated with the FARC to transport and distribute large cocaine shipments; benefited from, and caused others to participate in, the provision of heavily-armed security to protect the cocaine shipments; caused large quantities of previously-seized cocaine to be sold to drug traffickers in exchange for millions of dollars; interfered with drug-trafficking investigations and pending criminal cases in Venezuela and elsewhere; and helped provide the FARC with military-grade weapons. (S2 Indictment ¶ 14(e)). As described below, the defendant played an important role in facilitating much of the foregoing, as the FARC grew to become the single largest supplier of cocaine to the United States.

### B. The Defendant's Provision of Material Support and Transfer of Firearms to the *Fuerzas Armadas Revolucionarias de Colombia*

The defendant does not dispute that, beginning in or about 2006, while he was a general in the National Bolivarian Armed Forces of Venezuela, the defendant provided support to the FARC, knowing that FARC members engaged in drug trafficking and kidnappings to support the FARC's goals. (PSR ¶ 12; Def. Mem. at 6-7). The defendant also does not dispute that his support of the FARC included: (1) preventing FARC members and associates from being arrested by Venezuelan law enforcement or being engaged by the Venezuelan military; (2) providing protection, including freedom of movement and freedom from interference, for FARC members and associates that the defendant knew trafficked cocaine; and (3) providing weapons to the FARC, including approximately 20 grenades and two grenade launchers intended for two high-ranking FARC leaders, Marin and Rodrigo Londoner Echeverri, a/k/a "Timochenko" ("Timochenko"). (PSR ¶ 12; Def. Mem. at 6-7).[5]



This was not all. The defendant's material support of the FARC extended to directly helping the FARC to distribute cocaine. For example, in 2007, the defendant attended a meeting with other members of the Cartel, including Carvajal, as well as drug traffickers associated with the FARC. (PSR ¶ 17). At the meeting, attendees discussed ways in which the FARC and members of the Cartel could aid the FARC, including by allowing FARC aircraft transporting drugs to access landing strips along the Venezuela-Colombia border and providing advance notice of Venezuelan military activity near landing strips or near FARC camps. (PSR ¶ 17). Additionally, Carvajal told

---

[5] As noted in Section III.B, *infra*, aside from the foregoing paragraph, which comprises the stipulated facts set forth in the Plea Agreement, the defendant disputes the remaining facts set forth in Section I.B and Paragraphs 10 and 13 through 19 of the PSR and argues that these allegations are not relevant to sentencing. (*See* Def. Mem. at 7).

The Honorable Alvin K. Hellerstein																			Page 5
January 15, 2024

the defendant that he should assist the drug traffickers because they were affiliated with a particular high-level FARC commander ("CC-1"). After the meeting, a drug trafficker who was present for the meeting requested the defendant's assistance multiple times, including to stop Venezuelan military movements along the Colombian-Venezuela border where FARC camps were located; to prevent a military helicopter from approaching a Venezuelan airstrip while a plane was being loaded with cocaine; and to evacuate wounded and dead FARC members by airplane for CC-1. (PSR ¶ 17). In exchange for the defendant's assistance, this drug trafficker bribed the defendant multiple times.

In 2007 and 2008, the defendant facilitated cocaine shipments for a major Venezuelan drug trafficker ("CC-2")[6] allied with the FARC who operated one of the largest drug-trafficking organizations in the country at the time, in part through his control of one of Venezuela's main ports as well as the main airport in Valencia, Venezuela. CC-2 effectively controlled the flow of narcotics and narcotics proceeds through the Valencia airport. And the defendant was critical to CC-2's control. The defendant was, at that time, the general who commanded the Venezuelan National Guard unit stationed at the Valencia airport. (PSR ¶ 15). CC-2 paid the defendant approximately $150,000 for each cocaine-laden plane that CC-2 flew out of the Valencia airport, in exchange for the defendant's assistance with ensuring that the National Guardsmen did not interdict the drug loads. (PSR ¶ 16). For example, CC-2 paid the defendant $150,000 for his assistance with a plane carrying approximately 1,500 kilograms of cocaine belonging to the Beltrán-Leyva Cartel[7] in Mexico and 1,500 kilograms belonging to CC-2 and another drug trafficker, which was also bound for Mexico (for likely redistribution to the United States) in 2007. (PSR ¶ 16). As another example, CC-2 paid the defendant $150,000 for his assistance with a plane carrying approximately 3,500 kilograms of cocaine, which was bound for Mexico in 2007 or 2008. (PSR ¶ 16). Their lucrative dealings ceased around 2008, when CC-2 coordinated with officials other than the defendant to land a plane at the Valencia airport. (PSR ¶ 16). In retaliation, the defendant ordered his soldiers to seize the empty plane before it could be loaded, causing a rift between the defendant and CC-2. (PSR ¶ 16).

While the defendant's control of the Valencia airport provided him with the opportunity to help the FARC move tons of cocaine, this, too, does not lay bare the full extent of his assistance to the FARC's cocaine trafficking. In fact, because the defendant exercised control over the central region of Venezuela, Carvajal recommended the defendant to a large-scale Venezuelan drug trafficker ("CC-3") who sourced cocaine from the FARC. And CC-3 did, in fact, seek the defendant assistance with his cocaine loads. For example, in 2008, a drug trafficker ("CC-4") who was working for CC-3 encountered problems when escorting a large tractor-trailer carrying approximately 1,000 kilograms of cocaine from the Colombia-Venezuela border toward Venezuela. (PSR ¶ 18). At a checkpoint, Venezuelan National Guard members, including a lieutenant, stopped the vehicle convoy, which consisted of three vehicles in total. (PSR ¶ 18). Before the officials could begin to search the vehicles, CC-4, who was armed, called CC-3. (PSR ¶ 18). CC-3 advised CC-4 that the defendant would call CC-4 to clear up the issue. Soon thereafter, the defendant did, in fact, call CC-4's phone; CC-4 then passed his phone to the National

---

[6] On November 4, 2010, a superseding indictment was unsealed charging CC-2 with conspiracy to import cocaine. CC-2 was arrested in Colombia and was extradited to Venezuela, where he is currently serving a 14-year sentence.

