THE LAW FIRM OF

# CÉSAR DE CASTRO, P.C.

ATTORNEY AT LAW

The District
111 Fulton Street - 602
New York, New York 10038
631.460.3951 Office
646.285.2077 Mobile
646.839.2682 Fax
cdecastro@cdecastrolaw.com
cdecastrolaw.com

March 10, 2024

*Via* **ECF, E-mail & Facsimile**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:  <u>*United States v. Cliver Alcalá Cordones,* 11 Cr. 205 (AKH)</u>

Dear Judge Hellerstein,

We submit this letter in further support of our objections, following the February 27 and 28, 2024 *Fatico* hearing, to paragraphs 10 and 13 through 19 of the Presentence Report ("PSR"). For the reasons set forth herein, we respectfully submit that the evidence submitted by the government did not sufficiently prove that General Alcalá was involved in the conduct alleged in the aforementioned PSR paragraphs and, thus, the Court should strike them from the PSR and sentence General Alcalá solely for the conduct to which he pled guilty.

General Alcalá pled guilty to providing material support and weapons to the Fuerzas Armadas Revolucionarias de Colombia ("FARC") knowing that FARC members engaged in, *inter alia*, drug trafficking. However, General Alcalá denies, as alleged in the relevant PSR paragraphs, that he personally and directly facilitated the FARC's drug trafficking. The government called three witnesses at the *Fatico* hearing: Roberto López Perdigon (deputy to Venezuelan narcotrafficker Walid Makled), Antonio Arvelaiz (deputy to Venezuelan narcotrafficker Carlos Orense), and a witness who testified under the pseudonym Jorge Leon (former police official who was involved in the torture and murder of three individuals taken into custody and thereafter left the police force). The government's witnesses either provided second-hand information (at times double hearsay), were inherently inconsistent or incredible, and simply did not make sense; at times a combination of all three. Furthermore, none of these witnesses was able to provide evidence containing sufficient indicia of reliability to satisfy the government's burden relating to the allegations contained in Paragraphs 10 and 13 through 19 of the PSR. Each of the disputed paragraphs is included below followed by an analysis of the testimony proffered by the government in support of the disputed facts.

**I.**   **Paragraph 10.**  CLIVER ANTONIO ALCALÁ CORDONES, along with co-defendants NICOLAS MADURO MOROS, the current President of Venezuela; DIOSDADO CABELLO RONDON ("CABELLO"); and HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "Ell Pollo" ("CARVAJAL") – were members of the Cártel de Los Soles, or "Cartel of the Suns" (the "Cartel").  The Cartel was a Venezuelan organization comprised of high-ranking Venezuelan officials who, in connection with their support of the Fuerzas Armadas Revolucionarias de Colombia (the "FARC") – including LUCIANO MARIN ARANGO, a/k/a "Ivan Marquez" ("MARIN") facilitated the importation of tons of cocaine into the United States.

The "Cartel de los Soles" was never mentioned during the entirety of the *Fatico* hearing.  The government failed to introduce any evidence at the *Fatico* hearing that supports the allegation in Paragraph 10 that the Cartel de los Soles even existed.  Moreover, assuming *arguendo*, that the Court credits the government's unsupported allegation as to the existence of the Cartel de los Soles, the government failed to introduce any evidence at the *Fatico* hearing that General Alcalá was a member of such a group.  Accordingly, Paragraph 10 should be removed from the PSR.

**II.**   **Paragraph 13.**  ALCALÁ CORDONES participated in the following to support the FARC:

While Paragraph 13 is an introductory paragraph, it is important because it signals that all of the information in Paragraphs 14 through 19 relate to General Alcalá's support for the FARC (in addition to the support to which he already pled guilty).  There was no evidence introduced at the *Fatico* hearing that General Alcalá did *anything* for the FARC.  For example, Mr. Arvelaiz testified that the connection between the Orense drug trafficking organization and the FARC was Hugo Carvajal, not General Alcalá. (Tr. 156:9; 156:20).  Mr. Perdigon testified that the Makled organization obtained its cocaine from Luis "El Pulpo" in Colombia, and that El Pulpo had his own lab in Colombia that *sometimes* the FARC would use.  (Tr. 20:25-21:25).  Mr. Perdigon distanced everyone from any involvement with or knowledge of dealings with the FARC, specifying that it was only Makled who dealt with the FARC. (Tr. 46:12 – 47:17).  Thus, even if the Court were to accept the testimony of the government's witnesses, the government failed to prove the allegation that General Alcalá engaged in the alleged drug trafficking "to support the FARC."

