

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 13, 2024

<u>Via ECF</u>
The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

     **Re:**    ***United States v. Cliver Antonio Alcala Cordones*, S3 11 Cr. 205 (AKH)**

Dear Judge Hellerstein:

     The Government respectfully submits this letter (i) in response to the defendant's March 10, 2024 submission (Dkt. 167 (the "March 10 Letter")), after the February 27 and 28, 2024 *Fatico* hearing; (ii) to provide additional information regarding sentences imposed in similar cases, pursuant to the Court's directive on February 28, 2024 (Feb. 27-28, 2024 *Fatico* Hr'g Tr. ("Hr'g Tr.") 191-92); and (iii) to clarify the record regarding the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") in this case.

     The defendant's March 10 Letter is yet another example of his attempt to avoid accepting full responsibility for his criminal conduct. The evidence at the *Fatico* hearing revealed the full extent of the defendant's egregious conduct and, in particular, demonstrated his role as a long-time ally of terrorists and drug traffickers. For the reasons set forth below, as well as those detailed in the Government's January 15, 2024 sentencing submission (Dkt. 150), a Guidelines sentence of 360 months' imprisonment is appropriate in this case.

## I.      Applicable Law

     Pursuant to Federal Rule of Criminal Procedure 32, the Court must, prior to sentencing, "for any disputed portion of the presentence report or other controverted matter . . . rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). The Court is not required to "perform a line-by-line review of the PSR," so long as it "resolve[s] the substantive challenges" thereto. *United States v. Reiss*, 186 F.3d 149, 156-57 (2d Cir. 1999). Any conduct considered must be proven by a preponderance of the evidence. *See Witte*, 515 U.S. 389, 401 (1995); *see also United States v. Garcia*, 413 F.3d 201, 220 n.15 (2d Cir. 2005); *United States v. Ruggiero*, 100 F.3d 284, 290 (2d Cir. 1996) ("the Second Circuit has held repeatedly that 'disputed facts relevant to sentencing, even under the Guidelines, need be established only by a preponderance of the evidence.'") (quoting *United States v. Concepcion*, 983 F.2d 369, 388 (2d Cir. 1992), *cert. denied*, 510 U.S. 856 (1993)). In this Circuit, courts may conduct this inquiry by way of a *Fatico* hearing, during which "the prosecution and the defense

may introduce evidence relating to the appropriate sentence." *United States v. Lohan*, 945 F.2d 1214, 1216 (2d Cir. 1991) (citing *United States v. Fatico*, 603 F.2d 1053, 1053 (2d Cir. 1979)). The Federal Rules of Evidence do not apply to sentencing proceedings. Fed. R. Evid. 1101(d)(3); *see also* U.S.S.G. § 6A1.3(a); *Fatico*, 603 F.2d at 711.

## II.    The Defendant's Objections are Undermined by the Testimony at the *Fatico* Hearing

The *Fatico* hearing on February 27 and 28, 2024, established that the defendant worked with other high-ranking Venezuelan officials and drug traffickers to facilitate the distribution of cocaine produced by the Fuerzas Armadas Revolucionarias de Colombia (the "FARC").

### A.    Roberto Lopez Perdigon

The testimony of Roberto Lopez Perdigon ("Perdigon") sufficed to establish the allegations contained in Paragraphs 15 and 16 of the PSR by a preponderance of the evidence. Perdigon testified about the critical support the defendant provided to the drug trafficking organization run by Walid Makled ("Makled") in transporting cocaine supplied by the FARC through the international airport in Valencia, Venezuela (the "Valencia Airport"). He explained that Makled paid the defendant $150,000 for every plane loaded with narcotics leaving the Valencia Airport, and in return, the defendant ensured that the military battalion station at the airport left its post so that each plane could land, get loaded with narcotics, and depart, undetected and without interference from the military. (Hr'g Tr. 26-31). Perdigon described two such instances—around 2007 and 2008, as detailed in Paragraph 16 of the PSR—and testified about Makled introducing him to the defendant during a meeting in 2007 about one of those planes landing in Valencia and being dispatched to Mexico full of cocaine. (Hr'g Tr. 29-30). Perdigon learned at that meeting that the defendant was in fact the general whom Makled paid for such support. (Hr'g Tr. 29-30). Perdigon also testified to being present for one such payment made by Makled to the defendant. (Hr'g Tr. 34-36). He further described Makled's massive drug trafficking operation, including how he sourced cocaine from the FARC in Colombia and partnered with Makled associates like Emilio Enrique Martínez, a/k/a "Chiche Smith" ("Chiche Smith") and Simon Alvarez ("Alvarez") to send narcotics loads by boat to locations in the Caribbean from coastal points north of Puerto Cabello, Venezuela. (Hr'g Tr. 38-42).

