O48BCORS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                 11 Cr. 205 (AKH)

5  CLIVER ANTONIO ALCALA
   CORDONES,

6

7          Defendant.

8                           Sentence

   ------------------------------x
9

                           New York, N.Y.
10                        April 8, 2024
                          11:00 a.m.
11

12  Before:

13

14              HON. ALVIN K. HELLERSTEIN,

                            District Judge
15

                     APPEARANCES
16

17  DAMIAN WILLIAMS
      United States Attorney for the
      Southern District of New York
18  BY:  KAYLAN E. LASKY
      NICHOLAS BRADLEY
19      KEVIN SULLIVAN
      Assistant United States Attorneys
20

   CESAR de CASTRO
21  ADAM S. KAUFMANN
   CRISTIAN FRANCOS
22  VALERIE GOTTLIEB
      Attorneys for Defendant
23

24  Also Present:  Gabriel Mitre, Interpreter (Spanish)
                Humberto Garcia, Interpreter (Spanish)
25                Sabrina Gen, Paralegal Specialist, USAO

O48BCORS

1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your

3    appearance for the record.

4              MS. LASKY:  Good morning, your Honor.

5              Kaylan Lasky, Nicholas Bradley and Kevin Sullivan for

6    the U.S. Attorney's office, as well as Paralegal Specialist

7    Sabrina Gen.

8              THE COURT:  Good morning.

9              MR. de CASTRO:  Good morning, your Honor.

10             For General Alcala, Cesar de Castro, Adam Kaufmann,

11   Cristian Francos, and you should have Valerie Gottlieb on the

12   phone due to a medical circumstance she's joining us via

13   telephone condition, and of course the General is here seated

14   to our right.

15             THE COURT:  Good morning, General Alcala.  I first

16   note that I issued an order presenting post-*Fatico* factual

17   findings, which I posted on ECF which I intended to put before

18   you as resolutions of the disputed paragraphs of the PSR.  So

19   the first step is to ask Mr. Kaufmann if General Alcala has any

20   objections?

21             MR. de CASTRO:  Obviously we have objections in the

22   sense of we challenged in the *Fatico* hearing, but we received

23   the order --

24             THE COURT:  Why don't you take the podium, please.

25             MR. de CASTRO:  I'm sorry.  We received the order.  We

O48BCORS

1    reviewed it with General Alcala.  In terms of objections, we

2    respect the Court's ruling.  We understand the Court's ruling.

3    As we wrote in our submission prior to, we believe that the

4    witnesses did not support that finding.

5              THE COURT:  This submission is prehearing, right?

6              MR. de CASTRO:  No, post-hearing, post-*Fatico* hearing

7    submission, and the government's response as well.  It was

8    March 10.

9              THE COURT:  I have it.  I read it, but I want to

10    refresh my recollection.  You notice, Mr. Kaufmann, in the

11    proposed paragraph 10 does not mention the Cártel de los

12    Soles, right?

13              MR. de CASTRO:  That's right.

14              THE COURT:  So is there any further objection to

15    paragraph 10 as I've proposed to have it written?

16              MR. de CASTRO:  No further objections, no.

17              THE COURT:  How about paragraph 13 as I've rewritten

18    it?

19              MR. de CASTRO:  Judge, we don't have any objections

20    other than our objections at the hearing, which of course the

21    Court has concluded what the Court has concluded.  So we would

22    just preserve our prior objections in the sense of, we

23    challenge --

24              THE COURT:  Well, some of these are written so that

25    they be your points.

O48BCORS

| 1 | MR. de CASTRO: I hear you, Judge. Thirteen I think

2 | is -- I think 13 is the same as in the PSR, Judge.

3 | THE COURT: How about 14?

4 | MR. de CASTRO: So for 14, your Honor, I think we just

5 | maintain our same objections that we don't believe that the

6 | government prove that at the *Fatico* hearing. I see the cites,

7 | the transcript cites, but we don't believe that was credible

8 | evidence.

9 | THE COURT: Well, there's testimony in 2006, on the

10 | property of a large scale drug trafficker located in Falcón,

11 | Venezuela, in Central West, Venezuela, police officers

12 | discovered thousands of kilograms of cocaine that had been

13 | loaded on trucks bearing military plates. You take issue with

14 | that?

15 | MR. de CASTRO: We do, Judge. We have issue with, in

16 | order for the Court to conclude that, the Court has to find the

17 | witnesses credible on that point.

18 | THE COURT: You think this is all imagined?

19 | MR. de CASTRO: We think it was false testimony.

20 | THE COURT: All imagined?

21 | MR. de CASTRO: False testimony, yes.

22 | THE COURT: I find it's credible. The next sentence,

23 | All the trucks were filled to their capacity with bricks of

24 | cocaine. You take exception to that?

25 | MR. de CASTRO: We do. The witnesses testified that

O48BCORS

there was cocaine on trucks.  There was cocaine on the ground,
but then in one instance, it was only on the ground.  A
different instance it was on trucks.

THE COURT:  There was nothing brought to bear that
contradicted that witness at all in any credible way.  And then
the next sentence, Near the trucks the police encountered
Alcala Cordones, who identified himself by name, as well as
other military commanders and well-known drug traffickers.
It's in accord with the testimony, and there was nothing
brought to bear to contradict that testimony.

The next sentence, When the police attempted to arrest
Alcala Cordones, Alcala Cordones said this was an army matter
and asked why the ranch had been raided without orders, and he
said that heads will roll.  That was the testimony.  It was
credible, and there was nothing presented that contradicted it.

Next, Alcala Cordones also made several phone calls.
Soon after, over 80 Venezuela military personnel arrived by
vehicle and helicopter.  He was giving instructions to the
military personnel who appeared at the site and told them to
remove the investigating police officers.  Subsequently, the
military escorted the policemen back to police headquarters and
confiscated their radios, computers and investigative files.
The following day the police unit that was involved in the
confrontation was disbanded.  Again, there was no evidence that
contradict that.  I find the evidence credible.

O48BCORS

1          Does the government have any comments with respect to

2     paragraph 14?

3          MS. LASKY:  Your Honor, just two minor points.  One is

4     with respect to paragraph 10.  The government would

5     respectfully suggest that the Court strike the language

6     "bearing military plates" so that it just reads "trucks."