[7] The Beltran-Leyva Cartel was a powerful Mexican drug cartel that was run by five brothers.

The Honorable Alvin K. Hellerstein  Page 6
January 15, 2024

Guardsman who had stopped the convoy. (PSR ¶ 18). After speaking with the defendant by phone, the National Guardsman permitted the vehicle convoy, carrying approximately one ton of cocaine, to pass through the National Guard checkpoint. (PSR ¶ 18). Thus, again, the defendant aided in the FARC's ability to move *one ton* of cocaine, in just one shipment, through Venezuela, bound, most likely, for the United States.

The defendant's role continued in subsequent years. For example, in 2009, the defendant provided armed manpower to ensure that a plane carrying approximately 1,000 kilograms of cocaine for CC-3 could safely depart, from one of CC-3's airstrips at a ranch located in the Venezuelan state of Apure, to Guatemala. (PSR ¶ 19). Prior to the plane's departure, CC-3—who sourced cocaine from the FARC—informed CC-4 that the defendant would be sending military officials to the airstrip to provide support—in other words, to ensure that other Venezuelan military or law enforcement officers did not intercept the cocaine. (PSR ¶ 19). Shortly thereafter, armed National Guardsmen surrounded CC-3's ranch and set up a checkpoint, and the plane was able to depart with the cocaine. (PSR ¶ 19).

And the defendant was paid handsomely for his valuable assistance. In 2008 or 2009, CC-3 directed CC-4 to provide the defendant's associates with duffle bags filled with $2 or $3 million in cash. CC-3 delivered the duffle bags to four armed men in plain clothes, who were riding in two official vehicles with Venezuelan National Guard license plates. (PSR ¶ 19). Thus, while the defendant claims poverty at the time of his surrender in March 2020, it was not because he was not paid along the way—just the opposite, as he received large payments, for many years, for helping to fuel the cocaine trade in the United States.

As another illustration of the defendant's power in Venezuela and essential role in drug trafficking, in 2006, Venezuelan police officers entered the property of a known large-scale drug trafficker ("CC-5") located in the Venezuelan state of Falcón, where they discovered a massive amount of cocaine. (PSR ¶ 14). Specifically, the cocaine was loaded on approximately seven heavy trucks bearing military plates, each carrying approximately 4,000 or 5,000 kilograms of cocaine—in other words, approximately 28,000 to 35,000 kilograms of cocaine in total. Near the trucks, the police encountered the defendant, who identified himself by name and was the highest-ranking military member at the ranch, as well as other military commanders and CC-5. (PSR ¶ 14). Upon discovering the cocaine, the police attempted to arrest the defendant. (PSR ¶ 14). The defendant rebuffed the police's attempt to arrest him, stating that this was a job for the armed forces, interfering would have consequences, and "Cambur verde mancha," which roughly translates as "you're screwed." (PSR ¶ 14). The defendant also made several phone calls; soon after, approximately 80 armed Venezuelan National Guardsmen arrived in vehicles and a helicopter (PSR ¶ 14), and the policemen's supervisors ordered the policemen to leave the ranch. National Guardsmen then escorted the policemen back to police headquarters, where they confiscated their radios, computers, and investigative files. (PSR ¶ 14). The following day, the police unit involved in the confrontation was disbanded. (PSR ¶ 14).

## II.     Procedural History

On March 5, 2020, a grand jury in this District returned the S2 Indictment, which charges the defendant and his co-defendants with the following crimes: (1) narco-terrorism conspiracy, in violation of Title 21, United States Code, Section 960a; (2) cocaine-importation conspiracy, in

violation of Title 21, United States Code, Section 963; (3) possession of machineguns and destructive devices, in violation of Title 18, United States Code, Sections 924(c)(1)(A), 924(c)(1)(B)(ii), and 2; and (4) conspiracy to possess machineguns and destructive devices, in violation of Title 18, United States Code, Section 924(o). (S2 Indictment).

On March 26, 2020, the defendant surrendered to law enforcement agents in Colombia. (PSR ¶ 20). On March 30, 2020, the defendant was presented in this District and has remained remanded. (PSR ¶ 20).

On June 29, 2023, the defendant pled guilty, pursuant to the Plea Agreement, to (1) providing, and aiding and abetting the provision of, material support or resources to an FTO, *i.e.*, the FARC, in violation of Title 18, United States Code, Sections 2339B and 2 ("Count One"), and (2) receiving and transferring firearms and ammunition, knowing and having reasonable cause to believe that such firearms and ammunition would be used to commit the Federal Crime charged in Count One of the S3 Information ("Count Two"). (PSR ¶ 4). At the defendant's plea hearing, the defendant allocuted to the stipulated facts in the Plea Agreement, and also specifically stated the following:

- Marin and Timochenko "were the number one and number two people of the FARC in the territory that corresponded to [the defendant] in Venezuela." (June 29, 2023 Plea Transcript, Dkt. 117 ("Plea Tr.") at 22).
- The defendant, knowing that the FARC generally, and Marin and Timochenko in particular, engaged in narcotics trafficking, provided them with weapons. (Plea Tr. at 22-23).
- The defendant knew that the weapons would be used in a federal crime of terrorism. (Plea Tr. at 26).
- At the time that the defendant provided support to the FARC, he knew that the State Department had designated the FARC as an FTO and that the "FARC had engaged in terrorist activities." (Plea Tr. at 23).