**III.**   **Paragraph 14**.  In 2006, on the property of a large-scale drug trafficker located in Falcón, Venezuela, Venezuelan police officers discovered thousands of kilograms of cocaine loaded on multiple heavy trucks bearing military plates.  Near the trucks, the police encountered ALCALÁ CORDONES, who identified himself by name, as well as other military commanders and well-known drug traffickers.  When the police attempted to arrest ALCALÁ CORDONES, ALCALÁ CORDONES said that this was a job for the armed forces, that interfering would have consequences, and "Cambur verde mancha," which roughly translates as "you're screwed."  ALCALÁ CORDONES also made several phone calls.  Soon after, dozens of armed Venezuelan National Guardsmen arrived, by vehicle and helicopter.  Subsequently, the National Guardsmen escorted the policemen back to police headquarters and confiscated their radios, computers, and investigative files.  The following day, the police unit that was involved in the confrontation was disbanded.

This allegation was based on the testimony of a former police officer who testified under the pseudonym Jorge Leon. Mr. Leon's testimony was borderline incomprehensible. Mr. Leon's testimony was inconsistent and incredible as to the most basic facts. On direct examination, he testified that he was a police officer in Venezuela until 2016. However, in reality he was a police officer until 2019. (Tr. 91:15-92:7). He left out on direct examination that he left the police force in 2019 after he was accused in an incident where three individuals were murdered and burned by officers under his command. (Tr. 92:9-15). And he also left out that as discipline for that incident, he was stripped of his position and placed under the command of the national directorate. (Tr. 117:17-20). He further admitted that he fled to Colombia because of this incident and refused to come back to Venezuela to discuss the incident when requested by the Venezuelan government. (Tr. 92:23-93:4).

With respect to his claims relating to General Alcalá, Mr. Leon's account was equally incredible. Despite being confronted with his communications with the DEA in which he claimed the incident involving General Alcalá occurred in 2005, and then switching to 2008 after being confronted by the agents, in court he was steadfast that the incident at the Alvarez finca occurred in 2006, Carabobo and that General Alcalá commanded that state.[1] His testimony can be disregarded – in 2006 General Alcalá was promoted to Brigadier General and transferred to Zulia, where he commanded the 11th Brigade of Maracaibo, approximately six hours away from the finca, according to Google Maps, and in a completely different state. *See* Google Map Print Out attached hereto at **Exhibit 1**.

In addition to this obvious and basic problem regarding the year, the material inconsistencies of Mr. Leon's allegations regarding the Alvarez finca renders his testimony inconsequential and incredible. For example, Mr. Leon testified on direct examination that he had been detained for ten days. (Tr. 90:11-12). On cross-examination he admitted that he had not revealed this in his earlier meetings with the DEA and had only told the prosecutors he had been detained in the days immediately before he testified. (Tr. 107:5-108:19).