Against this backdrop, the defendant's arguments seeking to discredit Perdigon's testimony are without merit and belied by the otherwise uncontroverted record before the Court.

Specifically, the defendant's claim that Perdigon's testimony failed to establish that the defendant engaged in narcotics trafficking in support of the FARC because Perdigon "distanced everyone" but Makled from dealings with the FARC, *see* Mar. 10 Ltr. at 2,[1] is undermined by the actual record. Perdigon's testimony was clear: Makled used a Colombian associate known as "El Pulpo" to source cocaine from the FARC, and El Pulpo purchased cocaine from the FARC and also allowed the FARC to use his lab to manufacture cocaine. (Hr'g Tr. 20-21). The Court's own

---

[1] The defendant admits, as he must, that he pled guilty to providing material support and weapons to the FARC, "knowing that FARC members engaged in, *inter alia*, drug trafficking." (March 10 Ltr. at 1).

The Honorable Alvin K. Hellerstein                                                    Page 3
March 13, 2024

examination of Perdigon effectively demonstrated that (i) working for an organization that sources cocaine from the FARC and (ii) assisting in sending planeloads full of cocaine from Venezuela indisputably suffices to establish by a preponderance of the evidence that this constituted narcotrafficking with and in support of the FARC:

> THE COURT: What was your role as second in command?
>
> THE WITNESS: To receive and dispatch the airplanes
> filled with cocaine from Valencia Airport.
>
> THE COURT: So Walid Makled bought it, you took it
> from Makled, put it in the airplane, and sent it off to Mexico
> and the United States.
>
> THE WITNESS: Yes.
>
> THE COURT: Receiving cocaine from the FARC and paying
> money to the FARC?
>
> THE WITNESS: Yes.

(Hr'g Tr. 47:2-11; *see also* 46:18-19 ("THE COURT: It's wrong to say you are not connected to the FARC.")).

Moreover, the defendant's attempt to cast aside all of Perdigon's testimony because he first discussed the defendant with the Government only when asked about the defendant during a proffer in 2021 is similarly unavailing. (*See* Mar. 10 Ltr. at 4-5). Perdigon testified that over the course of his work for the Makled drug trafficking organization, the largest in Venezuela at the time, he worked with numerous narcotics traffickers and Venezuelan officials, and that, in meetings with Government agents and prosecutors, he answered questions and provided information on the individuals about whom the Government asked.[2] (Hr'g Tr. 72-74.). This makes sense. Perdigon worked with many large-scale, violent, narcotics traffickers, and the Government asked him about scores of people. When the Government asked Perdigon about the defendant, he provided clear, inculpatory, information, just as he did when he testified (and was cross-examined) at the *Fatico* hearing. That he also talked about other people when the Government asked him about them, as well, does not dilute his testimony.

---

[2] In making this point, defense counsel both in its March 10 Letter and on the record during the *Fatico* hearing repeatedly asserted that Captain Vassyly Kotosky, another Venezuelan military officer who was discussed in Perdigon's earlier meetings with the Government, worked out of the Valencia Airport. (Hr'g Tr. 52:10-12; Mar. 10 Ltr. at 5). That is incorrect. Indeed, the same 3500 material the defendant cites on this point in his March 10 Letter, 3503-11 (*see* Def. Ltr. at 5), references Captain Kotosky in connection with Perdigon's trafficking activities at the international airport near Caracas in Maiquetía, Venezuela (the "Maiquetía Airport")—not Valencia. And Perdigon clarified this and the fact that Captain Kotosky was stationed at the Maiquetía Airport during the Government's re-direct examination. (Hr'g Tr. 72:25-73:6).

Finally, the defendant's emphasis on Perdigon's interchangeable use of the words "military" and "national guard" to describe the battalion of soldiers at the Valencia Airport as a material inconsistency that would warrant completely disregarding his testimony is unpersuasive. (*See* Mar. 10 Ltr. at 5.) To a lay civilian who has not served in any branch of the Venezuelan military—whether army or national guard, as Perdigon testified (Hr'g Tr. 49:17-20)—"military" or "national guard" or "army" is a distinction without a difference. Perdigon was clear, as the Court itself elicited, that, to him, "military," "army" and "national guard" effectively mean the same thing. (Hr'g Tr. 57-60, 70-71).