7          THE COURT:  In paragraph 10?

8          MS. LASKY:  I'm sorry.  That was in paragraph 14.  So

9     that is in the first sentence of paragraph 14.  And the other

10    change for paragraph 14 --

11         THE COURT:  Strike "bearing military plates?"

12         MS. LASKY:  Correct, your Honor.

13         THE COURT:  Done.

14         MS. LASKY:  Instead of reading Falcón, it should read

15    Yaracuay, Y-A-R-A-C-U-A-Y.

16         THE COURT:  Y-A-R-A-C-U-A-Y instead of Falcón.  Done.

17    I could go through all of these.  Apart from objections that

18    you've made so far, are there any other objections,

19    Mr. Kaufmann, I don't mean to keep you up if there's nothing

20    further.

21         MR. de CASTRO:  No, Judge.  We don't see the need for

22    the Court to go sentence by sentence.  It's up to the Court of

23    course.  We maintain sort of our general objection.  I know the

24    Court has overruled that, so we'd be happy to proceed.

25         THE COURT:  Do you have any specific objections?

O48BCORS

1          MR. de CASTRO:  No.

2          THE COURT:  Does the government have any to the

3    following paragraphs?

4          MS. LASKY:  Only one, your Honor.  In paragraph 19 the

5    government would suggest striking the sentence, it's the second

6    to last sentence, "the military officials were paid later."

7          THE COURT:  Done.

8          MS. LASKY:  Thank you, your Honor.

9          THE COURT:  The brackets around Alcala Cordones, just

10   put his name in for the pronoun him or he or the like.  Okay.

11   I adopt these findings as amended.  I instruct that the PSR be

12   amended accordingly.

13          Okay.  So we have so far found the application of the

14   guidelines.  I forget, Ms. Lasky, whether it was 37 or 40 that

15   I found?

16          MS. LASKY:  So, your Honor, on that, I believe your

17   Honor found 40 after applying leadership points.  The

18   government of course stands by its plea agreement which did not

19   include three leadership points.  The other point that the

20   government would respectfully request that the Court make is

21   whether the Court is applying the three points for acceptance

22   of responsibility under guideline section 3E1.1.  The

23   government believes that after applying leadership points which

24   includes three points, but then also subtracting the three

25   points for acceptance of responsibility, the resulting offense

O48BCORS

1   level under the Court's calculations would be 40 rather than 43

2   which --

3           THE COURT:  Why is it that you think I should not

4   reduce the calculation for acceptance of responsibility?  You

5   want me to put the government to a *Fatico*?

6           MS. LASKY:  No.  The government does not object to the

7   Court including the three points.  I believe though at the

8   prior proceeding in January, the Court may not have stated that

9   the Court was in fact --

10          THE COURT:  I do find it, and the government does not

11  object.  So I think let me find the applicable guideline is 37.

12          MS. LASKY:  If I may, your Honor.  I believe it would

13  be 40 then.

14          THE COURT:  It's 40 minus three is 37, without giving

15  three points for leadership, because you didn't have it in the

16  plea agreement.  And I'll give Mr. Alcala, General Alcala, the

17  benefit of the doubt that way, so it's 37 that I find.

18          Let me ask the question about section 3A1.4, which

19  states that if the offense is a felony that involved or was

20  intended to promote a federal crime of terrorism, I'm suppose

21  to increase, but that's not applicable.  But subparagraph B is,

22  that states in such case the defendant's criminal history

23  category shall be category VI.  And I think international

24  narcotics offense, the importation of large quantities of drugs

25  into the United States qualifies as terrorism.  Am I right?

O48BCORS

1          MS. LASKY:  Your Honor, he pled guilty to material

2     support, your Honor.  So, yes, we maintain that the terrorism

3     enhancement applies.

4          THE COURT:  Mr. Kaufmann, any objection you pleaded to

5     that, right?  Mr. Kaufmann.

6          MR. de CASTRO:  Mr. de Castro.

7          THE COURT:  I'm sorry.  You're in the first seat.  You

8     are mister --

9          MR. de CASTRO:  De Castro.

10          THE COURT:  Mr. De Castro.  I'm sorry. You pleaded to

11     section 3A1.4?

12          MR. de CASTRO:  Yes.  We accepted in the plea

13     agreement that the terrorism enhancement applies.  Our

14     argument -- and I think on the 18th when we were here, January

15     18th, the Court indicated some reservation, because the

16     argument we're making is that, the terrorism enhancement just

17     improperly in this case enhances his criminal history and the

18     offense level.

19          And I believe what the Court said at the time that it

20     was thinking of doing was not applying that slide across to

21     level six, and thought that that was -- not necessarily not

22     applying it, but considering that as -- or disregarding the

23     slide across on criminal history, and sort of considering that

24     the more appropriate starting point.  We of course believe you

25     should take both away and consider that a more appropriate

O48BCORS

1    starting point.  But that is our argument under 3553(a), not a

2    guidelines challenge.

3          THE COURT:  You're asking for a variance?

4          MR. de CASTRO:  Correct, that's a 3553(a) argument,

5    not a guidelines challenge.

6          THE COURT:  I find in accordance with the plea that

7    the net offense behavior level is 37, that the criminal history

8    category because of section 3A1.4 is VI, and that equates to a

9    range of custodial punishment of 360 months to life.  Do I have

10   it correct, Ms. Lasky?

11         MS. LASKY:  Yes, your Honor.  The sentence is

12   statutorily capped here at 360 months.

13         THE COURT:  So it's 360 months?

14         MS. LASKY:  That's correct, your Honor.

15         THE COURT:  Do you agree, Mr. de Castro?

16         MR. de CASTRO:  Yes.

17         THE COURT:  I so find.  All right.  So General Alcala

18   is 62-years-old.  He was extradited to this country from

19   Columbia.  He's a citizen of Venezuela.

20         MR. de CASTRO:  I'm sorry for the interruption. He was

21   not extradited.  He voluntarily surrendered and came here.

22         THE COURT:  Thank you.  And he's been in custody since

23   March 30 of 2020?

24         MR. de CASTRO:  March 26.

25         THE COURT:  March 26.  Have you done a calculation of

O48BCORS

1  months?

2             MR. de CASTRO:  49 months.

3             THE COURT:  49 months.  I'll hear you, Mr. De Castro.

4             MR. de CASTRO:  Thank you.  I'll move over to the

5  podium.

6             THE COURT:  Yes, please.

7             MR. de CASTRO:  So as the Court knows, our request

8  here is 72 months.  We think it's a reasonable request.  We

9  think it's based on a reasonable analysis.  As I sort of

10  alluded to a few minutes ago, if the Court were to disregard

11  the terrorism enhancement completely under a 3553(a) analysis,

12  because we believe that it results in an inordinately and

13  unjustifiably high guideline range, General Alcala's advisory

14  guideline range would be around 78 to 97 months' imprisonment.