### III. Disputed Facts

The defendant admits to stipulated facts set forth in the Plea Agreement, but disputes the remaining facts set forth in Section I.B and Paragraphs 10 and 13 through 19 of the PSR and also argues that these allegations are not relevant to sentencing. (*See* Def. Mem. at 7). This, of course, runs contrary to clear Second Circuit precedent and the Sentencing Guidelines. *See United States* v. *Watts*, 519 U.S. 148, 152 (1997) ("Highly relevant—if not essential—to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.") (internal quotation marks omitted); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); *United States* v. *Reese*, 33 F.3d 166, 174 (2d Cir. 1994) ("[W]hen determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal."). To that the extent the defendant continues to deny the allegations in Paragraphs 10 and 13 through 19 of the PSR, the Government respectfully requests that the Court hold a *Fatico* hearing.

The Honorable Alvin K. Hellerstein  Page 8
January 15, 2024

## DISCUSSION

### IV. The Undisputed Guidelines Sentence is 360 Months' to Life Imprisonment

It is undisputed that the Guidelines call for a sentence of 360 months' to life imprisonment. The parties' Plea Agreement calculates the applicable offense level as 37 and the applicable Criminal History Category as VI, yielding a stipulated Guidelines range of 360 months' to life imprisonment. (PSR ¶ 4). The defendant has no known criminal convictions. (PSR ¶ 4). Since the offense involved a federal crime of terrorism, however, the applicable Criminal History Category is VI, pursuant to U.S.S.G. § 3A1.4(b). (PSR ¶ 4). A total offense level of 37 and a Criminal History Category of VI result in a Guidelines range of 360 months' to life imprisonment. (PSR ¶ 4).

Probation calculates the same Guidelines range as the parties, but has assessed a three-level enhancement pursuant to U.S.S.G. § 3B1.1(b), because the defendant was a manager or supervisor as a general in the Venezuelan military and the criminal activity involved five or more participants or was otherwise extensive.[8] (PSR ¶¶ 25-41, 71-72). This enhancement, which results in an offense level of 40, rather than 37, does not affect the applicable Guidelines range. (PSR ¶ 72). Probation has recommended a sentence of 360 months' imprisonment, after assessing that the defendant's "supervisory role in providing material support and weapons to a terrorist organization is alarming and warrants a significant term of imprisonment" and that no "circumstances . . . warrant a variance from the applicable guidelines range." (PSR at 22).

### A. Application of the Terrorism Enhancement is Appropriate

While the defendant has stipulated to an applicable Guidelines range of 360 months' to life imprisonment, which includes application of the so-called "terrorism enhancement" under U.S.S.G. § 3A1.4, and continues to agree that it is "appropriate," he now argues that it overstates the offense conduct and counsels in favor of a downward variance. (Def. Mem. at 3-4, 12-14). Specifically, the defendant asserts that the terrorism enhancement unfairly increases the defendant's Guidelines range where he purportedly did not directly seek to harm the United States (Def. Mem. at 3-4, 12-14); and the terrorism enhancement unfairly overstates his culpability because he is not in need of rehabilitation or incapacitation (Def. Mem. at 4). The defendant's arguments are meritless and run contrary to both the facts of this case and the law. As discussed at greater length below, courts in this Circuit have rejected arguments of this sort, and the Second Circuit has repeatedly upheld the application of the enhancement in terrorism cases such as this one.

As background, in 1994, Congress mandated that the Sentencing Commission establish a Guidelines enhancement to ensure that those convicted of terrorism offenses receive punishment commensurate with the extraordinary nature of their conduct. *See United States v. Stewart*, 590 F.3d 93, 172 (2d Cir. 2009) (Walker, J., concurring in part and dissenting in part) (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022). The resulting terrorism enhancement at U.S.S.G. § 3A1.4(a) reflects Congress's intention

---

[8] The Government acknowledges that an additional three points should have been assessed pursuant to § 3B1.1(b), but stands by the Plea Agreement.

that individuals—such as the defendant—who are convicted of terrorism offenses serve sentences that are appropriate in light of the extreme dangerousness of their crimes and the unique risk of recidivism that they present. As Judge Walker explained in his concurrence in *Stewart*:

> The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."

*Id.* at 172-73 (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)); *accord United States v. Ceasar*, 10 F.4th 66, 79 (2d Cir. 2021).

The terrorism enhancement appropriately reflects the seriousness of the defendant's criminal conduct. As set forth above, the defendant aligned himself with the FARC, a terrorist group responsible for untold violence, including murders, kidnapping, and mass slaughter. *See, e.g.*, n.5, *supra* (listing examples of the FARC's terrorist acts, including kidnappings and murders of U.S. citizens). The defendant admits that his assistance included providing the FARC with weapons of war—grenades and grenade launchers capable of massive loss of life. The defendant supported the FARC with eyes wide open—the defendant allocuted during his plea conference that he was aware, at the time that he provided support to the FARC, that the FARC had been designated as an FTO by the State Department and had engaged in "terrorist activities" as well as narcotics trafficking. (Plea Tr. at 22-23). Providing material support and resources—in this case, weapons and personnel, among other things—to a dangerous FTO is a core terrorism offense of immense seriousness. *See, e.g.*, *United States v. Mora-Pestana*, 496 F. App'x 98, 100 (2d Cir. 2012) (summary order) (holding that 180-month sentence, the statutory maximum, was substantively and procedurally reasonable for a Colombian defendant who communicated with and was paid $4,500 for transporting supplies to the FARC). Such conduct fits within the class of activity that Congress has deemed worthy of significant punishment through the application of the terrorism enhancement, and the Guidelines do not overstate the seriousness of the defendant's conduct.