Mr. Leon was also inconsistent regarding the drugs that were recovered. He testified that he found seven trucks each with 3,000-3,500 kilograms of cocaine (Tr. 108:24 – 109:13), or 21,000 – 24,500 kilograms. However, he informed the DEA when he first met with them that he found the drugs, 800 kilograms, in a wooden structure under a tarp and *not* on any trucks. Mr. Leon denied having made such a statement, until confronted with the DEA report containing his statement after which he then changed his account to include the drugs on the ground *in addition* to the drugs on trucks. (Tr. 109:15 – 111:6). Mr. Leon again tried to justify his inconsistent answers, but again was tripped up by his prior statements, admitting that in May 2022 he told DEA agents that he "did not see drugs on the farm anywhere but on the trucks." (Tr. 111:13 – 20). Then, as the examination continued, Mr. Leon changed his answer again to describe

---

[1] As I am sure the Court recalls, Mr. Leon was confronted with his text communications with U.S. law enforcement in which the agents, after interviewing him for the first time, questioned him regarding his account and that it could have occurred in 2005. The agents directly confronted him with the fact that Governor Heredia (whom Mr. Leon had claimed spoke with him and his law enforcement team and scolded them for conducting the operation at the Alvarez Finca), did not assume office until 2008. The text stream with the agents continues a day later when Mr. Leon says he was wrong and the incident occurred in 2008, acknowledging that he was wrong. However, after many more meetings and preparation, he testified to yet a totally different year, 2006. And as noted above, General Alcala was not even in the state of Carobobo in 2006.

3

additional bags that were "approximately one meter high or that were approximately one meter in size that were on the ground beside the trucks." (Tr. 111:21).[2]

Mr. Leon's account simply cannot be credited. Most of his testimony is unclear, however, what is clear is that after General Alcalá was arrested and the reward was announced, Mr. Leon was able to transform himself from a refugee (and possible fugitive) living in Colombia to a well-paid DEA informant ($45,000 to date, with a $3,000 monthly stipend since May 2023) with United States support for his asylum application and a chance to recover a substantial reward. Because Mr. Leon's testimony was the only evidence introduced by the government at the *Fatico* hearing in support of the allegations in Paragraph 14 of the PSR, it must be removed from the PSR and the allegations contained therein must not be considered by the Court in imposing sentence on General Alcalá.

IV.  **Paragraph 15**. In 2006 or 2007, Walid Makled García ("Makled"), a large-scale narcotics trafficker allied with the FARC, sent drugs on planes from an airport located in Valencia, Venezuela, to Mexico and Central America (with the United States as the ultimate destination for the narcotics). ALCALÁ CORDONES controlled the Venezuelan National Guard stationed at the airport.

**Paragraph 16**. Makled paid ALCALÁ CORDONES approximately $150,000 for every plane that Makled flew out of the airport, in exchange for ALCALÁ CORDONES' assistance ensuring that the National Guardsmen did not interdict the drug loads. As just two examples, in early 2007, a plane carrying approximately 1,500 kilograms of cocaine belonging to the Beltrán-Leyva Cartel in Mexico and 1,500 kilograms belonging to Makled and another drug trafficker, departed from the Valencia airport for Mexico. As another example, in late 2007 or early 2008, a plane loaded with 3,500 kilograms of cocaine departed from the Valencia airport for Mexico. Makled paid ALCALÁ CORDONES $150,000 in connection with each of those flights. In 2008, Makled landed a plane at the Valencia airport without ALCALÁ CORDONES in coordination with Venezuelan officials other than ALCALÁ CORDONES. ALCALÁ CORDONES ordered his soldiers to seize the empty plane before it could be loaded, which caused a rift between ALCALÁ CORDONES and Makled.

The source for Paragraphs 15 and 16 was Roberto López Perdigon. Mr. Perdigon testified that he was second in command and in charge of logistics for the Walid Makled narcotics organization, "the biggest narco trafficker that Venezuela has ever known" (Tr. 17:9-15; 18:12; 18:24). Mr. Perdigon was also a witness that this Court should disregard as incredible as it relates to the government's allegations regarding General Alcalá.

Mr. Perdigon began his cooperation with the government as soon as he was extradited to the United States, beginning in 2012, but never mentioned General Alcalá for *nine years*, until 2021. (Tr. 57:11-15). In countless interviews over those nine years, Mr. Perdigon described many corrupt officials engaged in narcotics trafficking – politicians, military officers, national guard officers, and airport officials. In September 2012, Mr. Perdigon met with agents and discussed

---

[2] Notably, while Paragraph 14 states that "the Venezuelan police officers discovered thousands of kilograms of cocaine loaded on multiple heavy trucks bearing military plates", Mr. Leon testified that the trucks containing the kilograms of cocaine had no license plates. (Tr. 81:9-10).