None of the foregoing is sufficient alone or collectively to require the Court to call into doubt Perdigon's testimony, as the defendant would have this Court do. Perdigon's testimony was credible and overwhelmingly established the defendant's participation in narcotics trafficking for the FARC.

### B.  Jorge Abasta Leon

The testimony of Jorge Abasta Leon ("Abasta") established, by a preponderance of the evidence, the facts described in Paragraph 14 of the PSR, and further underscored the overwhelming evidence of the defendant's direct participation in FARC-sourced cocaine trafficking. Abasta, a former sergeant with the Yaracuy State police, searched a *finca* (or ranch) controlled by drug trafficker—and Makled associate—Simon Alvarez in the municipality of Boraure in Yaracuy State, where he found Alvarez, the defendant (in full military uniform), and another Makled associated drug trafficker, Chiche Smith, along with seven military trucks filled with thousands of kilograms of cocaine. (Hr'g Tr. 77-85, 109). After Abasta and his team inspected the cocaine on the trucks, they attempted to arrest the defendant, who threatened Abasta that "heads would roll." (Hr'g Tr. 85:15-19). The defendant made several phone calls, and within minutes, dozens of armed members of the Venezuelan military arrived to arrest Abasta and his team. Once at the *finca*, the military personnel took orders from the defendant while shaking hands and hugging the drug traffickers Alvarez and Smith that Abasta had previously placed under arrest. (Hr'g Tr. 85-88). All the while, the cocaine-laden trucks stayed on the *finca* while the defendant continued to threaten Abasta that the "officers and their family members were going to pay for this." (Hr'g Tr. 87:88:4). Abasta and his police team were held under armed guard for ten days at their police barracks, where Abasta feared he would be subject to a forced disappearance by Venezuela's military intelligence division, led by Hugo Carvajal. (Hr'g Tr. 89:8-90:15).

The defendant makes no serious effort to challenge these events. He was caught red-handed in his military uniform on Simon Alvarez's *finca* with thousands of kilograms of cocaine. Instead, the defendant quibbles with perceived inconsistencies with which the Court can easily dispense:

- First, there is no evidence whatsoever to support the defendant's claim that he was in Zulia State, six hours away from the Alvarez *finca*, in 2006. (Mar. 10 Ltr. at 3). The defendant did not introduce evidence during the *Fatico* hearing, and the Court should reject the defendant's

The Honorable Alvin K. Hellerstein
March 13, 2024

Page 5

baseless attempt to suggest an alibi through a Google Maps printout attached to post-hearing briefing. (*Id.*).[3]

- Second, Abasta was clear that he found the defendant on the Alvarez *finca* with truckloads of cocaine in 2006. (Hr'g Tr. 101). Whether it occurred in 2006 or 2008 is immaterial. Abasta also testified that his commissioner spoke with Julio Leon Heridia, who at the time of the Alvarez *finca* search, was the "director of the PSUV, [] the national party, the Venezuelan Nationalist Socialist Party." (Hr'g Tr. 104:1-105:4). Regardless, the date of this conversation— which Abasta did not participate in—and Heridia's title, are irrelevant to the veracity of Abasta's testimony.

- Third, the defendant's attempt to undermine Abasta's testimony is self-defeating. At most, the defendant elicited on cross examination that there were even *more* suspected drugs on the Alvarez *finca* than what Abasta saw on the trucks. (Hr'g Tr. 109-12). And despite the defendant's attempt to manufacture inconsistencies out of this damning testimony, Abasta refreshed his recollection and clearly testified that "there was cocaine that was loaded on the trucks. And also off to the side there were some packages or bundles of cocaine which we did not get the opportunity to search." (Hr'g Tr. 112:2-6). And, of course, Abasta did not have that opportunity to search those additional packages to determine their contents because he was arrested by the defendant and the armed military forces that the defendant commanded.

In short, the defendant's letter does nothing to undermine Abasta's testimony, which clearly shows the defendant using the imprimatur of his uniform to facilitate large scale drug trafficking. Moreover, the defendant did so with Simon Alvarez, who sourced cocaine from the FARC through Makled's associates. The Court should reject the defendant's invitation to disregard Abasta's testimony, which should be credited in its entirety.[4] And, thus, the Court should overrule the defendant's objections to Paragraph 14 of the PSR.