15             THE COURT:  How do you get that?

16             MR. de CASTRO:  We would take away the increase on the

17  offense level and bring him back to criminal history I, which

18  would put him --

19             THE COURT:  It's still 37, and criminal history

20  category I is 210 to 262 months.

21             MR. de CASTRO:  I'm getting to that.  If you included

22  the offense increase under the terrorism enhancement, which

23  jacks up the offense level up to 37, then you're right, it

24  would be 210 to 262 months; and that's 17-and-a-half years to

25  30 years as an advisory range.

O48BCORS

Then if you take the government's statistics that they provided you as an exhibit post-*Fatico* -- now the Court at the end of the *Fatico* hearing said, can you give some comparable cases, government, because we had a witness sitting there who was the second in command to drug trafficker Makled, the largest drug trafficker in Venezuelan history according to the testimony, and he had received a sentence of 210 months. So the government responded in their submission and provided some cases that they felt were sort of comp cases.

Now, as an exhibit to that, they decided to give you a few cases, which I could talk about specifically, but I think what I'd like to direct the Court to is the statistics from the sentencing commission that the government itself provided which show that the median and mean sentences for their view of the comparables was between 14 and 18 years of imprisonment. So if you take what the Court is suggesting in terms of what a proper place to start is, they are around the same place, 17, 14 years. And we think with other the other factors under 3553(a) that the Court could further vary and give an appropriate sentence that we believe is 72 months. And that would be considering that his history and characteristics, his role in the offense as a soldier aiding the president of Venezuela at the time, the conditions of his confinement.

As we just discussed, he's been detained for four years. He's been cut off from all of his family during the

O48BCORS

1    entirety of the Covid pandemic, and all of the jail lockdowns.

2    And he's going to have immigration consequences which are quite

3    significant here because he doesn't have a country to return

4    to.  He is a wanted man in Venezuela because he took arms

5    against the current president of Venezuela, and ironically

6    apparently his co-conspirator in the case.

7         THE COURT:  Does your analysis take into consideration

8    my finding of personal profit by him?

9         MR. de CASTRO:  Well, it takes into consideration your

10   findings, yes, Judge.  Because, first, your finding personal

11   profit I hear and I wanted to address that which is to say,

12   when General Alcala was arrested -- surrendered and arrested,

13   the government knows that this is a person who was taking arms

14   against President Maduro.  He was organizing armed rebellion

15   against President Maduro.  If in fact he received all of this

16   compensation that these witnesses testified to, why would he

17   need funding at all for that?  Why was he going around begging

18   to try to find funding?  Why was he driving an old model

19   Nissan?  They know.  The government themselves, they knew just

20   for him to go anywhere he needed money, assistance, to even pay

21   his rent. There's no trappings of wealth, zero.

22        THE COURT:  There's a different between acquisition of

23   money and retention of money.

24        MR. de CASTRO:  There's a difference, you're right.

25   The government hasn't shown this Court where any of that money

O48BCORS

1    went, zero.

2            THE COURT:  Doesn't have to.

3            MR. de CASTRO:  Well, if we're going to address that

4    question, I would hope the Court would want to know at least

5    that there was a scintilla of evidence that the money went

6    somewhere.

7            THE COURT:  Well, there's credible testimony that he

8    was charging $150 a load.

9            MR. de CASTRO:  Right.  But at the beginning of this

10   conversation between us, it was that he personally profited,

11   and I don't see --

12           THE COURT:  That's a personal profit.

13           MR. de CASTRO:  Well, there has not been one piece of

14   evidence.

15           THE COURT:  There's testimony how he asserted his

16   position as a general officer to facilitate importation of

17   narcotics into the United States, and to take money for doing

18   so.  And that's a finding I made.  And I think that your

19   suggestion of 72 months is not consistent with that finding.

20   If you want to help me with something, I am not helped by 72

21   months.

22           MR. de CASTRO:  But what I'm pointing out before 72,

23   that's our ask.  But even if the Court considers the

24   government -- that's why I was saying exhibit A of their

25   submission -- tells you the median, gives you 14 to 18 months.

O48BCORS

The guidelines as we suggest should be around 17-and-a-half
months if you removed the criminal history VI increase under a
3553(a) analysis.  And then if the Court were to go on and
consider General Alcala the person, the individual
circumstances, which I'll get into, then I think, we think, 72
months is appropriate.  But if the Court does not, I don't
think that means 360 months as the government has been pitching
is anywhere near appropriate either.

     So if I could just bring those factors to the Court's
attention that we think bear careful consideration, I can do
that now.  Obviously we've written a comprehensive memo
addressing these things, and I don't mean to repeat them, so
I'm going to try to highlight as best I can.

     THE COURT:  Don't worry about it.  Take whatever time
you need.

     MR. de CASTRO:  Thank you.  So General Alcala has
lived an exemplary life.  He has a history of honorable service
to his county.  It's 30 years in the military.  He reached the
rank of major general all while raising a beautiful family, a
family from which he has been separated for more than four
years and that need him and miss him desperately.  The letters
that the Court has received I think speak eloquently and
passionately to who this man is as a family man, to his
extremely honorable and positive characteristics, how he's
lived a lifetime of service, service to others, and sacrifice

O48BCORS

for his family and his country.

His history and characteristics establish that since his arrest in this case, he has suffered immensely from being separated from his family, to learning the fate of many of his countrymen that joined him trying to free his country, they were killed, some, and imprisoned others. His history and characteristics establish that he's a good man that does not need to be imprisoned for the length of time that the government is seeking here. His history and characteristics establish that he's a remorseful man. He's remorseful for his conduct to which he pled guilty, and he will express that remorse to you today. His history and characteristics establish that he is not a threat to the United States and never has been. His history and characteristics establish that this 62-year-old man, without a country right now to call home, has been deterred. And there's virtually no concern regarding recidivism.

The lawyers in this room are the only people that are really going to see General Alcala with whatever sentence this Court imposes. That's who's going to visit him. He's been cutoff from his family. Now, the Court can say that his own doing, the government can say that, and that's fine, but it's a circumstance. And that means his time is more difficult time. His time is more difficult time than the average inmate, and that bears on the appropriate sentence in the case. The impact

O48BCORS

1    of arriving in the United States at the precise time that the

2    global pandemic, quarantines and lockdowns commence over the

3    COVID-19 pandemic, was an extremely unfortunate coincidence for

4    General Alcala.  He's been detained and not had a single social

5    visitor for years.  That significance cannot be overstated.