The defendant argues that the terrorism enhancement's impact on the defendant's criminal history category, in particular, leads to an inflated Guidelines range. (Def. Mem. at 3). Again, the defendant is wrong. He admits that the terrorism enhancement applies in this case. Application of the terrorism enhancement on the applicable criminal history category reflects the Sentencing Commission's assessment of the high likelihood of recidivism, and the corresponding need for deterrence, in terrorism cases such as this one—an assessment the Second Circuit has repeatedly and emphatically endorsed. *See e.g., Stewart*, 590 F.3d at 143 (citing *Meskini*, 319 F.3d at 92). In particular—

> Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a

> longer period of time. Thus, the terrorism guideline legitimately considers a single act of terrorism for both the offense level and the criminal history category.

*Meskini*, 319 F.3d at 92. "Considering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases." *Id.* (citing U.S.S.G. § 4A1.3); *see also United States v. Al-Farekh*, 810 F. App'x 21, 27 (2d Cir. 2020); *United States v. Mumuni Saleh*, 946 F.3d 97, 112 n.64 (2d Cir. 2019) (applying U.S.S.G. § 3A1.4 and "enforcing the aforementioned congressional directives by directing district courts to increase a defendant's offense level by 12 and his criminal history category to VI if his felony 'involved, or was intended to promote, a federal crime of terrorism' ") (quoting U.S.S.G. § 3A1.4). Accordingly, the terrorism enhancement is grounded in sound findings by Congress and the Sentencing Commission related to the relatively severe culpability and risks posed by terrorism offenders. By its terms, the enhancement applies in this case and, as discussed in more detail below, the sentencing recommendation resulting from the application of the enhancement sets forth an appropriate range of imprisonment for the Court's consideration. In particular, the defendant argues that rehabilitation and incapacitation are not concerns here. (Def. Mem. at 3-4). This is hard to square with the facts of this case, which include years of support to a violent, terrorist organization; the receipt of millions of dollars in cocaine-fueled bribes; and then, by the defendant's own admission, his participation in an attempted armed invasion of Venezuela. The defendant has certainly not left behind his life of violence, and the Court should be concerned about where he will turn his focus (and considerable experience) after he is released.

Simply put, application of the terrorism enhancement in this case is plainly correct, and a long line of cases in this District approving of and applying the enhancement firmly reinforces that conclusion. *See, e.g.*, *United States v. Cordoba-Bermudez*, No. 08 Cr. 1290 (DC) (S.D.N.Y.), Dkt. 30 (applying terrorism enhancement and imposing 180-month sentence, the statutory maximum, for a Colombian defendant who was paid $4,500 in exchange for transporting supplies to the FARC); *United States v. Bradley*, 21 Cr. 277 (PAE) (S.D.N.Y.), Dkt. 112 at 61-62 (applying terrorism enhancement and noting that material support is "inherently and unusually grave and alarming crime with unusual capacity for destruction"; "where a defendant has been convicted of such an offense, there's a compelling argument for a long sentence to reflect just punishment and to reflect the seriousness of the crime"; and "there is a greater than usual reason to fear recidivism"); *United States v. Alimehmeti*, No. 16 Cr. 398 (PAE) (S.D.N.Y.), Dkt. 133 at 16 ("The Second Circuit has, time and again, in its words expressly upheld the lawfulness of the terrorism enhancement. And the Circuit has also specifically found that the Sentencing Commission had a rational basis in fashioning that guideline to increase both a defendant's offense level and his criminal history category. It has reasoned to the latter that even terrorists with no criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.") (internal quotations and citations omitted); *United States v. Clark*, No. 20 Cr. 76 (NRB) (S.D.N.Y.) (applying terrorism enhancement, and rejecting defense argument that it resulted in overstated offense level and criminal history category, in case involving defendant who supported ISIS through disseminating propaganda online); *United States v. Ullah*, No. 18 Cr. 16 (RJS) (S.D.N.Y.), Dkt. 116 at 10-13 (finding that terrorism enhancement applied where defendant had attempted to carry out lone-wolf attack in the name of ISIS without having any direct contact with members of ISIS); *United States v. El Bahnasawy*, No. 16 Cr. 376 (RMB) (S.D.N.Y.) (applying terrorism enhancement over defense objection where defendant was

convicted of conspiring to carry out terrorist bombing on behalf of ISIS in New York City); *United States v. Rahimi*, No. 16 Cr. 760 (RMB) (S.D.N.Y.) (applying terrorism enhancement where defendant was convicted of carrying out terrorist bombings in Chelsea neighborhood of Manhattan and New Jersey); *accord United States v. Arcila Ramirez*, No. 22-11190, 2023 WL 3477811, at *3-*5 (11th Cir. May 16, 2023) (finding that ample evidence supported lower court's finding that the terrorism enhancement applied where the defendant provided material support to the Ejercito de Liberacion Nacional, another FTO based in Colombia, and that 240-month sentence was not substantively unreasonable).