4

the use of planes to move shipments of cocaine. In that meeting, he named numerous officials: Hugo Carvajal aka "el Pollo" the director of military intelligence, Captain Kotovsky of the National Guard (who was also mentioned by Mr. Arvelaiz), another military member who worked at the Valencia Airport, and an air traffic controller at the Valencia Airport, but made no mention of General Alcalá. (Tr. 52:1-54:5; 3503-11). If General Alcalá were actually involved in narcotics trafficking from the Valencia Airport, and if he controlled security at the airport as Mr. Perdigon claimed, it is simply not plausible that Mr. Perdigon would fail to mention him in this debrief. In his next meeting, in October 2012, Mr. Perdigon discussed the activities of other officials at the airport, Jesus Alberto and Alfredo Itriago. In this meeting, he described Mr. Itriago as playing the same role he now ascribes to General Alcalá – clearing out security; and claimed then that he paid Mr. Itriago the same amount he now claims General Alcalá was paid $150,000. (Tr. 54:7-55:23). In November 2012, Mr. Perdigon reviewed his cellphone contacts with U.S. law enforcement. Mr. Itriago was listed and discussed; General Alcalá's number was not in Mr. Perdigon's phone nor was he mentioned. (Tr. 55:24-56:9).

Mr. Perdigon was cross-examined regarding his prior statements regarding which specific Venezuelan law enforcement/military entities controlled and had a battalion at the Valencia airport. Despite his prior statements in meetings with the government and sworn testimony at a trial in this District last year that it was the Venezuelan National Guard, at the *Fatico* hearing his testimony became that it was "the military." The distinction was important, and clearly not lost on the government and the witness, because General Alcalá has always been a member of the Venezuelan Army and has never been a part of the Venezuelan National Guard. As such, he had control over the army structure in the region of his command but did not have control over the National Guard. In his past statements, Mr. Perdigon consistently referenced the National Guard as it related to the Valencia airport and never mentioned the "military" except in the preparation on the eve of the *Fatico* hearing. *See, e.g.*, 3503-54 at 1; 3503-31 at 2; 3503-26 at 3; 3503-27 at 2-3; 3502-29 at 1-3, 5.

Mr. Perdigon's testimony lacks sufficient indicia of reliability and his testimony should be rejected by the Court. Because Mr. Perdigon's testimony was the only thing elicited by the government at the *Fatico* hearing in support of the allegations in Paragraphs 15 and 16 of the PSR, they must be removed from the PSR and the allegations contained therein must not be considered by the Court in imposing sentence on General Alcalá.

**V.**     **Paragraph 17**. In 2007, ALCALÁ CORDONES attended a meeting with other members of the Cartel, including CARVAJAL, and drug traffickers associated with the FARC. At the meeting, attendees discussed ways in which the FARC and members of the Cartel could cooperate, including by allowing FARC aircraft transporting drugs to access landing strips along the Venezuela-Colombia border and providing advance notice of Venezuela military activity near landing strips or near FARC camps. After that meeting, a drug trafficker who was present called upon the ALCALÁ CORDONES' assistance at various times, including to stop Venezuelan military movements near the border, stopping a military helicopter from approaching a Venezuelan airstrip where a plane was being loaded with drugs, and evacuating wounded and dead FARC members.

The government failed to introduce any evidence at the *Fatico* hearing that supports the allegations in Paragraph 17. For that reason, Paragraph 17 should be removed from the PSR and the allegations contained therein must not be considered by the Court in imposing sentence on General Alcalá.