### C. Antonio Arvelaiz

Finally, Arvelaiz's testimony established, by a preponderance of the evidence, the material facts described in paragraphs 18 and 19 of the PSR. Arvelaiz, a drug trafficker who was the right-

---

[3] Nothing in the record supports the defendant's claim that the Alvarez ranch was in Carabobo State either, but regardless, the Court should reject his self-serving attempt to use a post-hearing letter brief to introduce evidence of his whereabouts. (Mar. 10 Ltr. at 3, & n.1).

[4] The Court should also reject the defendant's baseless attempt to cast Leon as a "possible fugitive," which is no supported by the record, as is the defendant's claim that Leon was "involved" in acts of torture and murder. (Mar. 10 Ltr. at 1, 4). The defendant appears to base this accusation on Abasta's testimony that he resigned from Venezuelan law enforcement after officers under his command allegedly killed three individuals. (Hr'g Tr. 117). There is no evidence that Abasta was involved in that conduct, and he testified that he fled Venezuela after learning that the individuals who died were part of a collective, which he described as "structures that are run by the national government in order to carry out operations against any opposition member and to move against them." (Hr'g Tr. 117-18).

The Honorable Alvin K. Hellerstein
March 13, 2024

hand man for convicted drug trafficker Carlos Orense ("Orense"), testified about Orense's dealings with the defendant, including bribes he paid to and assistance with drug loads that he received from the defendant. (*See, e.g.*, Hr'g Tr. 121 (the defendant "helped my uncle in several locations, and he would help us with respect to logistics")). Arvelaiz's testimony established that Orense worked with high-ranking officials, including the defendant, Carvajal, Pedro Luis Martin Olivares (Hr'g Tr. 120-21, 139), and other drug traffickers, such as Chiche Smith (Hr'g Tr. 138), in order to distribute cocaine on a massive scale. With respect to the defendant, specifically, Arvelaiz testified about three events: (i) the defendant provided armed manpower to ensure that a plane carrying approximately 1,000 kilograms of cocaine for Orense could safely depart from one of Orense's airstrips at a ranch located in Apure State, to Guatemala (Hr'g Tr. 150-53); (ii) Arvelaiz, at Orense's direction, provided the defendant with two duffle bags that were filled with approximately $2 or $3 million in cash, through the defendant's associates (Hr'g Tr. 141-44); (iii) when Arvelaiz was having difficulty passing a military checkpoint with Orense's cocaine, the defendant called Arvelaiz's phone, and then spoke with the military official at the checkpoint, who subsequently allowed the convoy to pass without inspection (Hr'g Tr. 144-50).

The defendant's last-ditch efforts to undermine Arvelaiz's testimony fail. *First*, the defendant claims that Arvelaiz could not have recognized the defendant's voice when the defendant called Arvelaiz's phone to help him move cocaine through a military checkpoint, as described in Paragraph 18 of the PSR. (Mar. 10 Ltr. at 64). But critically, both before and after the defendant called Arvelaiz, Orense confirmed that *the defendant* was the caller. (Hr'g Tr. 149-50) ("A while later he called me back and said, I'm going to call General Cliver"; "You made me bother General Cliver"). Arvelaiz also testified that the voice on the phone was "very familiar," and he believed it was the defendant, based on his prior meetings with the defendant—but his recognition of the defendant's voice was not the only reason that he thought the defendant was on the call. (*See* Hr'g Tr. 149, 161). Additionally, Arvelaiz's testimony that he was transporting approximately 500 kilograms when the defendant called him—rather than 1,000 kilograms—of cocaine does not cast doubt on the crux of Arvelaiz's testimony, and must be viewed in the context of the vast sums of cocaine that Orense was distributing. (Hr'g Tr. 349) (attributing 40,000 kilograms of cocaine per year to the Orense drug distribution network).