6    We've cited and written about how other courts, and I'm sure

7    this Court has downwardly varied based on the impact of being

8    detained and locked down in this terrifying time at this time

9    in our world history.  And the Court should factor it in a

10   downward variance.

11       I think as I noted earlier also, I definitely noted,

12   he has no country.  The immigration consequences for General

13   Alcala are unique than other defendants.  He's not the only

14   person that's gone through this, but unique as to the general

15   defendant the Court sees that will be facing a removal

16   following serving that sentence to a country that may or may

17   not want that individual.  He is a Venezuelan citizen.  He's

18   taken up arms against that current authoritarian regime.  Taken

19   up arms against a regime that is often cited by this country

20   and the world as human rights violators.  After he serves

21   whatever sentence the Court imposes, he will likely have to

22   serve significant amount of time in immigration detention while

23   any asylum request are resolved.  He has to engage in that

24   exercise to see where, if any, country will accept him.  For he

25   cannot be returned to Venezuela where he will be jailed and

O48BCORS

1    potentially killed for his opposition.

2            And sort of lastly, I want to bring the Court back to

3    even accepting the government's suppose *Fatico* submission.

4    They told you what the average and the mean for these kinds of

5    cases are, the cases they think are comparable, and that's 14

6    to 18 years.  We think that the Court should vary further below

7    14 to 18 years, but that's the government saying that.  That's

8    the mean.  They give you examples to be fair of much, much

9    higher sentences, and I'm happy to address them, but these are

10    mostly FARC military leaders.  The first case they give you is

11    a 600 and something sentence that a judge that notoriously

12    sentences in this courthouse to the maximum in almost every

13    case.  So I think that's an outlier.

14            And we've pointed the Court to similar sentences and

15    material support cases.  And one in particular in our

16    sentencing submission where the court in the Eastern District

17    sentence someone who had provided $20 million worth of weaponry

18    and received a sentence of 108 months.  So I say all that, I'll

19    end where I started which is, I hear you that 72 months you

20    don't think is appropriate.  That is our ask.  We stick to it,

21    but at the same time I don't think the government's ask is

22    anywhere near appropriate.  And we ask that you impose a

23    reasonable sentence.  A sentence that --

24            THE COURT:  Probation suggest 360 months.

25            MR. de CASTRO:  Yes, they do.  And they look at the

O48BCORS

1  guidelines and they apply guidelines I think.

2          THE COURT:  No, not necessarily.  Usually they're off

3  the guidelines.

4          MR. de CASTRO:  That's true in my experience as well,

5  Judge. But in this case, they are applying a guidelines

6  analysis, and they are not considering any of the factors I

7  just referenced.  They are not considering the immigration

8  consequence.  They're not considering that he took arms against

9  the country that's considered his home and his allege

10  co-conspirator in the case.  The probation department has no

11  benefit of any *Fatico* hearings or anything like that, and

12  really has no benefit of having this case for four years.  They

13  did one interview, took the information from the government,

14  and they've applied a guidelines analysis.  So you're obviously

15  not constrained by the probation department's recommendation.

16          THE COURT:  No, I'm not, but I'm concerned about a

17  number of things.  A major general shouldn't be facilitating

18  exportation from Columbia for importation into the United

19  States in clandestine ways huge amounts of narcotics.  He's

20  misusing his position, and he's misusing it for personal gain.

21  That marks considerations of seriousness.  It has to be

22  reflected in a punishment that I give.  That is, what you say,

23  he's been in jail four years.  He's not seen his family.  He's

24  a family man.  Apart from the facts here, he lived an ordinary

25  life, but the facts here drive it out of the ordinary.

O48BCORS

1      MR. de CASTRO:  On the first point, Judge, I would say

2   that, that's why you look at the statistics.  That's why you

3   look at them.  And they say, they considered those facts.  You

4   look at other cases, they considered those types of facts as

5   well, the importation piece.  And they consider those facts,

6   and that's why you see a mean and a median of 14 to 18 years'

7   imprisonment.  The government has pointed to you the cases that

8   they have chosen are in the 360 or 200.  Even as the Court

9   pointed out, Makled's right hand got 210 months, and that was a

10   concern from the Court.  And the government pointed that out as

11   well in their submission.  And they pointed out an additional I

12   think 210 month sentence as well.

13      And so I think those do take into consideration what

14   the Court is saying.  And then on the flip side, the Court does

15   have to take into consideration who General Alcala was, who he

16   is, who he is to his family, and the time he spent in this

17   country.  And I think it is no small factor that he

18   surrendered.  It is no small factor he surrendered.  We have a

19   co-defendant in this case that was captured and fought

20   extradition and has been pending.  He surrendered and came here

21   to answer these charges voluntarily, and that is a

22   distinguisher of almost every case the government cites.

23      THE COURT:  Thank you, Mr. De Castro.  Government,

24   Ms. Lasky.

25      MS. LASKY:  If the Court's okay with me standing here,

O48BCORS

1    I can remain here, or I can go to the podium.

2                THE COURT:  I think if you stand there you'll block

3    Mr. de Castro, so please take the podium.

4                MS. LASKY:  Your Honor, the government submission sets

5    forth in detail why the government believes that a sentence of

6    360 months is appropriate here.  I'd like to highlight a couple

7    of points, and then of course if the Court has questions, I'm

8    happy to answer it.  The defendant as the Court has said was a

9    former major general in the Venezuelan military, extremely high

10   rank.  He provided material support to the FARC, a violent

11   terrorist organization based in Columbia that sought to

12   overthrow the Columbian government.

13               THE COURT:  There's two aspects to this.  One is the

14   importation into the United States for personal gain, and the

15   second that the money for the narcotics was going to subsidize

16   a terrible organization that wrecked havoc in Columbia, almost

17   destroying the democracy in that country.  And those are two

18   aspects that I take into consideration.

19               MS. LASKY:  That's correct, your Honor.

20               THE COURT:  And I may have expressed some skepticism

21   about terrorism before.  Here is the terrorism enhancement;

22   kidnapping by FARC, destroying the democracy, attempting to

23   destroy the democracy, for paralyzing government and co-opting

24   people into its organization.  This is information that has

25   been widespread in the press over the years, and there's no

O48BCORS

1    reason to disbelieve it.  I don't accuse or believe that

2    Mr. General Alcala is accused of having in mind the

3    depredations of FARC.  He didn't have to.  He knew it was a

4    terrorist organization, and he was helping them and giving them

5    material support.  However, 30 years less four already served

6    yields 26.  He's 62.  sixty-two and 26 is 88.  It's too much.