The defendant also argues that the terrorist enhancement overstates his culpability because he allegedly "did not seek to directly harm the United States, its interests or its nationals." (Def. Mem. at 3; *see also* Def. Mem. at 12-14). Again, this is hard to square with the defendant's history with the FARC and the Cartel, and both of their explicit efforts to harm the United States for years. As described above, FARC leadership had ordered FARC members to kidnap and murder U.S. citizens and to attack U.S. interests to dissuade the United States from continuing its efforts to disrupt the FARC's manufacture and distribution of cocaine. (PSR ¶ 11; *see also* S2 Indictment ¶ 11); *see also Cordoba-Bermudez*, No. 08 Cr. 1290 (DC) (S.D.N.Y.), June 1, 2011 Sentencing Tr. at 36 (find that providing material support of FARC had an impact on the United Stated). Furthermore, the Cartel—of which the defendant was a high-ranking member—sought to "flood" the United States with cocaine, not only to increase the Cartel's wealth but also to increase the suffering of Americans. (S2 Indictment ¶ 4). And since as early as 1983 the FARC had been kidnapping (and in some instances, killed) U.S. citizens. *See, e.g.*, n.5, *supra*; Ex. A; Ex. B. Accordingly, the defendant's argument that his support of the FARC was not specifically aimed at harming the United States is meritless and troubling.

In this regard, the defendant's citation to *United States v. Thavaraja*, 740 F.3d 253, 257 (2d Cir. 2014), is unavailing. In that case, Judge Chin—the same judge who, as a then-district court judge, applied the terrorism enhancement in connection with a defendant *United States v. Cordoba-Bermudez*, No. 08 Cr. 1290 (DC) (S.D.N.Y.), a case involving material support of the FARC—writing for a 3-0 Second Circuit panel, considered the Government's appeal of a defendant's sentence after he was convicted of supporting the Liberation Tigers of Tamil Eelam in Sri Lanka during a civil war in that country. *Id.* The court held that the district court was permitted to consider "the degree of harm an individual member of an organization caused or intended to cause to the United States" in fashioning the appropriate sentence. *Thavaraja*, 740 F.3d 253 at 262. In so doing, the court emphasized several facts that distinguish *Thavaraja* from this case and, if anything, demonstrate that *Thavaraja* underscores why a substantial sentence here is appropriate. Most importantly, the court emphasized that the defendant had been caught in an ongoing civil war and noted with approval that the district court had considered that the case "involved people who certainly pose no direct threat to the United States." *Id.* at 260-62. This defendant, by contrast, was a high-ranking member of the Cartel—which had a stated goal of "flooding" the United States with poison—and a supporter of the FARC, which supplied the cocaine that the Cartel used to accomplish this goal, and which kidnapped and murdered scores of people over several decades, including Americans. At minimum, as he has admitted, the defendant supplied high-powered weapons to the FARC, and helped FARC members evade arrest. In either respect, the defendant clearly presented a "direct threat" to the United States. Thus, the defendant's reliance on *Thavaraja* is entirely misplaced.

The Honorable Alvin K. Hellerstein  Page 12
January 15, 2024

In sum, the defendant's indirect challenge to the application of the enhancement is meritless, and application of the terrorism enhancement—as stipulated by the parties' Plea Agreement and calculated by Probation—is entirely appropriate.

**V.     The Court Should Impose a Sentence of at Least 360 Months' Imprisonment**

    **A.     The Nature and Circumstances of the Offense, History and Characteristics of the Defendant, and Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment Warrant a Sentence of at Least 360 Months' Imprisonment**

The application of the terrorism enhancement and its impact on the Guidelines is appropriate. Beyond that, Section 3553(a) further supports a significant Guidelines sentence in this case. First, the nature and circumstances of the defendant's offense, the defendant's history and characteristics, and the seriousness of the offense merit a sentence of at least 360 months' imprisonment. 18 U.S.C. §§ 3553(a)(1) and (a)(2)(A). The defendant, as a high-ranking military leader in Venezuela and a member of the Cartel, provided material support to the FARC. The FARC was responsible for murders, kidnapping, and importing tons of cocaine into the United States. The defendant was fully aware of the FARC's capacity for violence—in fact, in his submission, he and those who wrote on his behalf discuss at length the FARC's kidnapping of Venezuelan citizens. (*See, e.g.*, Def. Mem. at 10). The defendant operated in the shadows as a key conduit and supporter of the FARC, providing them with serious weapons. And, beyond that, the defendant facilitated the FARC's cocaine trafficking and protected the FARC and its drug trafficking partners from interference by the Venezuelan military.

The defendant's crime is far from victimless. The FARC kidnapped and murdered Americans. The Cartel was determined to "flood" this country with the FARC's cocaine in order to harm the United States. As put by Judge Sullivan, "[t[he harm that is done by a ton of cocaine is almost incalculable. The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering." *United States v. Pelagio Suarez*, No. 16 Cr. 453 (RJS) (Dkt. No. 160, Tr. 27). "[T]he drugs at issue here cripple individuals and destroy[] families and whole communities." *United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) (quotations omitted). That is exactly what the defendant's conduct was intended to do—destroy families and communities here in the United States. His conduct resulted in staggering consequences. Drug trafficking of this magnitude leaves victims of all types in its wake—not just addicts, but also the individuals who live in the communities ravaged by traffickers—in the United States, Colombia, Venezuela, and the countries through which the drugs transited. Judge Sullivan explained it this way—

> It is clear that this type of activity has an impact on Colombia, on Mexico, and other countries, the safety of people in those countries, in the strength of their institutions, including their judicial institutions, including their police and prosecutorial forces. This drug activity contributes to all of that. It is organized crime. When people decide to assist organized crime enterprises, they have to understand the consequences that are caused by that in multiple countries. It is a serious crime.