**VI.     Paragraph 18**.  In 2008, the Venezuelan National Guard stopped two cars containing 1,000 kilograms of cocaine near the Venezuela side of the Colombia-Venezuela.  Before the officials began searching the cars, the drug traffickers responsible for the drug load called ALCALÁ CORDONES by phone; shortly thereafter, ALCALÁ CORDONES spoke by phone with the National Guardsman who had stopped the cars.  Soon thereafter, the two cars loaded with narcotics were permitted to pass.

The sole source for the allegations in Paragraph 18 was the testimony of Mr. Arvelaiz, whose testimony contradicted his prior statements to the government and was inherently incredible and unreliable.[3]  On direct examination, Mr. Arvelaiz claimed, for the first time, that he recognized General Alcalá's voice on the cellphone at the checkpoint.  However, Mr. Arvelaiz admitted on cross-examination that: (1) he originally told agents the voice was "unknown" to him (Tr. 167:17; 3502-42, last sentence on page 2 continuing to page 3); (2) that the voice spoke six words, "Put the lieutenant on with me."  (Tr. 168:1-2); and (3) the only time he had ever heard General Alcalá's voice was in a brief greeting outside a restaurant – they had never met or spoken other than that (Tr. 165:1-6).  His testimony that he recognized General Alcalá's voice based on a single prior meeting, and the utterance of the six-word sentence "Put the lieutenant on with me," strains credulity.   Mr. Arvelaiz is a career criminal and proven liar and fraudster, including a record of lying to law enforcement while acting as an informant.  (Tr. 173:21-174:4).

Finally, while the PSR specifies a shipment of 1,000 kilos in the truck, Mr. Arvelaiz testified that it was 500 kilos (Tr. 146:9), a material factual deviation.  Mr. Arvelaiz' s uncorroborated testimony has all the hallmarks of a fabricated tale, and we urge the Court to reject it.  Because Mr. Arvelaiz' testimony was the only thing elicited by the government at the *Fatico* hearing in support of the allegations in Paragraph 18 of the PSR, it must be removed from the PSR and the allegations contained therein must not be considered by the Court in imposing sentence on General Alcalá.

**VII.    Paragraph 19. [PART I].**  In 2008 or 2009, at the direction of Carlos Orense Azocar ("Orense"), duffle bags filled with $2 million USD in cash were provided to four individuals in plain clothes in an official vehicle with Venezuelan National Guard license plates, in order to pay off ALCALÁ CORDONES.

The sole basis for this allegation was the hearsay testimony of Mr. Arvelaiz that Carlos Orense told him to deliver money to General Alcalá's men.  The alleged declarant, Carlos Orense, was not present to be examined about the veracity of that alleged statement.  Thus, while the statement may have been legally admissible as a co-conspirator statement, it does not constitute the kind of factual proof the Court should accept to confirm the government's allegation.  When Mr. Arvelaiz allegedly delivered the cash, General Alcalá was not present and the armed men in civilian clothes who received the cash were not known to Mr. Arvelaiz and they did not refer to General Alcalá.  Mr. Arvelaiz revealed his lack of knowledge on direct examination when he stated, "I imagine it was people – I don't know who they were.  They were people that worked for him or with him." (Tr. 143:1).  Simply put, General Alcalá was not there, Mr. Arvelaiz did

---

[3] Mr. Arvelaiz' s criminal history is notable: murder (one victim), attempted murder (five victims), narcotics trafficking (over 100,000 kilos), the laundering of narcotics proceeds, bribery, stealing (from his own grandmother), a fraudulent investment scheme, lying to law enforcement while working as an informant, and selling defective milk products that sickened and killed consumers (unknown numbers).  After hearing the litany of crimes and immoral acts, the Court brightened the room with an apropos question: "Did there come a time when you became a nice man?" (Tr. 177:23).

not know the identities of the men to whom the money was delivered, and he had no independent or first-hand knowledge of the destination or final recipient of that money.  It would be unjust to predicate a factual finding on what Mr. Arvelaiz claims he was told or what he "imagined" as it lacks sufficient indicia of reliability.  Because Mr. Arvelaiz' testimony was the only evidence presented by the government at the *Fatico* hearing in support of the allegations in Paragraph 19 of the PSR, it must be removed from the PSR and the allegations contained therein must not be considered by the Court in imposing sentence on General Alcalá.