*Second*, the defendant argues that the Court should not credit Arvelaiz's testimony about the $2 or $3 million bribe that he provided to the defendant because the defendant and Arvelaiz's co-conspirator, Orense, told Arvelaiz that the bribe was for the defendant, and Orense was not a witness at the *Fatico* hearing. (Mar. 10 Ltr. 6-7). The Federal Rules of Evidence of course do not apply to sentencing proceedings. Fed. R. Evid. 1101(d)(3); *Fatico*, 603 F.2d at 711. Courts thus may consider hearsay evidence at *Fatico* hearings. *See United States v. Martinucci*, 561 F.3d 533, 535 (2d Cir. 2009) ("It has long been established that a district court may consider hearsay if the evidence is of sufficient reliability."). This is true even where, as here, the defendant cannot confront the witness whose statements are being admitted into evidence. *See United States v. Bedell*, 590 Fed. App'x 86, 88 (2d Cir. 2015). And the testimony on this issue was reliable and clear. Arvelaiz unequivocally stated that after a dispute with the defendant in a restaurant, Orense ordered Arvelaiz to deliver duffle bags filled with cash "to Cliver's people," specifically noting that Orense "was very targeted on that." (Hr'g Tr. 491). Arvelaiz then delivered the millions of dollars to "men that were armed and dressed in civilian clothes" in "two armed SUVs." (Hr'g Tr. 493-94). Although Arvelaiz may not have known the men's names, as the Court elicited, Arvelaiz knew they worked for the defendant because "Carlos Orense said [that] to me." (Hr'g Tr. 143).

The Honorable Alvin K. Hellerstein                                                                Page 7
March 13, 2024

Both Arvelaiz, and, as set forth above, Perdigon, thus provided compelling evidence regarding the defendant's acceptance of bribes. The defendant's protestations that he was broke while living in another country more than a decade later—which the defendant has offered no evidence to support—are entirely irrelevant even if true. (Mar. 10 Ltr. at 7-8).

*Third*, the defendant similarly attempts to undermine Arvelaiz's testimony that the defendant sent the military to an airstrip in Apure State to protect 1,000 kilograms of cocaine because Arvelaiz's co-conspirator, Orense, told Arvelaiz that the defendant would be doing so. (Mar 10 Ltr. 7). For the same reasons as those set forth above regarding the bribes paid to the defendant, this testimony is compelling and should be credited. Relatedly, the defendant argues— again, without providing any evidence—that he did not command any military power in Apure State at this time. Regardless of the defendant's official title, he was, as Arvelaiz testified, "very, very close to president Hugo Chavez." (Hr'g Tr. 140). Indeed by the defendant's own account, he previously served as the "personal military aide" to President Chavez and then later as a high-ranking, prominent general where he commanded "thousands of soldiers" and received direct orders and communications from Chavez. (Dkt. 144 at 7, 9-10). Therefore, the defendant's argument that, despite being in a position of such power within the Venezuelan military, he could not have sent soldiers to a ranch in Apure State falls flat, putting aside its complete lack of support in the record.

### III.    Sentences in Comparable Cases

The Government also writes, further to the Court's directive on February 28, 2024, to provide the Court with information regarding sentences that courts have imposed for comparable conduct. (Tr. 191-92). Courts have consistently imposed lengthy sentences for defendants who provided material support to the FARC. Several examples are set forth below:

- Judge Forrest imposed a 648-month sentence for a defendant who, for over 15 years, operated a large-scale drug trafficking organization out of Colombia and Venezuela, in coordination with the FARC. *United States v. Rios Suarez*, 11 Cr. 836 (VSB) (S.D.N.Y.), Dkt. 63.

- Judge Crotty imposed 216-month sentences upon two nephews of Venezuela's first lady, who devised a plan to work with the FARC members to import over 800 kilograms of cocaine to the United States, including from the Maiquetía Airport. *United States v. Campo Flores and Flores de Freitas*, S2 15 Cr. 765 (PAC) (S.D.N.Y.), Dkt. 191-92.

- A 2006 SDNY prosecution brought in the District Court for Colombia charging approximately 50 top FARC commanders with cocaine importation highlights the substantial sentences that courts have imposed in similar cases. In that case, *United States v. Marin et al.*, 04 Cr. 446 (TFH) (D.D.C.), each of the five defendants who has been convicted to date received a sentence exceeding 20 years: (i) Erminso Cuevas Cabrera, who operated a cocaine laboratory on behalf of the FARC, received a 348-month sentence (Dkts. 299, 305); (ii) Juan Jose Martinez Vega, who trafficked tons of cocaine to obtain logistical supplies and weapons for the FARC, received a 330-month sentence (Dkts. 277, 320); (iii) Gerardo Aguillar Ramirez, a Commander of the FARC's 1st Front, received a 324-months sentence (Dkts. 169, 293); (iv) Ignacio Leal Garcia, a financial officer for the FARC's 10th Front, received a 294-month sentence (Dkts. 417, 422);

The Honorable Alvin K. Hellerstein                                                    Page 8
March 13, 2024

and (v) Jorge Enrique Rodriguez Mendieta, a Commander of the FARC's 24th Front, received a 244-month sentence (Dkts. 170, 254).