7           MS. LASKY:  Your Honor, I'd like to address a couple

8    of points that the Court just made.  And the Court stated this

9    as well, that the defendant's immense power in Venezuela is

10   what makes his case unique.  I know the government provided as

11   an exhibit as the defense has stated to its original sentencing

12   memorandum some comparators, and we also provided comparators

13   to the Court too.  In the exhibit that we provided just based

14   on the number of cases that had come down, there were only 10

15   defendants who were sentenced under that guideline in our

16   exhibit.  I think here what makes the defendant frankly in a

17   unique position and very culpable is the power that he enjoyed

18   in Venezuela.  He was working with other high ranking

19   Venezuelan officials that supported the FARC, and he did so as

20   the Court noted to facilitate the importation of cocaine.  The

21   Court heard during the *Fatico* hearing testimony about several

22   of these men.

23          THE COURT:  He compromised the integrity of the police

24   forces of Venezuela.  How was it that a police force stops a

25   convoy of drugs and a general come in and interferes and says

O48BCORS

1   no, no, let them go through.  It's not only Columbia, it's also

2   Venezuela that he is corrupted.

3        MS. LASKY:  Yes, your Honor, it's Venezuela, exactly.

4   And the status that he abused made his crime all the worse.

5   And his claims of poverty do not square with the privilege that

6   frankly he enjoyed in Venezuela for many, many years.  And

7   particularly when we're talking about claims of poverty many,

8   many years later after the millions of dollars in bribes that

9   he is been -- the testimony described him as receiving actually

10  were provided to him.

11        As the Court directly heard from witnesses during the

12  *Fatico* hearing, the defendant used his power in a number of

13  different ways, including to ensure that FARC members and their

14  associates weren't arrested or stopped by the Venezuelan legal

15  authorities, to dispatch the military, to protect planes with

16  tons of loads of cocaine, to make sure that loads were not

17  interdicted, to provide military grade weapons.  And for his

18  assistance, he did receive millions of dollars.  It is people

19  like the defendant who enjoy such power, who make it so that

20  the FARC can engage in terrorism with near impunity.  Now with

21  respect to comparators, the Court has seen the cases that the

22  Court has put in its different submissions on pages 15 of 17 of

23  our January 15 submission, and also pages seven to eight of our

24  March 13th submission.

25        It includes various importation cases in the general

O48BCORS

1   ballpark of the size and scale, including sentences imposed in

2   the 2006 prosecution in the District of Columbia where

3   defendants across the board got upwards of 20 years.  It also

4   includes the 54-year sentence imposed by Judge Forrest that

5   defense counsel described.  These are some of the importation

6   cases.  And again, these are cases where the defendants did not

7   enjoy the privilege and the position that this defendant

8   enjoyed within Venezuela.  So I think this is something that

9   frankly makes his case unique and is a factor that is

10   aggravating.

11          The government also put in its submission various

12   cases that concern material support, in particular including

13   the *Cordoba-Bermudez* in which Judge Chin imposed a 180 months

14   sentence which was the statutory maximum for a Columbian

15   defendant who transported supplies for the FARC.  Another case

16   that I would put before the Court is *United States v. Serhan*.

17   This is 19 Cr. 764 where Judge Castel imposed a 240 month

18   sentence in a Narco-terrorism conspiracy and money laundering

19   case where the defendant conspired to sell machine guns,

20   grenade launchers and service-to-air missiles for a different

21   guerilla group in South America.

22          Now the Second Circuit has also repeatedly made clear

23   --

24          THE COURT:  You think this case is worse than that?

25          MS. LASKY:  I do, your Honor, based on the defendant's

O48BCORS

1    position.  It's different in some ways.

2              THE COURT:  He didn't sell machine guns.

3              MS. LASKY:  He did not, but he did plead guilty and

4    allocute to the fact that he provided serious weapons to the

5    FARC.

6              THE COURT:  Where, in the stipulation?  Was that in

7    the stipulation?

8              MS. LASKY:  In the stipulated facts, your Honor, in

9    the plea agreement.

10              THE COURT:  Remind me what he said.

11              MS. LASKY:  If your Honor goes to the final

12    presentence report, it will be at paragraph 12.  This paragraph

13    specifically 20 grenades and two grenade launchers.

14              THE COURT:  Thank you.

15              MS. LASKY:  In short, your Honor, a sentence of 72

16    months --

17              THE COURT:  Forget about 72 months.  It's just out of

18    line.

19              MS. LASKY:  Understood, your Honor.

20              THE COURT:  What about something like what Judge

21    Castel did, 240 months.

22              MS. LASKY:  Your Honor, I mean, the government

23    continues to believe that a sentence of 306 months is

24    appropriate here, particularly in light of the defendant's

25    position that he enjoyed in Venezuela, the way that he

O48BCORS

1   contributed to the persuasion of the entire rule of law in that

2   country.  But we believe that that sentence is more in line

3   with something that would be appropriate here, and that's one

4   of the reasons why we put it as a comparator for your Honor's

5   consideration.

6          THE COURT:  *United States v. Kourani*.  I gave the

7   defendant after trial 40 years, and that was a case where he

8   actively provided arms and created cells for Hizballah.  This

9   is not as bad as that, much less worse.  That was affirmed by a

10  two to one decision of the Court of Appeals.  Judge Pooler

11  thought my sentence was excessive.  It might be a marker, but

12  I'm thinking in the range of 240 months for General Alcala, and

13  I want to hear Mr. De Castro again on that subject.

14         MS. LASKY:  If I just may make two final points, your

15  Honor.  So it's clear here that the defendant, he's putting

16  forth different narratives, right.  In one version of his

17  narrative, he's a fearless patriot who commands thousands of

18  men, who's deserving of respect.  And then in another version

19  of this narrative, he was a poor officer with no agency who was

20  following orders.  But at the end of the day, it was the

21  defendant who decided to support the FARC, which is a terrorist

22  organization responsible for immense destruction in Venezuela

23  and beyond, including in this country. And his actions help the

24  FARC to protect its cocaine distribution network enabling tons

25  of poison to enter this country.