*United States v. Cabezas Garcia*, No. 17 Cr. 23 (RJS) (Dkt. No. 71, Tr. 21).

The Honorable Alvin K. Hellerstein  Page 13
January 15, 2024

The nature of the defendant's crimes is exacerbated by the status and privilege he abused in Venezuela. The defendant was among the most powerful people in Venezuela. He was a close confidant of President Chavez (Def. Mem. at 10) and, as a Major General in the Venezuelan Army, a "leader to thousands of soldiers" (Def. Mem. at 7). He graduated from college and the military academy. (PSR ¶¶ 58-62). He has close relationships with his family. (PSR ¶¶ 46-50). As this Court knows, the vast majority of defendants who come before the Court are in far more desperate circumstances than the defendant. The defendant makes much of the fact that he was in the Venezuelan military for decades and "was an educated person of substance and decency." (Def. Mem at 14). However, these points only serve to illustrate that the defendant was more than capable of sustaining himself and his family through a law-abiding existence. He cannot point to poverty, lack of opportunity, or a need to support his family as an excuse or mitigating consideration for his conduct. He cannot claim that he had no other choice or path forward. Quite the contrary—the defendant chose one of the most destructive paths possible, and left countless others without the same chance in his wake. *See, e.g.*, *United States v. Juan Antonio Hernandez Alvarado*, a/k/a "Tony Hernandez," 15 Cr. 379 (PKC) (Dkt. 288) (in sentencing defendant to life plus 30 years' imprisonment after a conviction for narcotics, firearms, and obstruction offenses, Judge Castel noted that the defendant had opportunities many in Honduras did not, and chose, instead, to "go in a very different direction" from a life of good and instead distribute tons of cocaine). His history and characteristics provide no justification for leniency in this case and, instead, counsel in favor of a Guidelines sentence.

The defendant highlights actions he took against the Venezuelan government after 2013 in trying to portray himself as a "fundamentally a good person and an individual who served his country's military for 30 years" who "fought for its return to democracy, peace, and prosperity." (Def. Mem. at 1-2). Whatever actions the defendant took years later—after he had already provided material support to the FARC—do not justify the dramatic variance he now seeks. Indeed, if anything, they show that the defendant is still prone to violence and has access to firearms and co-conspirators, and could reengage with them in other endeavors upon his release. The defendant's related argument that the Guidelines, including the terrorism enhancement, should be given little weight because he was merely a "soldier following the orders of his superiors" (Def. Mem. at 4) is a distraction and would, in some sense, be true of any number of defendants who receive orders from co-conspirators in the course of their terrorist activities. Whether or not the defendant was, in certain instances, supporting the FARC at the behest of President Chavez or his co-defendant, Carvajal, simply does not matter. He chose to support the FARC and join the Cartel, helping them transit tons of cocaine and weaponize the poison against this community. Moreover, the defendant was not simply a soldier; by his own admission, he was a general who commanded "thousands of soldiers" and was seen as a "leader" in Venezuela. (Def. Mem. at 7). The defendant's support for the FARC went beyond providing grenades and grenade launchers at Carvajal's request; the defendant protected FARC members and associates and their drug trafficking partners from Venezuelan the authorities and facilitated the movement of huge cocaine loads at dirt airstrips, major airports, and military checkpoints. For his help, the defendant received millions of dollars in bribes. Any claim that the defendant lacked agency in his choice, for years, to support the FARC simply is not credible. His sentence should reflect this reality.

The defendant makes several other meritless arguments in contending that a downward variance to 72 months' imprisonment is warranted. First, the defendant points to his conditions of confinement while he has been on pretrial detention, including lockdowns and quarantines as a

result of the COVID-19 pandemic. (Def. Mem. at 4-5). While the Court is, of course, free to take into consideration the conditions of the defendant's incarceration, a 72-month sentence on this basis would be wholly inappropriate and dramatically out of line with leniency granted in other cases with defendants who were similarly incarcerated during the pandemic. Moreover, while Putnam County Correctional Facility, where the defendant has been housed, has assuredly had challenges, including lockdowns, "lockdowns are a routine fact of life for incarcerated defendants and are hardly extraordinary." *See United States v. Pinto-Thomas*, 454 F. Supp. 3d 327, 331 (S.D.N.Y. 2020); *see also United States v. Mateo*, 299 F. Supp. 2d 201, 208 (S.D.N.Y. 2004) (courts typically grant variances or departures only where "the conditions in question [were] extreme to an exceptional degree and their severity [fell] upon the defendant in some highly unusual or disproportionate manner.").

Second, the defendant argues that his age warrants a variance. (Def. Mem. at 11-12). The defendant is only sixty-two years old and is in good health. (PSR ¶¶ 53-55) ███████████████████████████████████ Nothing about the defendant's age or health militate in favor of a stark variance like the one sought by the defendant.

Third, the defendant argues that a downward variance is justified because he likely will spend time immigration detention until he can secure asylum in a safe country or "at worst imprisonment and likely torture and/or death after being deported to Venezuela." (Def. Mem. at 6; 15-16). While the Court is, of course, able to take into account these the factors, the defendant will have an opportunity when confronted with deportation to make a case to the U.S. immigration authorities as to asylum or to where he should be deported.

Fourth, the defendant argues that his ties to family and friends constitute a mitigating factor. (Def. Mem. at 7-8). But these connections did not stop the defendant from providing material support to terrorists, including weapons of war. This argument urges the Court to consider the defendant's family and friends rather than those of the FARC's many victims.