VIII.   **Paragraph 19. [PART II].**  Additionally, in 2009, a plane loaded with approximately 1,200 to 1,500 kilograms of cocaine was loaded on Orense's personal airstrip in Apure, Venezuela.  Prior to the plane departing for Guatemala, Orense informed others that ALCALÁ CORDONES' "people," *i.e.*, military officials, would arrive at the airstrip shortly and to be careful not to show them much.  Shortly thereafter, military officials arrived, and the plane took off without incident.  The military officials were paid later.  Orense informed a witness ("CW-1") that Orense sourced cocaine from the Colombian guerillas, *i.e.*, from the FARC.

Like the allegations in prior paragraphs, the government presented no direct evidence that it was General Alcalá who provided security for this shipment that occurred in the Venezuelan state of Apure.  In this case, the strength of the evidence is even weaker than the hearsay outlined above.  Mr. Orense allegedly told Mr. Arvelaiz that General Carvajal told Mr. Orense that General Alcalá would handle security.  Moreover, as the Court pointed out in its review of the geography of the area, the state of Apure is far removed from the state of Carabobo, which was General Alcalá's command, noting it "is not an area where General Alcalá had sway, is it?"  (Tr. 186:3).  Mr. Arvelaiz scrambled to recover, claiming that General Alcalá was a major general and had power "all throughout all of Venezuela." (Tr. 186:11).  However, at this point in General Alcalá's career he was stationed in Valencia in the state of Carabobo and his authority was limited to that state.  In fact, the town specified by Mr. Arvelaiz, Guasdualito in the Apure (Tr. 185:25), is 410 miles away and over a 9-hour drive from Valencia according to Google Maps.  *See* Google Map Print Out attached hereto at **Exhibit 2**.  The claim that General Alcalá would send troops there is neither logical nor credible and should be rejected.

Mr. Arvelaiz repeatedly lied, including to law enforcement authorities in the past, whenever it served his interests. (Tr. 173:21-174:4.)  Mr. Arvelaiz is not an individual who should be relied upon by this Court.  His testimony was uncorroborated and lacks sufficient indicia of reliability.  Because Mr. Arvelaiz' s testimony was the only evidence presented by the government at the *Fatico* hearing in support of the allegations in Paragraph 19 of the PSR, it must be removed from the PSR and the allegations contained therein must not be considered by the Court in imposing sentence on General Alcalá.

IX.   **The Government's Evidence Presented at the *Fatico* Hearing Failed to Show Any Evidence of Wealth Attributable to General Alcalá.**

In addition to the deficiencies analyzed above, we note that none of the witnesses were able to address one of the fundamental deficiencies in the government's case: the lack of any wealth attributable to General Alcalá.  Although two of the witnesses testified to the millions of dollars that General Alcalá allegedly earned from narcotrafficking, the government has presented no evidence of wealth, or the trappings of wealth.  There is no dispute that at the time of his surrender to U.S. authorities in Colombia, he was living with his wife and four-year-old daughter

in a small rental apartment and was driving a Nissan sedan. He had none of the trappings that would go with a major narco-trafficker: no luxury cars or watches, no villas, not even a security detail. At every stage of this case the government has had the opportunity to present evidence supporting its claim that General Alcalá benefited financially from supporting drug traffickers, yet, to date it has failed to produce a scintilla of evidence that General Alcalá at any point in his life possessed assets beyond those that were consistent with his position as a career-long military official.

Accordingly, we respectfully ask that the Court order Probation to remove Paragraphs 10 and 13 through 19 from the PSR and that the Court disregard the allegations contained in those paragraphs in imposing sentence on General Alcalá and sentence him solely for the conduct and crimes to which he pled guilty.

Respectfully submitted,

/s/

César de Castro
Valerie A. Gotlib
Adam S. Kaufmann
Cristián Francos

cc: all counsel of record (*via* ECF)

8