- Finally, as the Court has already observed, Perdigon—Makled's "number two" (Hr'g Tr. 192)—was sentenced to 210 months' imprisonment for cocaine importation. *United States v. Perdigon*, 11 Cr. 20848 (KMW) (S.D.F.L.), Dkt. 33.

Additionally, and as further detailed on pages 10-11 and 16-17 of the Government's sentencing submission (Dkt. 150), courts routinely impose lengthy sentences, often at or near the statutorily permitted maximum, where defendants have provided material support to FTOs. *See, e.g.*, *United States v. Mora-Pestana*, 496 F. App'x 98, 100 (2d Cir. 2012) (summary order) (holding that 180-month sentence, the statutory maximum, was substantively and procedurally reasonable for a Colombian defendant who communicated with and was paid $4,500 for transporting supplies to the FARC); *United States v. Cordoba-Bermudez*, 08 Cr. 1290 (DC) (S.D.N.Y.), Dkt. 30 (imposing 180-month sentence, the statutory maximum, for Colombian defendant who was paid $4,500 in exchange for transporting supplies to the FARC); *United States v. Arcila Ramirez*, 22-11190, 2023 WL 3477811, at *3-*5 (11th Cir. May 16, 2023) (finding that 240-month sentence was not substantively unreasonable for defendant who provided material support to the Ejercito de Liberacion Nacional, another FTO based in Colombia). *See also* Ex. A (U.S. Sentencing Commission data indicating that, for defendants whose primary guideline was § 2M5.3, with an offense level of 40 and Criminal History Category VI, 214 months was the average length of imprisonment imposed).

IV.     **The Applicable Guidelines Sentence is 360 Months' Imprisonment**

Finally, the Government seeks to clarify the Guidelines calculation applicable to this defendant. At the proceeding on January 18, 2024, the Court increased the defendant's offense level by three levels, for his supervisory and management role[5], pursuant to § 3B1.1(b) and found that the applicable offense level was 43 and the applicable Criminal History Category was VI. (Jan. 18, 2024 Tr. 11-15).[6] The Government subsequently realized that the Court appears to have inadvertently omitted the three-level reduction, pursuant to U.S.S.G. §3E1.1, for acceptance of responsibility and timely notification of the intention to enter a plea of guilty (which would result in an offense level of 40, rather than 43). (*See* PSR ¶¶ 36-38).

Accordingly, the Government respectfully submits that, including the three points for an aggravating role, which the Court assessed pursuant to § 3B1.1(b), as well as the three-level

---

[5] This aggravating role enhancement was not reflected in the parties' Plea Agreement, and it ultimately does not affect the defendant's Guidelines sentence of 360 months. Regardless, the Government continues to seek a sentence consistent with the parties' Plea Agreement. The Plea Agreement assesses the applicable offense level as 37, the applicable Criminal History Category as VI, and the resulting Guidelines sentence as 360 months' imprisonment. (PSR ¶ 4).

[6] On January 30, 2024, with the defendant's consent, the Government informed the court reporter through an errata sheet of a repeated transcription error in pages 13 through 16 of the January 18, 2024 hearing transcript in which several references to Category VI appear incorrectly as Category IV.

The Honorable Alvin K. Hellerstein                                        Page 9
March 13, 2024

reduction, pursuant to U.S.S.G. §3E1.1, the applicable offense level would be 40 and the applicable
Criminal History Category would be VI, which would yield a stipulated Guidelines range of 360
months' to life imprisonment (PSR ¶¶ 25-41), but which is statutorily capped at 360 months'
imprisonment under U.S.S.G. § 5G1.1(a). (PSR ¶¶ 70-71).


                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney

                              By:       /s/
                                        Nicholas S. Bradley
                                        Kaylan E. Lasky
                                        Kevin T. Sullivan
                                        Assistant United States Attorneys
                                        (212) 637-1581 / 2315 / 1587


Cc:     Defense Counsel
        (Via ECF)