O48BCORS

1          THE COURT:  And compromise the police forces of

2     Venezuela.

3          MS. LASKY:  Correct, your Honor.  And it is for these

4     choices for his crimes that we believe it's important to

5     sentence him.  And, as well, we do believe that deterrence is

6     an important factor here, both specific deterrence for him.  It

7     shows the fact that he tried to overthrow the Venezuelan

8     government, even after he retired from the military shows that

9     he continued to have access to firearms and connections abroad.

10    And this sort of crime is not the type of crime that is

11    entirely mitigated with age.  In addition, we believe it's

12    important that the sentence send a message to other corrupt

13    military and political leaders in Venezuela and beyond who are

14    considering supporting terrorist group like the FARC.  At the

15    end of the day, we believe this case is fairly simple.

16         THE COURT:  You think if the sentence is too harsh it

17    might deter people who would turn themselves in from South

18    America?

19         MS. LASKY:  Your Honor, I'm less concerned with that

20    point.  I think --

21         THE COURT:  General Alcala turned himself.

22         MS. LASKY:  He did, your Honor.

23         THE COURT:  He may not have had choice.  The world may

24    have been turning on him, but he turned in.

25         MS. LASKY:  I think if the crime can be prevented at

O48BCORS

1    the inception, I think that's a more important and salient

2    factor than whether after it's committed whether someone ends

3    up turning themselves in, but I take the Court's point.  The

4    government does believe for all these reasons that a sentence

5    of 360 months is warranted and appropriate and supported by

6    case law.  If there are additional questions, happy to answer,

7    your Honor.

8              THE COURT:  Thank you very much, Ms. Lasky.  You want

9    to take another shot, Mr. de Castro?

10             MR. de CASTRO:  Yes.  One thing I wanted to do was

11   point the Court to a case which we cited in our original

12   sentencing memo, which feels like ages ago now.

13             THE COURT:  It feels like --

14             MR. de CASTRO:  -- ages ago now since we've had

15   hearings and other things.

16             THE COURT:  The only thing I express is my love for

17   you.

18             MR. de CASTRO:  Thanks.  Which was the case of *United*

19   *States v. Thavaraja*, T-H-A-V-A-R-A-J-A, for the reporter's

20   benefit.  And that was -- and I made reference to it earlier --

21   that was a material support case with the very significant aid

22   to an organization similar to the FARC.  We're talking about

23   the lead defendant, not picking some low level defendant

24   because those sentences ranged from 108 months, which by the

25   way was affirmed by the Second Circuit as reasonable.

O48BCORS

1          THE COURT:  They don't like to touch punishments.

2          MR. de CASTRO:  I know, but you just quoted how one of

3    your sentences someone cited as potentially unreasonable or

4    excessive.

5          THE COURT:  I was affirmed two to one.

6          MR. de CASTRO:  That's true.  And that defendant had

7    purchased at least $20 million worth of military grade weapons,

8    including anti-aircraft guns, rocket launchers and explosives,

9    and additional materials to make suicide bombs.  And those

10   guidelines were 360 to life. They were reduced based on a

11   statutory maximum to 240 months, and the judge went down 55

12   percent to 108 months.  And as I said --

13         THE COURT:  Who was the judge?

14         MR. de CASTRO:  Judge Dearie.  Am I correct it was

15   Judge Dearie?

16         THE COURT:  The government cites his decision too.

17         MR. de CASTRO:  They attempt to distinguish it by

18   saying our conduct is much worse.  I just don't see how that's

19   possible.

20         THE COURT:  It's really impossible to do comparisons.

21   They're useful to know what other people have done and what you

22   yourself has done in different situations, but comparisons are

23   impossible.

24         MR. de CASTRO:  But I think if the Court takes that,

25   okay, 108 months, the government can say it's ridiculous, fine.

O48BCORS

1    Even applying as I said earlier the mean, the average, anywhere

2    between 14, 18 years and impose a 15-year sentence here, that

3    would be a reasonable sentence, Judge.

4            THE COURT:  If I remember that case correctly, Judge

5    Dearie had some nasty things to say about the government.

6            MR. de CASTRO:  He may have.  He may have, but the

7    facts speak for themselves in terms of the conduct and the

8    history and characteristics of the defendant and the fact that

9    there was no prior -- I think his factors that he considered as

10   mitigating were --

11           THE COURT:  Let me hear from General Alcala.  I think

12   I have your points.  I think I have Ms. Lasky's points.  I

13   haven't heard General Alcala.  You don't have to speak, General

14   Alcala.  You have the right to, but it's not a compulsion.

15           THE DEFENDANT:  Thank you, your Honor.  May I begin?

16           THE COURT:  Good afternoon.  I'm standing so I can see

17   you better.  Go ahead.  You sit.  You sit.  Would you like to

18   read something?

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  Please.

21           THE DEFENDANT:  Thank you for the opportunity of

22   allowing me to address this honorable court.

23           THE COURT:  I'd like him to move the microphone away

24   from him a little bit.  Okay.

25           THE DEFENDANT:  To start off, I would like to say

O48BCORS

1    clearly that I fully accept responsibility for the conduct for

2    which I pled guilty.  I have admitted from the first time that

3    I met with agents of the United States over a decade ago now

4    that I did meet with the FARC, that I did deliver those two

5    weapons from World War II, obsolete now, to the FARC.  And that

6    I accompanied providing security to one of the FARC leaders on

7    their way to Caracas, the capital of my country, to initiate

8    the peace process between that group and the Columbian

9    government.  I have never denied it.

10          They were orders I had received from my supervisors,

11   including the president at the time.  And it was part of the

12   policy dictated by the Venezuelan government at the time.  The

13   orders for initial contact with the FARC included stopping one

14   of the greatest criminal acts that was financed by that group,

15   the kidnapping of Venezuelan and Columbian citizens.

16          During the year that I was stationed in the state of

17   Zulia which shares the border with Columbia, I achieve the

18   release of three kidnapped citizens, two of which were

19   Columbian whose release had been asked for by the president of

20   Columbia at the time Alvaro Uribe Velez.  The other kidnapped

21   person, a Venezuelan citizen was recovered at the request of

22   their family.  The children of the three kidnapped persons

23   wrote letters to you, Judge, speaking to my role in the

24   recovery of their father of their parents.

25          Also while I was in that area, I destroyed drug

O48BCORS

production labs.  I helped displaced communities along the
border, and I fought head-on against crime in that territory.
There are countless reports of all of that in the media.  I
deeply regret the time and resources wasted by this court upon
the statement of witnesses at the *Fatico* hearing.  It has
personally been very tough to listen to so many lies.  People
who I never had dealings with ever in my life who are in fact
seeking personal gain at the cost of destroying my personal
life and that of my family's.