**B. A Sentence of at Least 360 Months' Imprisonment is Necessary to Afford Adequate Deterrence and Protect the Public**

A sentence of at least 360 months' imprisonment is also necessary to adequately deter destructive conduct like that of the defendant and to protect the public. *See* 18 U.S.C. § 3553(a)(2)(A)-(B). The FARC's terrorism has taken innocent lives and threatened our national security. Terrorist groups like the FARC rely on persons with power, such as the defendant, to support the drug trafficking activities that fuel their terrorist acts. They also need weapons—like the grenades and grenade launchers that the defendant supplied—to carry out their acts of terrorism. Thus, the need to afford general deterrence to other individuals considering providing military-grade weapons to terrorists is important in this case. These individuals should know that they will be held accountable for giving weapons of war to terrorists—and that they will not receive a sentence of the likes that the defendant is asking for in this instant case: 72 months—just 20% of the *bottom* of the stipulated Guidelines range.

The length of the defendant's crimes and the impunity he enjoyed in Venezuela speaks to the importance of specific deterrence and the need to protect the public in this case. The defendant

could, once again, enjoy such power in the future—indeed, as he admits, he attempted to participate in the overflow of the government in Venezuela, and could have himself ended up in a position of power if he was successful.

General deterrence is arguably even more important here. This case has received significant press coverage. The defendant's guilty plea was covered extensively by the media in Venezuela, the United States, and elsewhere, and the defendant's sentencing will, no doubt, generate media attention as well.[9] And the drug trade from Colombia and Venezuela continues to flourish, with tons of cocaine pouring into the United States each year. *See, e.g.*, *United States v. Hernandez-Solarte*, 18 Cr. 262 (VEC) (charging four members and associates of the FARC with cocaine importation in 2017 to 2018). That aspect of the message resulting from the defendant's sentence is critically important because corrupt military and political leaders in Venezuela are essential to groups such as the FARC. As such, a serious sentence is warranted to send a message to those anywhere who would consider following the path the defendant's path. This, too, counsels in favor of a sentence of at least 360 months' imprisonment.

### C. A Sentence of 360 Months' Imprisonment Would Not Result in Unwarranted Sentencing Disparities

Nor would a sentence of at least 360 months' imprisonment result in unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6).

On this factor, the defendant cites *Thavaraja*, 740 F.3d 253 at 262, in which Judge Dearie imposed a 108-month sentence, a variance from the Guidelines sentence of 240 months' imprisonment. (Def. Mem. at 13-14). As discussed in part above, the defendant in *Thavaraja* provided support to the Liberation Tigers of Tamil Eelam in Sri Lanka during a civil war by supplying weapons and assisting in a scheme to bribe State Department officials. *Id.* at 256. In imposing sentence, the district court considered that (1) the defendant was motivated "not by power or self-aggrandizement but by a desire to help the Tamil people"; (2) his actions occurred during a civil war with "serious human rights violations on both sides"; (3) his actions were not directed at the United States; (4) the defendant had no criminal record; (5) he "accepted full responsibility" for his crimes"; (6) the defendant had no prison infractions; (7) he was an educated person of "substance and decency"; (8) the defendant was not in the United States voluntarily; and (9) the defendant might be deported and feared returning to Sri Lanka. *Id.* at 262-63.

Here, by contrast, (1) the defendant was motivated at least in part by the millions of dollars in bribes that he received for supporting the FARC and its drug trafficking partners; (2) Venezuela was not engaged in a civil war when he decided to provide material support the FARC—instead, he chose to join arms with a violent, international, terrorist organization; (3) his actions *were* directed at the United States; as a high-ranking member of the Cartel—which had a stated goal of

---

[9] *See, e.g.*, L. Cohen, "Venezuela ex-general pleads guilty to US charges of helping FARC," *Reuters* (June 30, 2023), *available at* https://www.reuters.com/world/americas/venezuela-ex-general-pleads-guilty-us-charges-helping-farc-2023-06-30/ (last accessed Jan. 15, 2024); "Cliver Alcala Reconoce Haber Entregado Armas a Ivan Márquez y a Timochenko," *El Nacional* (July 7, 2023), *available at* https://www.elnacional.com/mundo/cliver-alcala-reconoce-haber-entregado-armas-a-ivan-marquez-y-a-timochenko/ (last accessed Jan. 15, 2024).

"flooding" the United States with poison—and a supporter of the FARC, which supplied the cocaine that the Cartel used to accomplish this goal, and which kidnapped and murdered scores of people over several decades, including Americans; (4) the defendant had no criminal record due to the mass corruption in Venezuela and underscored that the defendant operated with impunity for years; (5) by averring that he was simply "following orders," the defendant does not fully grapple with, or even acknowledge, the gravity of his conduct and therefore had not "accepted full responsibility" in the manner that the defendant in *Thavaraja* did; (7) while the defendant is educated, the repeated corruption of his position as a Venezuelan military officer do not speak to his "substance and decency"; and (8) the defendant self-surrendered and was not extradited.[10] *Thavaraja* is thus readily distinguishable from the defendant's case.