       My attorneys have already identified all the
contradictions and motivations of this false testimony.  I
don't want to waste your time anymore, but the only thing I'd
like to note is that a short time after having arrived at my
military station in the state of Calabozo toward late August
2007, which the U.S. government maintained was the third
biggest trafficker in the world had fled. He was being sought
by my government, was later detained and extradited to my
country.  As is publicly known, my work was essential for his
arrest and jailing.  It was for a reason that he publicly
threatened me on several opportunities telling me that he would
be my shadow and he would come after me.  You see he did
achieve it.

       How long my sentence should be that I deserve for the
acts that I admitted culpability for is something that is in
your hands to decide, your Honor.  And I'll be grateful for the

O48BCORS

opportunity to talk to your Honor a little bit about who I am
before you make that decision.  The most important thing in my
life more than anything else is my family, my wife and our
young nine year old daughter, my two older daughters and my
grandson.  We are now all forced to be separated thanks to the
Venezuelan dictator, but our love is strong.  I'll allude to
this more shortly.

I served my country as a member of the Venezuelan
military for 34 years of my life, including during its first
four years.  I had an outstanding career, which is not put to
any doubt, which allowed me to reach the rank of major general.
I retired in 2013, having served actively for 30 years.  I've
lived a sacrificed and humble life receiving the salary
befitting of a Venezuelan soldier.  When I retired in 2013, the
current president Nicolas Maduro offered me a post as
ambassador in a European country.  An offer that I
categorically denied because I did not feel in a moral state in
order to represent him internationally.  I retired and then
started meeting with members of the Venezuelan opposition, who
like me fully disagreed with the policies of Nicholas Maduro.

And we felt that the president was betraying the
Constitution of our country and its democratic values.  With
these people, we formed a platform to defend the text of the
Constitution which was countered to the excesses of the
government where its members posted alongside their economic

O48BCORS

and political allies, a situation that promoted and undermined

the democratic institutions of the country.  There were five

years of constant battle against the government, where each

time we made gains for -- which made gains for control and

submission more and more, along with its political and legal

persecution against those who did not have a similar opinion.

My position is a military leader convince me that I

could not sit by and just watch as a dictator and his minions

just took over the country.  Twice I participated in planning

military upheavals to recover the true democracy of my country,

to recover the true democracy of my country.  Many of those who

joined me in those efforts have been jailed, tortured, and

murdered.  More than 60 of them remain jailed in extreme

conditions.  Eight were murdered.  After my first attempt to

remove Maduro in 2018, I saw myself forced to escape my country

over the huge danger that my family was in.  My older daughter

alongside her mother, her husband, and her son, my only

grandson, left for Spain.  My second daughter and her husband

left for Chile, and I left alongside my wife and my youngest

daughter, three years old at the time, for Columbia where I

started a deistical exile alongside the separation from my

family, a high price that my family has had to pay for my

convictions and my love for my country.

Nevertheless, during my time in Columbia, I continued

the struggle against the criminal government that was leading

O48BCORS

1   my country.  Work that I was able to undertake jointly with

2   other Venezuelans who found themselves in the same situation.

3   We shared one sole goal to achieve the political change

4   necessary to bring true democracy to our country.

5           On March 24, 2020, I was publicly implicated in an

6   indictment issued by the United States Attorney's office.  Of

7   course everything changed from then on, for me and for my

8   family.  On March 25, one day later that year, I was contacted

9   by phone by someone saying they were a civil servant of the

10  Embassy of the United States in Columbia.  And he asked if I

11  agreed to be moved to his country in order to appear before the

12  law for said indictment.  I agreed immediately.  I did not

13  cause any delay, and I voluntarily and immediately facilitated

14  this process.  On March 26, at 11 p.m., I entered the jail

15  where I am currently being held.  You know all the rest.

16          Nevertheless, I would like to take advantage of this

17  opportunity to add a few details about the last four years of

18  my life.  This journey that has separated me from my loved ones

19  has not been easy.  It was a difficult start, which was

20  complicated amid the deadly pandemic that ravaged the human

21  race and cost the lives of some good friends over that time

22  period, like my friend Venezuelan congressman Hernan Caliman,

23  who also fiercely fought against the criminal government of

24  Nicholas Maduro while in exile.

25          Nevertheless, together with my family, despite the

O48BCORS

distance between us, we have used the strength of unconditional

love to bear this time period.  The love of my wife, my

daughters, my siblings, my nephews, my friends, on top of the

good people that I've met during my detention, despite the fact

that I am not able to embrace and spend time with my loved ones

and communication has been difficult due to the high financial

toll and sometimes over the technological obstacles, every time

that I do communicate with my family, I enjoin to that the good

memories spent with them in the past.  They have not stopped

relaying me their strengths through their prayers and good

wishes.  Unfortunately, none of my family have been able to

visit me in person due to financial and immigration

difficulties, only my attorneys and the occasional friend.  I

hope to soon be with my family again and meet with them to have

a new beginning and to return to our family routine.

Judge, your Honor, I do not nor will I ever represent

a threat to this country.  The 29 people who have issued

letters of support to this Court on my behalf have already

described my life, my career, and the kind of person that I

really am.  These more than four years that I've been

incarcerated now, even if they have been very tough for me and

my family, have served me to be able to reflect and strengthen

my human aspects.  I still have the physical, emotional, mental

and spiritual capabilities to show that I am a good citizen.  I

know the meaning of honest work, and for this work to be

O48BCORS

1  significant to benefit my family, my community and my country.

2  Judge, I want to see my young daughter grow up.  I don't want

3  to lose these wonderful years of her childhood.  She is paying a

4  huge cost for facts that occurred 18 years ago.  Her father was

5  complying with his military orders.  I want to be able to bring

6  my family happiness again.  I sincerely apologize for my

7  mistakes, which I will say again, I fully acknowledge.  I don't

8  seek to make others responsible for them and for what I regret.

9  Today, I forge ahead with greater wisdom and inspiration toward

10  my future and that of my family.

11       Thank you very much for this opportunity, and may God

12  bless you.