Courts have routinely imposed sentences at or near the statutory maximum in other cases involving defendants convicted of providing or attempting to provide material support to FTOs. *See, e.g. See, e.g.*, *United States v. Cordoba-Bermudez*, No. 08 Cr. 1290 (DC) (S.D.N.Y.), Dkt. 30 (imposing 180-month sentence, the statutory maximum, for a Colombian defendant who was paid $4,500 in exchange for transporting supplies to the FARC); *United States v. Clark*, No. 20 Cr. 76 (NRB) (S.D.N.Y.) (defendant sentenced to statutory maximum of 20 years' imprisonment for disseminating large quantities of pro-ISIS propaganda and terrorist-attack training manuals in online chatrooms, participating and administering chatrooms, and exhorting other participants in chatrooms to commit lone-wolf attacks in United States); *United States v. Badawi, et. al*, No. 15 Cr. 60 (C.D. Cal.) (two defendants each sentenced to statutory maximum of 15 years' imprisonment for conspiring to provide material support to ISIS, where one defendant was arrested at airport attempting to travel overseas to join ISIS and the other defendant had supported and assisted his travel); *United States v. Pugh*, No. 15 Cr. 116 (NGG) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Syria to join ISIS); *United States v. Alaa Sadeh*, No. 15 Cr. 558 (SDW) (D.N.J.) (defendant sentenced to statutory maximum of 15 years' imprisonment for assisting another individual to travel to join ISIS overseas); *United States v. Zea*, No. 13 Cr. 72 (SJF) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Yemen to join AQAP); *see also United States v. Kourani*, 6 F. 4th 345, 357–59 (2d Cir. 2021) (affirming district court's sentence of 40 years' imprisonment for defendant's conviction of various offenses, including providing and conspiring to provide material support to Hizballah, in part because sentence "simply reflects Congress' judgment as to the appropriate national policy for such crimes" (alterations and internal quotation marks omitted)).

The defendant's request for a sentence of 72 months' imprisonment is completely out of line with other material support cases and utterly fails to account for the gravity of the defendant's crime. In this regard, a recent decision from the Second Circuit is instructive. In *United States v. Ceasar*, 10 F.4th 66 (2d Cir. 2021), the defendant "expressed her support for ISIS, encouraged others to join ISIS abroad, and helped individuals in the United States contact ISIS members overseas," who "then facilitated U.S.-based ISIS supporters' travel to ISIS-controlled territory." *Id.* at 68. The defendant "herself intended to travel to ISIS territory by way of Sweden, where she planned to marry another ISIS supporter." *Id.* However, the defendant was stopped by law enforcement at JFK Airport before she could achieve her goal. *See id.* The defendant ultimately

---

[10] On the remaining considerations, (6) and (9), the Government (6) is not aware of any prison infractions, and (9) acknowledges that the defendant may be deported to Venezuela.

The Honorable Alvin K. Hellerstein												Page 17
January 15, 2024

pleaded guilty to one count of conspiring to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and one count of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1). *See id.* at 68-69. The defendant's Guidelines range was 360 to 600 months' imprisonment. *See id.* at 69. The court imposed a sentence of just 48 months' imprisonment, approximately 13% of the bottom of the Guidelines range. *See id.*

On appeal by the Government, the Second Circuit vacated the sentence and remanded for resentencing. *See id.* at 70. The court's decision was based on several grounds, one of which was that, "in comparison with sentences for similar terrorism crimes, [the defendant's] sentence of 48 months' imprisonment was shockingly low and unsupportable as a matter of law." *See id.* In reaching that determination, the Second Circuit analogized to two other cases in which it had vacated a sentence and remanded for resentencing based on substantive unreasonableness: *Stewart*, 590 F.3d 93 (2d Cir. 2009), in which the defendant had a Guidelines range of 360 months' imprisonment, but was sentenced to only 28 months' imprisonment; and *United States v. Mumuni Saleh*, 946 F.3d 97 (2d Cir. 2019), in which the defendant had a Guidelines range of 85 years' imprisonment, but was sentenced to only 17 years' imprisonment. *See Ceasar*, 10 F.4th at 80-82. Additionally, the court surveyed "the sentences imposed in a handful of recent material support cases," which "illustrate[d] the unwarranted disparity reflected by the 48-month sentence imposed" by the district court. *See Ceasar*, 10 F.4th at 84. Specifically, the court cited *United States v. Naji*, No. 16 Cr. 653 (FB) (E.D.N.Y.), in which the defendant pleaded guilty to one count of attempting to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, based on his posting of violent, pro-ISIS content on social media and his travel to Yemen to join ISIS, and was sentenced to the statutory maximum of 240 months' imprisonment. *See Ceasar*, 10 F.4th at 84-85. The court also cited *United States v. Saidakhmetov*, No. 15 Cr. 95, 2018 WL 461516 (WFK) (E.D.N.Y. 2018), in which the defendants each pleaded guilty to one count of conspiring to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, after one defendant was arrested at JFK Airport while attempting to travel to ISIS-controlled territory through Turkey, and the other defendant was arrested at his apartment shortly before embarking on similar travel. *See Ceasar*, 10 F.4th at 85. The defendants were each sentenced to the statutory maximum of 180 months' imprisonment. These are yet two more cases that, along with the reasoning in *Ceasar*, support the imposition of a sentence of at least 360 months in this terrorism case.

Accordingly, a sentence of at least 360 months' imprisonment would not result in unwarranted sentencing disparities.

The Honorable Alvin K. Hellerstein Page 18
January 15, 2024

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that the Court should sentence the defendant to a sentence of at least 360 months' imprisonment.

 Respectfully submitted,

 DAMIAN WILLIAMS
 United States Attorney

 By: /s/_____
 Nicholas S. Bradley /
 Kaylan E. Lasky /
 Kevin T. Sullivan /
 Kyle A. Wirshba
 Assistant United States Attorneys
 (212) 637-1581 / 2315 / 1587 / 2493

Cc: Defense Counsel
 (Via ECF)