13       THE COURT:  Take a short recess.

14       (Recess)

15       THE COURT:  Be seated, everyone.  Mr. Bradley, will

16  you move to the side.  I don't want General Alcala's vision to

17  be obstructed.  The law imposes the duty to sentence on a

18  judge.  It's not an easy duty, and the laws make it even more

19  difficult.  I'm supposed to reflect on the seriousness of the

20  crime.  I'm supposed to reflect on the need to deter the

21  individual and other people from committing like crimes.  I'm

22  told to sentence so that the law is respected, and I'm also to

23  take into consideration the history and characteristics of the

24  individual and the crime he's committed.  These considerations

25  run into each other.  They don't harmonize.  They pull me in

O48BCORS

1    different directions.

2            I believe General Alcala that the people I sentence

3    are not bad people.  They've done bad things.  And those that

4    do bad things often do many good things.  They may have good

5    families.  They may be loyal to their families.  They may feel

6    patriotic urges, yet they do things against the law and commit

7    serious crimes.  So you've committed a very serious crime.

8    You've facilitated the dumping of huge amounts of narcotics

9    into the company which kill people, paralyze them, prevent them

10   from leading normal lives, destroy their families and destroy

11   them.  Anyone dealing with drugs has to know the consequences

12   and the outcome.

13           You've done it for personal profit and corruption.

14   You may not believe the people who came to testify.  You may

15   think that they come to haunt you and to get even with you, but

16   if that's the case, they're doing so with the truth.  By aiding

17   FARC and supplying them with money and the means to export

18   drugs from their country into the United States, you've built

19   up a terrorist organization, the likes of which there are few

20   parallels.

21           You do acknowledge your crime.  That took about a

22   minute of a very long statement to me.  You'd like to think

23   that you were a puppet of General Maduro, doing the things that

24   he wanted you to do.  You had to know in your heart that it was

25   wrong.  It was evil.  It was corruptive and had serious

O48BCORS

1    consequences on people.  You're 62 years old.  You've already

2    served four years.  The government's proposal for a 360 month

3    sentence is too long.  Your lawyer suggested for 72 months is

4    much too short.  I sentence you to 260 months in custody.

5              Is there a recommendation?

6              MR. De CASTRO:  Judge, two things for the judgment.

7    One is, northeast area.

8              THE COURT:  Sorry.

9              MR. De CASTRO:  Northeast.

10             THE COURT:  New York east area.

11             MR. De CASTRO:  New York area.  As I mention before,

12   we're going to be his only visitors I think.

13             THE COURT:  You want to give me a reason for the

14   northeast area?

15             MR. De CASTRO:  I think we're probably, this table, is

16   his only visitors, and we're all in New York.  He has no family

17   here in the United States, and we're going to be visiting him.

18   We're probably the only people.

19             THE COURT:  You need it for appellate purposes?

20             MR. De CASTRO:  Appellate purposes and just in general

21   for him to have a visitor.

22             THE COURT:  All right.

23             MR. De CASTRO:  The second request was a request we

24   made at the end of our sentencing memo, so I'm going to make it

25   now, which is that the judgment -- that you put in the judgment

O48BCORS

1   recommending that his removal and deportation be deferred

2   pending his ability to successfully secure political asylum in

3   a country where he will be free from the potential --

4          THE COURT:  I can't make that recommendation.

5          MR. De CASTRO:  Judge Dearie did that, for example, in

6   the case I cited before.

7          THE COURT:  Judge Dearie is a different man.  I'm a

8   judge.  I have limited powers.  I don't control ICE.  I don't

9   control the Bureau of Prisons.  I make recommendations.

10          MR. De CASTRO:  That's what I'm asking for, a

11   recommendation.  What we found is that puts it on ice for a

12   moment so that he can -- because what happens is, they go from

13   BOP into immigration custody.  We don't know where he goes, and

14   we can't file an application for asylum until that point.  And

15   right now he's wanted --

16          THE COURT:  They're not going to send him to a country

17   where he's going to be prejudiced I don't think.

18          MR. De CASTRO:  That's why I think -- we don't think,

19   but my concern is you just recommend that it be deferred so

20   that for a reasonable time -- he would be in custody.  He'd

21   just be in immigration custody for that issue.  For example,

22   the language Judge Dearie used was, the court strongly

23   recommends that careful consideration be given to the question

24   of removal in light of the genuine and understandable concern

25   for the defendant's safety if he is sent back to, in that case,

O48BCORS

Sri Lanka, but here Venezuela.  Those are our two ask for the

judgment.

THE COURT:  I recommend that he not be deported to a

country where his life or personal safety will be compromised.

MR. De CASTRO:  Thank you.

THE COURT:  There's no need for supervised release in

this case, right, Ms. Lasky?

MS. LASKY:  Your Honor, my understanding is it does

need to be imposed.  Although I understand that it's unlikely

to be served, and it does help to facilitate the removal

process for during that time period.

THE COURT:  He's pleaded to two counts which will be a

$200 special assessment?

MS. LASKY:  Correct, your Honor.

THE COURT:  So that's another part of the order.

Under Count One the guideline range is life.  Under Count Two

it's one to three years.

So I impose a supervised release term of three years,

subject to conditions, mandatory conditions, set out on page

23.  There's no need for a drug testing condition.  General

Alcala poses a low risk of future substance abuse.  The

standard conditions one through twelve set out on pages 23 to

25 are imposed.  The special conditions of obeying the

immigration laws and submitting to search are imposed, and

General Alcala will be supervised by the district of his

O48BCORS

1  residence.  There's no restitution in this case.  I'm not

2  imposing a fine.  Is there forfeiture?

3         MS. LASKY:  No, your Honor.

4         THE COURT:  No forfeiture.  I advise you, General

5  Alcala, that under the Constitution you have a right to appeal.

6  You should discuss with your counsel whether or not you wish to

7  appeal.  If you can't afford a lawyer, the government will

8  provide a lawyer free of charge.  And, Mr. De Castro, if ask to

9  appeal, I instruct you to do so on a timely basis.

10         MR. De CASTRO:  Yes, your Honor.

11         THE COURT:  Mr. Alcala is in detention and will remain

12  in detention.  Are there underlying counts?  There are in the

13  indictment, right?

14         MS. LASKY:  There are, your Honor.  The government

15  moves to dismiss the open counts.

16         THE COURT:  So ordered.  I think that's finished.  Is

17  there anything I missed?

18         MS. LASKY:  No, your Honor.

19         THE COURT:  Mr. De Castro?

20         MR. De CASTRO:  No, Judge.

21         THE COURT:  Okay.  Thank you very much.  Good luck to

22  you, General Alcala.

23         (Adjourned)

24

25